# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | )( | |
| | )( | **Criminal No. 21-204 (BAH)** |
| **v.** | )( | **Chief Judge Howell** |
| | )( | **Trial: August 1, 2022** |
| **MATTHEW BLEDOSE** | )( | |

# MOTION TO DISMISS COUNT ONE OF INDICTMENT
# FOR FAILURE TO STATE AN OFFENSE
# AND POINTS AND AUTHORITY IN SUPPORT THEREOF

COMES NOW the defendant, Matthew Bledsoe, by and through undersigned counsel, and respectfully moves this Honorable Court, pursuant to Fed. R. Crim. P. 12(b)(3)(B)(v), to dismiss count one of the indictment in this case for failure to state an offense, such count charging him with a violation of 18 U.S.C. § 1512(c)(2) (Obstruction of an Official Proceeding).  In support of this motion, Mr. Bledsoe would show:

1.      In connection with the events of January 6, 2021 at the United States Capitol, Mr. Bledsoe has been charged in a five-count indictment (Indictment) (ECF #23).

2.      In count one of the Indictment, Mr. Bledsoe is charged with Obstruction of an Official Proceeding under 18 U.S.C §§ 1512(c)(2) and 2.  Specifically, count one alleges:

> On or about January 6, 2021, within the District of Columbia and elsewhere, Matthew Bledsoe attempted to, and did, corruptly obstruct, influence, and impede an <u>official proceeding</u>, that is, a proceeding before Congress, <u>by entering and remaining in the United States Capitol without authority and threatening Congressional officials</u>.

Indictment at 1 (emphases added).

1

3.      In charging Mr. Bledsoe with Obstruction of an Official Proceeding under 18 U.S.C. § 1512(c)(2) for conduct he allegedly engaged in "[o]n or about January 6, 2021… in the United States Capitol," count one of the Indictment appears to indicate that the "official proceeding" at issue is the congressional hearing to count the Electoral College votes that occurred at the Capitol on January 6, 2021.

4.      18 U.S.C. § 1512(c)(2) does not apply to the to the conduct that Mr. Bledsoe is charged with in count one of the Indictment: "entering and remaining in the United States Capitol without authority and threatening Congressional officials."  Thus, in charging Mr. Bledsoe under § 1512(c)(2) for that conduct, count one of the Indictment fails to state an offense and must be dismissed.

5.      A congressional hearing to count the Electoral College votes is not a hearing that qualifies as an "official proceeding" for the purposes of 18 U.S.C. § 1512(c)(2).  Thus, for this reason too, count one of the Indictment fails to state an offense and must be dismissed.

**DISCUSSION**

**I.      COUNT ONE OF THE INDICTMENT FAILS TO STATE AN OFFENSE BECAUSE THE CONDUCT IT CHARGES MR. BLEDSOE WITH IS BEYOND THE REACH OF 18 U.S.C. § 1512(c)(2)**

18 U.S.C. § 1512(c), of which § 1512(c)(2) is obviously a part, was enacted by the Sarbanes-Oxley Act as an amendment to 18 U.S.C. § 1512.  Sarbanes-Oxley Act, Pub. L. No. 107-204, § 1102, 116 Stat. 807 (2002).  As enacted by the Sarbanes-Oxley Act, 18 U.S.C. 1512(c) states in its entirety:

Whoever corruptly—

(1)     alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2)     otherwise obstructs, influences, or impedes any official proceeding, or attempts to do,

Shall be fined under this title or imprisoned for not 20 years, or both.

§ 1512(c)(1) lists specific acts that affect or can affect an official proceeding, and § 1512(c)(2) describes in general terms conduct that affects or can affect an official proceeding.  As will be shown, the language of § 1512(c)(2)—the provision under which Mr. Bledsoe is charged—can only be understood to describe conduct that resembles the specific acts listed in § 1512(c)(1) in some way other that just being conduct that affects or can affect an official proceeding.  In count one of the Indictment, Mr. Bledsoe is charged with violating § 1512(c)(2) by "entering and remaining in the United States Capitol without authority and threatening Congressional officials."  However this conduct does not resemble the specific acts listed in § 1512(c)(1) in any way apart from just being conduct that affects or can affect an official proceeding.  Thus, it is beyond the reach of § 1512(c)(2).  Accordingly, because count one of the Indictment has charged Mr. Bledsoe with violating § 1512(c)(2) for engaging in conduct that is beyond § 1512(c)(2)'s reach, it fails to state an offense.

A finding that the language of § 1512(c)(2) can only be read to apply to conduct that resembles the specific acts listed in § 1512(c)(1) in some way other that just being conduct that affects or can affect an official proceeding is required by the following:

1.     A proper understanding of how Congress intended for § 1512(c)(1) and § 1512(c)(2) to work together within § 1512(c)'s structure.

2.     The interpretive canons of noscitur a sociis and ejusdem generis as illustrated by <u>Yates v. United States</u>, 135 S.Ct. 1074 (2015) and <u>Begay v. United States</u>, 553 U.S. 137 (2008).

3.     An understanding of why Congress enacted §1512(c)

4.     Due process.

5.     The rule of lenity.

**A.     How Congress Intended for § 1512(c)(1) and § 1512(c)(2) to Work Together**

A finding that Congress only intended for § 1512(c)(2) to apply to conduct that resembles the specific acts listed in § 1512(c)(1) in some way other that just being conduct that affects or can affect an official proceeding is required by a proper understanding of how it intended for the two provisions to work together in § 1512(c)'s scheme.

18 U.S.C. § 1512(c) consists of one sentence.  Within that sentence, the behavioral conduct (actus reus) it addresses is contained entirely in its two substantive provisions—§ 1512(c)(1) and § 1512(c)(2).  Both provisions use the term "official proceeding," and both deal with conduct that affects or can affect an official proceeding. Apart from § 1512(c)(1) and § 1512(c)(2), § 1512(c) consists of nothing else but the introductory phrase, "Whoever corruptly" and a concluding phrase that spells out the punishment for violating § 1512(c).  The adverb "corruptly" in the introductory phrase ascribes a mens rea element to § 1512(c) that is above and outside both § 1512(c)(1) and § 1512(c)(2).  This indicates that Congress did not intend for the two provisions to

4

criminalize conduct on their own.  Rather, it only intended for them to identify conduct
that is subject to being criminalized under § 1512(c).  Only if the conduct indentified by §
1512(c)(1) and § 1512(c)(2) is engaged in "corruptly" does it in fact become criminalized
under § 1512(c) and thus punishable per the operation of  § 1512(c)'s concluding phrase.
It is perhaps worthwhile to mention here that the adverb "corruptly" in the introductory
phrase does nothing to shed light on what behavioral conduct Congress intended for §
1512(c)(1) and § 1512(c)(2) to actually identify.

 The fact that Congress inserted the word "otherwise" at the very beginning of §
1512(c)(2) immediately after the word "or" at the very end of § 1512(c)(1) shows that
Congress intended for § 1512(c)(1) and § 1512(c)(2) to somehow work together to
identify the conduct that is subject to being criminalized under § 1512(c).  This is
because, if Congress just intended for the two provisions to work independently of each
other, it would not have used the word "otherwise" at all.  Thus, the fact that Congress
inserted the word "otherwise" at the start of § 1512(c)(2) immediately after the word "or"
at the end of § 1512(c)(1) shows that Congress was modifying the word "or" so that it
would not delineate a clean break between § 1512(c)(1) and § 1512(c)(2).  At this point,
it must be recognized that Congress had to use a mechanism to make § 1512(c)(1) and §
1512(c)(2) work together because otherwise the two provisions would not be compatible
in § 1512(c)'s scheme.  The language of §1512(c)(2)—"obstruct[ing], influence[ing], or
imped[ing] any official proceeding, or attempt[ing] to do so"—generally describes all
conduct that affects or can affect an official proceeding.  However, § 1512(c)(1) just lists
a few specific acts that affect or can affect an official proceeding.  Thus, because

1512(c)(2) would otherwise render 1512(c)(1) superfluous, Congress needed a way to make them work together in order to prevent this from happening.  This fact confirms that, by connecting § 1512(c)(1) and § 1512(c)(2) with the "or… otherwise" construct, Congress did actually intend for them to somehow work together to identify the conduct that is subject to being criminalized under § 1512(c).

Given the above, in order to determine just what conduct Congress intended for the language of § 1512(c)(2) to actually apply to, it is important to understand how Congress intended for § 1512(c)(1) and § 1512(c)(2) to work together to identify the conduct that is subject to being criminalized under § 1512(c) by connecting them with the "or… otherwise" construct.  At this point, it must be recognized that there are only two ways that the two provisions could work together to identify such conduct: 1) by working together to indentify different conduct or 2) by working together to identify similar conduct.  As will be shown, the former way causes § 1512(c)(1) and § 1512(c)(2) to end up working together to cover the universe of conduct that affects or can affect an official proceeding and thereby fails to account for why Congress even included § 1512(c)(1) in 1512(c)'s scheme in the first place.  The latter way has the two provisions only reaching a subset of conduct that affects or can affect an official proceeding and, in doing so, gives § 1512(c)(1) an critical role to play in § 1512(c)'s scheme, thus explaining its presence in the scheme.  Accordingly, the latter way must be viewed as the correct one.

If Congress had intended to connect § 1512(c)(1) and § 1512(c)(2) with the "or… otherwise" construct in order to make them work together to identify different conduct, it would necessarily have been intending for § 1512(c)(2) to identify all conduct that affects

or can affect an official that is <u>not</u> one of the specific acts of such conduct listed in §

1512(c)(1).  Given the language of § 1512(c)(2), there is no other way to make the two

provisions work together to identify different conduct except for this.  However, under

this arrangement, while § 1512(c)(2) would not be reaching all conduct that affects or can

affect an official proceeding on its own, § 1512(c)(1) and § 1512(c)(2) would still be

working <u>together</u> to reach all such conduct.  But if Congress had wanted § 1512(c) to

criminalize all conduct that affects or can affect an official proceeding that is engaged in

corruptly, it would not have even bothered to have included § 1512(c)(1) in § 1512(c)'s

scheme in the first place.  It would just have made § 1512(c)(2) be § 1512(c)'s sole

provision for identifying the conduct that is subject to being criminalized under § 1512(c)

and left it at that.  Accordingly, it makes no sense that Congress would have connected §

1512(c)(1) and § 1512(c)(2) with the "or… otherwise" construct in order to make the two

provisions work together to identify different conduct that is subject to being criminalized

under § 1512(c).

On the other hand, if it is understood that Congress connected § 1512(c)(1) and §

1512(c)(2) with "or… otherwise" construct in order to make the two provisions work

together to identify similar conduct that is subject to being criminalized under § 1512(c),

then the fact that Congress put § 1512(c)(1) into § 1512(c)'s scheme becomes clear.

Here, it must be recognized that, by making the two provisions work together to identify

similar conduct, Congress would necessarily be intending for them to work together to

identify conduct based on something more than just the fact that the conduct affects or

can affect an official proceeding.  This is because identifying conduct that affects or can

affect an official proceeding is something that Congress already has each provision doing all on its own.  Thus, to the extent that Congress would be using the "or… otherwise" construct to make § 1512(c)(1) and § 1512(c)(2) work <u>together</u> to identify similar conduct, it would necessarily be intending for them to identify a subset of conduct that affects or can affect an official proceeding based on some more specific characteristics. Beyond this, because § 1512(c)(1) lists specific acts of conduct that affects or can affect an official proceeding and § 1512(c)(2) only describes in general terms such conduct, whatever more specific characteristics Congress intended for § 1512(c)(1) and § 1512(c)(2) to use when working together to identify a subset of conduct that affects or can affect an official proceeding would have to come from § 1512(c)(1).  In short, if Congress was using the "or… otherwise" construct to connect § 1512(c)(1) and § 1512(c)(2) so as to make them work together to identify similar conduct, then it would necessarily be intending for them to work together to identify the particular subset of conduct that affects or can affect an official proceeding that is exemplified by the specific acts listed in § 1512(c).  This makes sense because it explains why Congress put § 1512(c)(1) into § 1512(c)'s scheme.  Under this arrangement, § 1512(c)(1) has an important role to play in § 1512(c)'s scheme.  This would be the case whether the language of § 1512(c)(2) is read to describe conduct that includes the specific acts listed in § 1512(c)(1) or not.  In either event, § 1512(c)(1) would be serving to fundamentally inform just what conduct that affects or can affect an official proceeding § 1512(c)(2) applies to.

Given the above, it seems that, by connecting § 1512(c)(1) and § 1512(c)(2) with the "or... otherwise" construct, Congress must have intended for the two provisions to work together to identify similar conduct that would be subject to being criminalized under § 1512(c). This means that the language of § 1512(c)(2) can only be read to apply to conduct that resembles the specific acts listed in § 1512(c)(1) in some way other than just being conduct that affects or can affect an official proceeding. Understanding that, by connecting § 1512(c)(1) and § 1512(c)(2) with the "or... otherwise," Congress intended for the language of § 1512(c)(2) to be read in this way in consistent with the commonsense view that, in enacting § 1512(c), Congress was chiefly focused on the specific acts listed in § 1512(c)(1). However, it also recognized that there might be other acts that resemble them that it was overlooking, so it included § 1512(c)(2) to avoid being under-inclusive.

B.    **Noscitur a Sociis and Ejusdem Generis**

That Congress only intended for § 1512(c)(2) to apply to conduct that resembles the specific acts listed in § 1512(c)(1) in some way other than just being conduct that affects or can affect an official proceeding is required by the application of the interpretative canons of noscitur a sociis and ejusdem generis as illustrated by <u>Yates v. United States</u>, 135 S.Ct. 1074 (2015) and <u>Begay v. United States</u>, 553 U.S. 137 (2008).

1.  **<u>Yates</u> and <u>Begay</u>**

In <u>Yates</u>, the Supreme Court engaged a classic fact pattern involving a commercial fisherman who had directed members of his crew to throw some grouper overboard after a federal resource-management officer had issued him a citation for

9

possession of undersized fish.  135 S.Ct at 1079-80.  For his actions, the fisherman ended

up getting charged with a violation of 18 U.S.C. § 1519—a felony carrying up to a

twenty-year sentence.  Id. at 1520.  18 U.S.C. § 1519 makes it a crime to "alter[],

destroy[], mutilate[], conceal[], cover[] up, falsif[y], or make[] false entry in <u>any record,</u>

<u>document, or tangible object</u>" in relation to certain types of investigations, matters, and

cases.  18 U.S.C. § 1519 (emphasis added).  The charge against the fisherman obviously

contemplated that the grouper that were thrown overboard were "tangible object[s]" for

the purposes of the statute.  The fisherman was convicted at trial, and he appealed to the

Eleventh Circuit.  Id. at 1080-81.  At trial and before the Eleventh Circuit, the fisherman

argued that the term "tangible object" in § 1519 had to be understood within the context

of its placement with the words "record" and "document" and thus that the term only

applied to tangible objects that were of a type with a "record" or "document."  The

fisherman argued that, while it is undeniable that a fish is a tangible object, it is not a

"tangible object" in the same sense that § 1519 uses that term.   His argument fell on deaf

ears.  Id. at 1080-81.  The Supreme Court reversed.  Id. at 1081.

In reversing the Eleventh Circuit's judgment, a four-Justice plurality of the

Supreme Court noted that 18 U.S.C. § 1519 was created through the Sarbanes-Oxley Act

(the same act that created 18 U.S.C. §1512(c), under which Mr. Bledsoe is charged).  The

plurality noted that the Sarbanes-Oxley Act "was prompted by the exposure of Enron's

massive accounting fraud and revelations that the company's outside auditor, Arthur

Andersen, LLP, had systematically destroyed potentially incriminating documents."

Yates, 135 S.Ct. 1081.  Against this backdrop, the plurality then went on to determine

that the term "tangible object" in § 1519 is only meant to refer to tangible objects that are of a type with a "record" or "document" and not just to "all objects in the physical world." Id. at 1081. The four-Justice plurality indicated that this conclusion was compelled by use of the interpretive canons of noscitur a sociis (it is known by its company) and ejusdem generis (of the same kind). Id. at 1085-86. In this, they were joined by a fifth Justice. Id. at 1089-90.

As the plurality in Yates explained, under the noscitur a sociis canon, a term should not be ascribed "a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." Id. at 1085 (quoting Gustafson v. Alloyd Co., 513 U.S. 561, 575 (1995)). Under the ejusdem generis canon, "[w]here general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." Id. at 1086 (quoting Washington State Dept. of Social and Health Servs. v. Guardianship Estate of Keffeler, 537 U.S. 371, 384 (2008)) ("[usually]" added in Yates). By applying the noscitur a sociis canon and the ejusdem generis cannon to the phrase "any record, document, or tangible object" in § 1519, the four-Justice plurality and the concurring Justice determined that "tangible object" should not be understood to be something of a type different than "record" or "document." Yates, 135 S.Ct. 1087, 1089. As to the latter interpretive cannon, the plurality further elaborated, "We typically use ejusdem generis to ensure that a general word will not render specific words meaningless." Id. (quoting Transp., Inc. v. Alabama Dept. of Revenue, 131 S.Ct 1101, 1113 (2011)). The plurality then went on, "Had

Congress intended 'tangible object' in § 1519 to be interpreted so generically as to capture physical objects as dissimilar as documents and fish, Congress would have had no reason to refer specifically to 'record' or 'document' [in the first place]." Yates, 135 S.Ct at 1088.

Prior to Yates, the Supreme Court had confronted a similar issue of statutory interpretation in Begay v. United States, 553 U.S. 137 (2008). In Begay, the Court was dealing with the Armed Career Criminal Act. Id. at 139-40. Under that act, a felon who is convicted of unlawfully possessing a firearm under 18 U.S.C. § 922(g) is subject to a fifteen-year mandatory minimum sentence if he has three prior convictions for either "a violent felony or a serious drug offense." 18 U.S.C. § 924(e)(1). At the time that Begay was decided, a "violent felony" was defined as:

> [A]ny crime punishable by imprisonment for a term exceeding one year… that—
>
> (i)     has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii)    is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another[.]

18 U.S.C. § 924(e)(2)(B) (emphasis added).[1] In Begay the Court addressed whether a prior conviction for driving under the influence (DUI) qualified as a violent felony under § 924(e)(2)(B)(ii) on the theory that it is a crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another." Id. at 140. Noting that "[d]runk driving is an extremely dangerous crime," the Court concluded that it is correct

---

[1] The underlined language represents the so-called "residual clause" that was later declared unconstitutional by the Court on due-process (vagueness) grounds in Johnson v. United States, 135 S.Ct 2551 (2015).

to say that "DUI involves conduct that 'presents a serious potential risk of physical injury

to another.'"  <u>Id.</u> at 141.  However, the Court went on, "Even so, we find that DUI falls

outside the scope of clause (ii).  It is too unlike the provision's listed examples [burglary,

arson, extortion, or crimes involving explosives] for us to believe that Congress intended

the provision to cover it."  <u>Id.</u> at 142.

In reaching the above conclusion about the reach of § 924(e)(2)(B)(ii), the Court

in <u>Begay</u> explained:

> In our view, the provision's listed examples—burglary, arson, extortion, or crimes
> involving the use of explosives—illustrate the kinds of crimes that fall within the
> statute's scope.  Their presence indicates that the statute covers only <u>similar</u>
> crimes, rather than <u>every</u> crime that "presents a serious potential risk of physical
> injury to another."  § 924(e)(2)(B)(ii).  If Congress meant the latter, i.e., if it
> meant the statute to be all encompassing, it is hard to see why it would have
> needed to include the examples at all.  Without them, clause (ii) would cover <u>all</u>
> crimes that present a "serious potential risk of physical injury."  <u>Ibid.</u>
> Additionally, if Congress meant clause  (ii) to include <u>all</u> risky crimes, why would
> it have included clause (i)?  A crime which has as an element the "use, attempted
> use, or threatened use of physical force" against the person (as clause (i) specifies)
> is likely to create "a serious potential risk of physical injury" and would seem to
> fall within the scope of clause (ii).

<u>Begay</u>, 553 U.S. at 142 (emphases in original).  The Court then went on, "'[T]o give

effect… to every clause and word' of this statute, we should read the examples as

limiting the crimes that clause (ii) covers to crimes that are roughly similar, in kind as

well as in degree of risk posed, to the examples themselves."  <u>Id.</u> at 142 (<u>quoting</u> <u>Duncan</u>

<u>v. Walker</u>, 533 U.S. 167, 174 (2001).

## 2.  Interpreting § 1512(c)(2) in Light of <u>Yates</u> and <u>Begay</u>

Under <u>Yates</u> and <u>Begay</u>, the conduct described in general terms in 18 U.S.C. §

1512(c)(2)—"obstruct[ing], influenc[ing], or imped[ing] [an] official proceeding, or

attempt[ing] to do so"—must be understood as being similar in type to the specific acts of conduct listed in its companion provision, 18 U.S.C. § 1512(c)(1)—"alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object, or attempt[ing] to do so, with the intent to impair the object's integrity or availability for use in an official proceeding."  The interpretive canon of <u>noscitur a sociis</u> requires that the conduct described in general terms in § 1512(c)(2) be understood as being of the same character as the specific acts of conduct listed in § 1512(c)(1), and <u>ejusdem generis</u> canon requires that the conduct described in general terms in § 1512(c)(2) not be read to embrace meanings broader in nature than the specific acts of conduct listed in § 1512(c)(1).  Given this, the language of § 1512(c)(2) can only be read to apply to conduct that resembles the specific acts listed in § 1512(c)(1) based on some intrinsic quality that it shares with them—and not just on the fact that it might have an outward effect that is similar to theirs.  Accordingly, the language of § 1512(c)(2) cannot be read to describe conduct that does not resemble the specific acts listed in § 1512(c)(1) in any way other than just being conduct that affects or can affect an official proceeding.

At this point, it should be stressed that unless the language of § 1512(c)(2) is interpreted as being informed by the language of § 1512(c)(1) as just described, § 1512(c)(1) becomes a superfluity.  If Congress did not intend for the language of § 1512(c)(2) to describe only conduct that is similar in type to the specific acts of conduct described in § 1512(c)(1) and if it therefore meant for § 1512(c)(2) to reach all conduct that can be characterized as "obstruct[ing], influence[ing], or imped[ing] [an] official proceeding, or attempt[ing] to do so" as a general matter, it would not have even bothered

to have included § 1512(c)(1) in §1512(c)'s scheme in the first place.  Certainly, conduct related to "obstruct[ing], influenc[ing], or imped[ing] [an] official proceeding, or attempt[ing] to do so" as a general matter would necessarily include all conduct related specifically to "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object, or attempt[ing] to do, with the intent to impair the object's integrity or availability for use in an official proceeding."  For this reason, too, the canon of <u>ejusdem generis</u> prevents that the language of § 1512(c)(2) from being read to describe conduct that does not resemble the specific acts of conduct listed in § 1512(c)(1) in any way other than just being conduct that affects or can affect an official proceeding.  <u>See</u> <u>Yates</u>, 135 S.Ct at 1088 ("We resist a reading of [a statutory provision] that would render superfluous an entire provision passed in proximity as part of the same Act."); <u>Marx v. General Revenue Corp.</u>, 133 S.Ct. 1166, 1178 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").[2]

## C.       Why Congress Enacted § 1512(c)

That Congress intended for § 1512(c)(2) to only reach conduct that resembles the specific acts listed in § 1512(c)(1) in some way other than just being conduct that affects or can affect an official proceeding is required because, in enacting § 1512(c), Congress was focused on addressing only a particular type of conduct that affects or can affect an

---

[2] It should be noted that, if accepted as valid, a reading of § 1512(c)(2) that has the provision covering all conduct that can be characterized as "obstruct[ing], influenc[ing], or imped[ing] [an] official proceeding, or attempt[ing] to do so" as a general matter would necessarily render 18 U.S.C. § 1512(a), 18 U.S.C. § 1512(b), 18 U.S.C. § 1512(d) superfluous as well, since those provisions all deal with conduct that would also be covered by such a reading of § 1512(c)(2).

official proceeding—not all conduct that affects or can affect an official proceeding as a general matter.  Specifically, it was focused on conduct that, like the specific acts of conduct listed in § 1512(c)(1), can affect the evidence that might be relevant at an official proceeding.  Like 18 U.S.C. § 1519 (the provision at issue in Yates), 18 U.S.C. § 1512(c) was also created by the Sarbanes-Oxley Act and thus similarly informed by that act's focus, in the wake of the Enron/Arthur Andersen scandal, on criminalizing the destruction of documents that could have evidentiary value.

Beyond this, in enacting § 1512(c), Congress chose to make it a part of the scheme that it had already put in place in 18 U.S.C. § 1512.  In addition to § 1512(c), § 1512 contains three other proscriptive provisions: § 1512(a), § 1512(b), and § 1512(d).  When § 1512 was amended to include the current § 1512(c), the old § 1512(c) was re-designated as §1512(d).  Pub L. 107-204, § 1102, 116 Stat. 807 (2002).  Given that the current § 1512(c) was thus inserted into the middle of § 1512's three other proscriptive provisions, an understanding what these three other provisions proscribe sheds light on the type of conduct that Congress also intended for § 1512(c) as whole to proscribe.  "A statutory provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme [it is placed in] because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law. " Util. Air Regulatory Grp. v. E.P.A., 573 U.S. 302, 321 (2014).   A review of § 1512(a), § 1512(b), and § 1512(d) shows that each provision proscribes only conduct that is intended to cause the suppression or corruption of testimony, evidence, and information that could be relevant at an official proceeding: § 1512(a) proscribes murder or attempted

murder and the use of force, threats of force, or attempts to use force or threats of force that has such intent, § 1512(b) proscribes intimidation, threats, and corrupt persuasion that has such intent, and § 1512(d) proscribes harassment that has such intent.  Given that Congress inserted the current § 1512(c) into the scheme that included these three other provisions shows that it was intending for § 1512(c) as whole to only address conduct that might affect the evidence an official proceeding would review—not all conduct that affects or can affect an official proceeding as a general matter.  This shows that Congress did not intend for the language of § 1512(c)(2) to describe conduct that does not resemble the specific acts listed in § 1512(c)(1) in any way other than just being conduct that affects or can affect an official proceeding.

### D.        Due Process

A finding that Congress must have intended for § 1512(c)(2) to only reach conduct that resembles the specific acts listed in § 1512(c)(1) in some way other than just being conduct that affects or can affect an official proceeding is required to keep § 1512(c)(2) from running afoul of due process on vagueness grounds.  As a basic matter of statutory interpretation, courts are to presume that "Congress intended the interpretation [of the provision under consideration] which is constitutionally permissible." United States v. Thompson, 452 F.2d 1333, 1337 (D.C. Cir. 1971) (citing Gutknecht v. United States, 396 U.S. 295 (1970); United States v. Rumely, 345 U.S. 41, 45 (1953)). Accordingly, when an "interpretation of a statute would create a substantial doubt as to the statute's constitutional validity, the courts will avoid that interpretation absent a "clear statement" of a contrary legislative intent." Thompson, 452 F.2d at 137.  A criminal

statute is unconstitutionally vague if it "'fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement.'"  United States v. Bronstein, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting Johnson v. United States, 135 S.Ct 2551, 2556 (2015)).  "The void-for-vagueness doctrine . . . guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes.  And the doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries and judges."  Sessions v. Dimaya, 138 S. Ct. 1204, 1212 (2018) (citing Kolender v. Lawson, 461 U.S. 352, 358 (1983)).

### 1.  Notice

Here, if the language in § 1512(c)(2) is not read to describe conduct that resembles the specific acts listed in § 1512(c)(1) in some way other than just being conduct that affects or can affect an official proceeding, it would not properly serve to give fair notice of what conduct Congress was intending for the provision to apply to.  On its face, the language of § 1512(c)(2)—"obstruct[ing], influence[ing], or imped[ing] [an] official proceeding, or attempt[ing] to do so"—appears to cover all conduct that affects or can affect an official proceeding.  However, § 1512(c)(2) is just part of a single sentence that contains both § 1512(c)(1) and § 1512(c)(2).  Neither provision criminalizes any conduct on its own.  Both provisions just identify conduct that would become criminal under 1512(c) if it is engaged in "corruptly."  See infra at 4-5.  Given all this, a person reading § 1512(c) could reasonably think that Congress intended for § 1512(c)(1) and § 1512(c)(2) to be understood in relation to each other.  Moreover, precisely because they

are specific acts, the specific acts listed in § 1512(c)(1) have intrinsic qualities.  Thus, a person reading § 1512(c) could reasonably think that Congress was intending for the conduct it was describing in general terms in § 1512(c)(2) to also have similar intrinsic qualities.  Indeed, he could even reasonably think that the reason Congress listed specific acts in § 1512(c)(1) in the first place was to signal that the conduct described in § 1512(c)(2) should be understood as having similar intrinsic qualities.  Accordingly, he might reasonably think that one could not be charged under § 1512(c)(2) for engaging in conduct that does not resemble the specific acts listed in § 1512(c)(1) in any way apart from the fact that it has some outward effect that those specific acts might also have.  At the very least, it seems he would have some confusion on this point.  Given this, if § 1512(c) is read to apply to conduct that does not resemble the specific acts listed in § 1512(c)(1) in some way other than just being conduct that affects or can affect an official proceeding, it would not give fair notice as to what conduct it actually applies to and thus would violate due process.   Accordingly, it cannot be read to apply to such conduct.

### 2.  Arbitrary Enforcement

Given that § 1512(c)(2) only reaches the conduct that Mr. Bledsoe is charged with in count one of the Indictment if it is read to include conduct that does not resemble the specific acts of conduct listed in 1512(c)(1) in any way other than just being conduct that affects or can affect an official proceeding, it is clear that this broad reading of the provision is the one that the government is using to prosecute Mr. Bledsoe in connection with the congressional hearing to count the Electoral College votes that occurred at the United States Capitol on January 6, 2021.  At this point, it must be noted that there in no

evidence that, in connection with that hearing, Mr. Bledsoe forcibly entered the Capitol, destroyed any property, or assaulted anyone, nor is there any evidence that he saw anyone else engage in such conduct.  Indeed, while the Indictment describes his conduct as "entering and remaining in the United States Capitol without authority and threatening Congressional officials," there is not even any evidence that he did in fact threaten any congressional officials.  At present, there are over 800 people charged in connection with the events at the Capitol on January 6.  Almost all them entered and remained in building when Congress was convened to count the Electoral College votes.  However, the majority of these people have not been charged with violating § 1512(c)(2) like Mr. Bledsoe has.  Also, since § 1512(c)(2)'s enactment in 2002, people have routinely disrupted hearings—not just before Congress but elsewhere, too—that would appear to meet the definition of an "official proceeding" under § 1512(c)(2).  It appears that many of these people have not been prosecuted under § 1512(c)(2) either.

Given all this, it is does not appear that there is a statutorily-based standard that the government is using for its broad reading of § 1512(c)(2) that would explain why Mr. Bledsoe is being singled out for prosecution under the provision.  It s submitted that, if Mr. Bledsoe's prosecution is not in fact arbitrary, the government should be able to articulate a credible statutorily-based standard that would explain why it thinks his alleged conduct falls under its broad reading of § 1512(c)(2) in a way that also accounts for why it has failed to charge not only other persons whose alleged conduct would also have disrupted the counting of the Electoral College votes on January 6 but also persons who have disrupted official proceedings in the past.  Such an explanation is not known to

exist.  Accordingly, it would appear that reading § 1512(c)(2) to include conduct that

does not resemble the specific acts of conduct listed in § 1512(c)(1) in any way other than

just being conduct that affects or can affect an official proceeding, which is the reading

that the government is using to prosecute Mr. Bledsoe, does not adequately protect

against arbitrary enforcement and thus runs afoul of due process on vagueness grounds.

See Johnson, 135 S.Ct at 2558 ("repeated failures to craft a principled and objective

standard out of [a statutory provision] confirm its hopeless indeterminacy").

Accordingly, § 1512(c)(2) cannot be read to include conduct does not resemble the

specific acts listed in 1512(c)(1) in any way other than just being conduct that affects or

can affect an official proceeding.

### E.        The Rule of Lenity

To the extent there would be a question as to whether § 1512(c)(2) can be read to

include conduct that does not resemble the specific acts of conduct listed in 1512(c)(1) in

any way other than just being conduct that affects or can affect an official proceeding, the

rule of lenity still requires that this question be resolved in Mr. Bledsoe's favor.  Indeed,

in Yates, the plurality of the Supreme Court, after finding that the term "tangible object"

in § 1519 only applied to objects of a type with "record" or "document," affirmed its

finding with reference to the rule of lenity: "[I]f our recourse to traditional tools of

statutory interpretation leaves any doubt about the meaning of 'tangible object,' as that

term is used in § 1519, we would invoke the rule that "ambiguity concerning the ambit of

criminal statutes should be resolved for lenity."  Yates, 135 S.Ct. at 1088 (quoting

Cleveland v. United States, 531 U.S. 12, 25 (2000)).  Accordingly, the plurality

concluded, "In determining the meaning of 'tangible object' in § 1519, 'it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.'" Yates, 135 S.Ct at 1088 (quoting Cleveland, 531 U.S. at 25). The rule of lenity applies no less in Mr. Bledsoe's case than it did in Yates.

At this point it must be stressed that, even if it seems likely that § 1512(c)(2) cannot be read in the way being advocated here, this would still not be sufficient to find against Mr. Bledsoe on this point. As the Supreme Court has stated, "[P]robability is not a guide which a court, in construing a penal statute, can safely take." United States v. Santos, 553 U.S. 507, 515 (2008) (quoting United States v. Wiltberger, 18 U.S. 76 (1820)). Accordingly, where a differing view regarding the meaning of a statute is not "unambiguously correct," courts must "apply the rule of lenity and resolve the ambiguity in [the defendant's] favor." United States v. Granderson, 511 U.S. 39, 54 (1994). Especially when viewed with an appreciation of the rule of lenity, § 1512(c)(2) cannot be read to include conduct does not resemble the specific acts of conduct listed in 1512(c)(1) in any way other than just being conduct that affects or can affect an official proceeding

## II.    COUNT ONE OF THE INDICTMENT FAILS TO STATE AN OFFENSE BECAUSE A CONGRESSIONAL HEARING TO COUNT THE ELECTORAL COLLEGE VOTES IS NOT AN "OFFICIAL PROCEEDING" AS THAT TERM IS USED IN 18 U.S.C. § 1512(c)(2)

The statutory text of 18 U.S.C. § 1512(c)(2) explicitly states that, for conduct to be illegal under the provision, it must relate to an "official proceeding." Count one of the Indictment charges Mr. Bledsoe with a violation of 18 U.S.C. § 1512(c)(2) for conduct that was related to the congressional hearing to count the Electoral College votes that

occurred at the United States Capitol on January 6, 2021.  Congressional hearings to count Electoral College are conducted under 3 U.S.C. § 15.  However, as will be shown, a hearing conducted under 3 U.S.C. § 15 is not an "official proceeding" for the purposes of § 1512(c)(2).  Accordingly, because count one of the Indictment charges Mr. Bledsoe with violating § 1512(c)(2) for conduct related to a hearing that is not an official proceeding, count one of the Indictment fails to state an offense and must be dismissed.

When looked at is isolation, the term "official proceeding" is ambiguous. However, contextual considerations show that, for the purposes of § 1512(c)(2), Congress did not intend for term "official proceeding" to apply to a congressional hearing to count the Electoral College votes.  To the extent that there is a question as to whether a congressional hearing to count the Electoral votes is an "official proceeding" for the purposes of § 1512(c)(2), the rule of lenity requires resolving the question in Mr. Bledsoe's favor.

### A.    What is an Official Proceeding?

18 U.S.C. § 1515(a)(1) defines the term "official proceeding" for the purposes of § 1512 generally—and thus for §1512(c)(2) specifically.  §1515(a)(1) states:

[T]he term "official proceeding" means—

(A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;

(B) a proceeding before the Congress;

(C) a proceeding before a Federal Government agency which is authorized by law; or

      (D) a <u>proceeding</u> involving the business of insurance whose activities affect interstate commerce <u>before</u> any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce[.]

<u>Id.</u> (emphases added).

It is noteworthy that § 1515(a)(1) defines the term "official proceeding" in § 1512 by simply providing a laundry list of "proceeding[s]" occurring "before" various entities and persons that the term is meant to include. In doing this, § 1515(a)(1) does not try to define what the word "proceeding" actually means, thus leaving the word "proceeding" open to interpretation. This is a problem because, as the Ninth Circuit noted in <u>United Sates v. Ermoian</u>, 752 F.3d 1165, 1169-70 (9th Cir. 2013) the word "proceeding" has a range of meanings:

"Proceeding" has been defined in various ways, ranging from the broad to the specific. But an account of both lay and legal dictionaries suggests that definitions of the term fall into one of two categories: "proceeding" may be used either in a general sense to mean "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior" or more specifically as a legal term to mean "[a] legal action or process; any act done by authority of a court of law; a step taken by either party in a legal case." Proceeding, Oxford English Dictionary, available at http://www.oed.com; <u>see also</u> Black's Law Dictionary 1241 (8th ed. 2004) (defining proceeding either narrowly as (1) "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment;" (2) "[a]ny procedural means for seeking redress from a tribunal or agency;" and (3) "[t]he business conducted by a court or other official body; a hearing" or more broadly as "an act or step that is part of a larger action.").

<u>Id.</u> at 1169.

"The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as whole." <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 341 (1997).

Here, given that word "proceeding" can have various meanings, the term "official proceeding" in § 1512—and thus in § 1512(c)(2)—remains similarly ambiguous notwithstanding § 1515(a)(1)'s attempt at defining it.  Thus, it is appropriate to look at how the word "proceeding" is used in § 1515(a)(1) and how the term "official proceeding" is used in § 1512 to better understand what meaning Congress intended for the term "official proceeding" to have in § 1512 .  Doing so shows that what Congress meant by "official proceeding" in § 1512—and thus in § 1512(c)(2)—is a court-like proceeding that has the ability to secure witness testimony and evidence for purposes related to the administration of justice.  This is also borne out by considering how § 1512 fits within its statutory scheme in Chapter 73 of Title 18, United States Code.  See Util. Air Regulatory Grp., 573 U.S. at 321 (the legislative intent behind a statutory provision can be revealed by looking at the broader statutory scheme the provision is a part of).

## 1.  § 1515(a)(1)

Looking at the word "proceeding" is used in the context of § 1515(a)(1) shows that Congress was not intending for the word to be understood as referring to a proceeding in the general sense.  Rather, it was intending for it to refer only to a proceeding that is essentially court-like.  On this point, Ermoian, 752 F.3d 1165, and United States v. Ramos, 537 F.3d 439 (5th Cir. 2008) are instructive.

In Ermoian, the Ninth Circuit was dealing with an alleged violation of § 1512(c)(2) where two defendants were charged with obstructive conduct in relation to an ongoing FBI investigation.  752 F.3d at 1165-68.  In deciding whether an FBI investigation was actually an "official proceeding" for the purposes of § 1512(c)(2), the

court looked at the word "proceeding" in the context § 1515(a)(1) and took note of how "[s]everal aspects of the [provision] suggest that the legal—rather than the lay— understanding of the term 'proceeding' is implicated." Id. at 1170.  For starters, the court noted that the term "official proceeding," which § 1515(a)(1) seeks to define contains "the descriptor 'official.'" Ermoian, 752 F.3d at 1170.   The court stated that this indicates a sense of formality normally associated with legal proceedings." Id.  Beyond this, the court pointed to the fact that, as used in § 1515(a)(1)(A)-(D), the word "proceeding" is "surrounded with other words that contemplate a legal usage of the term, including 'judge or court,' 'Federal grand jury,' 'Congress,' and 'Federal government agency.'" Id.  The court went on to note that, when used in legal contexts, "'Proceeding' is a word much used to express the business done in courts.'" Id. (quoting Edwin E. Bryant, The Law of Pleading under the Codes of Civil Procedure (2d ed. 1899) (emphasis in Ermoian).  Also, turning to the fact that § 1515(a)(1)(C) specifies that an "official proceeding" is a proceeding that occurs "before" an agency, the court pointed out that the "use of the preposition 'before' suggests an appearance in front of an agency sitting as a tribunal." Id. at 1171 (quoting 18 U.S.C. § 1515(a)(1)(C)) (emphasis added).

Prior to Ermoian, in United States v. Ramos, 537 F.3d 439 (5th Cir. 2008), the Fifth Circuit confronted a situation where two Border Patrol agents had allegedly violated § 1512(c)(2) by interfering with a Border Patrol investigation into their alleged misconduct.  Id. at 447.  Just as the Ninth Circuit later did in Ermoian, the Fifth Circuit looked at the word "proceeding" in the context of § 1515(a)(1) to determine what Congress meant by the term official proceeding in § 1512(c)(2).   Id. at 462.  Like the

Ninth Circuit, the Fifth Circuit found it important that, in specifying what an "official proceeding" is in § 1515(a)(1), Congress included a proceeding that occurs "before" an agency.  Id. at 463 (quoting 18 U.S.C. § 1515(a)(1)(C).  The court found that this shows that the type of proceeding that Congress was referring to was a proceeding that "involves some formal convocation of the agency in which parties are directed to appear."  Id. at 462-63 (emphasis added).

### 2.   § 1512

While looking at word "proceeding" in the context of § 1515(a)(1) shows that Congress intended for the term "official proceeding" to only apply to a court-like proceeding, looking at how the term "official proceeding" is actually used in § 1512 shows that what Congress thought makes a proceeding sufficiently court-like to be considered an "official proceeding" for the purposes of § 1512 is the ability to secure witness testimony and evidence.  This fact provides a ready way to differentiate what is an "official proceeding" in the sense that Congress intended for the purposes of § 1512 from one that is not.  Again, Ermoian, 752 F.3d 1165, and Ramos, 537 F.3d 439, are instructive.

In Ermoian, in looking at the term "official proceeding" in the context of § 1512, the Ninth Circuit identified the features that make a proceeding sufficiently like a "tribunal" to qualify as "official proceeding" under the statute:

> Section 1512 refers to "prevent[ing] the attendance or testimony of any person in an official proceeding"; "prevent[ing] the production of a record, document, or other object, in an official proceeding"; and "be[ing] absent from an official proceeding to which that person has been summoned by legal process."  18 U.S.C. § 1512(a)(1)(A)-(B), (a)(2)(B)(iv).  The use of the terms 'attendance,'

<u>'testimony,' 'production,' and 'summon[]' when describing an official proceeding strongly implies that some formal hearing before a tribunal is contemplated.</u>"

<u>Id.</u> at 1172 (emphasis added).  With that said, the court then went on to find that the FBI investigation it was considering did not qualify as "official proceeding" under the statute. <u>Id.</u>  Similarly, in <u>Ramos</u>, in finding that a Border Patrol investigation was not an "official proceeding" for the purposes of § 1512, 537 F.3d at 462, the Fifth Circuit noted that the term "official proceeding" is "consistently used throughout § 1512 in a manner that contemplates a <u>formal environment in which persons are called to appear or produce documents</u>."  <u>Id.</u> at 463 (emphasis added); <u>accord</u> <u>United States v. Binette</u>, 828 F. Supp. 2d 402 (D. Mass. 2011) (where SEC personnel conducting an investigation did not have the power to "issue subpoenas or compel attendance or testimony," the investigation did not qualify as an "official proceeding" under § 1512(c)(2)).  <u>Id.</u> at 404-05.

In addition to finding that the term "official proceeding" in consistently used in §1512 in such a way to indicate that Congress intended for it to apply to proceedings where witness testimony and evidence can be secured, the court in <u>Ramos</u> also found another clue that provides a way to distinguish a proceeding that is a an "official proceeding" in the sense Congress intended from one that is not.  In <u>Ramos</u> the court noted that in enacting 18 U.S.C. § 1512, Congress declared the purpose of the statute is "to enhance and protect the necessary role of crime victims and witnesses in the criminal justice system."  537 F.3d at 462 (<u>quoting</u>  Pub. L. No. 97-291, § 2, 96 Stat. 1258 (1982)).  This declaration of legislative intent strongly indicates that Congress intended the term "official proceeding" as used in § 1512 to refer to a proceeding related to the administration of justice.  This conclusion is further underscored by the fact that, when it

enacted § 1512, Congress entitled it, "Tampering with a witness, victim, or informant."
Though the current version § 1512(c) was only added to § 1512 as an amendment in 2002
by the Sarbanes-Oxley Act, see supra at 2, the fact remains that, through that act,
Congress chose to place the provision in the context of other provisions that were
designed to enhance the administration of justice.

### 3.  Chapter 73

That Congress intended for the word "proceeding" in § 1515(a)(1) and the term
"official proceeding" in § 1512 to apply to court-like hearings that have the ability to
secure witness testimony and evidence for purposes related to the administration of
justice is further borne out by considering § 1512 in the context of Chapter 73 of Title 18,
United States Code.  Chapter 73 of Title 18, United States Code, which is entitled,
"OBSTRUCTION OF JUSTICE" contains 18 U.S.C §§ 1501-1521. A review of those
provisions shows that they are designed to secure the integrity of tribunal-like
proceedings where witness testimony and evidence can be secured to aid the
administration of justice.  See, e.g., 18 U.S.C. § 1501 (assault on a process sever); 18
U.S.C. § 1503 (influencing a juror generally); 18 U.S.C. § 1504 (influencing a juror in
writing); 18 U.S.C. § 1508 (recording, listening to, or observing proceedings of grand or
petit juries while deliberating); 18 U.S.C. § 1513 (retaliating against a victim, witness, or
informant); 18 U.S.C. § 1514 (restraining civil actions that harass a victim or witness); 18
U.S.C. § 1519 (destruction, alteration, or falsification of records); 18 U.S.C. § 1520
(destruction of corporate audit records); 18 U.S.C. § 1521 (retaliating against a federal
judge or law enforcement officer by false claim or slander of title).

### B.      The January 6 Hearing

The processing and counting of the Electoral College votes by Congress is conducted pursuant to rules spelled out in 3 U.S.C. § 1 et seq.  The actual hearing to count the Electoral College votes is conducted pursuant to 3 U.S.C. § 15.  At such a hearing, "certificates of electoral votes" are "presented" to Congress by "tellers" on a state-by-state basis and "read… in the hearing of the two Houses."  After such reading of the certificates of electoral votes from each state, the votes are then "counted… and delivered to the President of the Senate, who shall thereupon announce the state of the vote, which announcement shall be deemed a sufficient declaration of the persons, if any, elected President and Vice President of the United States."  Id.  This procedure allows for no exercise of judgment on the parts of the tellers and the President of the Senate, id., and their roles must therefore be regarded as purely ceremonial or ministerial.  Moreover, it should be noted that the certificates of the electoral votes serve no role in informing any decision-making process.  To the extent they determine who will be the President and the Vice President, they do so purely by their own operation of declaring to whom the electors of the states that issued them have awarded their electoral votes.  See U.S.C. § 9.

To be sure, § 15 does permit, in some limited circumstances, for Congress to reject certificates of electoral votes that the states submit.  Congress can reject a state's certificate of electoral votes when it determines that the votes at issue "have not been regularly given by he electors whose appointment has been lawfully certified" pursuant to the state's laws.  3 U.S.C. § 15; see 3 U.S.C. § 6.  However, the procedure for making this determination does not involve calling witnesses and producing evidence.  3 U.S.C. §

15.  Rather, it only involves time-limited debate.  <u>See</u> 3 U.S.C. § 17.  Moreover, in those

instances where a state submits more than one certificate of electoral votes, Congress can

determine which certificate from that state to accept, but making this determination does

not involve hearing testimony or considering evidence either.  Rather, it involves

applying the set of spelled-out hierarchical rules.  3 U.S.C. § 15.

      Given the above, a congressional hearing to count the Electoral College votes

cannot be considered an "official proceeding" for the purposes of § 1512 generally—and

thus for the purposes of § 1512(c)(2) specifically.  While it can perhaps be debated

whether or not a congressional hearing to count the Electoral College votes is a court-like

proceeding in the abstract, what is not debatable is that, for such a hearing, there are no

provisions in place to secure witness testimony or evidence that might aid whatever

decision-making needs to be done.  Indeed, the hearing does not even have the ability to

make decisions based on witness testimony or evidence.  It is primarily a ceremonial

proceeding that, to the extent it does involve any kind of decision-making on the part of

its participants at all, does so based only on debate and the application of hierarchical

rules.  Moreover, it is not a proceeding related to the administration of justice.

Accordingly, it cannot be considered an "official proceeding" for the purposes of §

1512(c)(2).

      **C.**     **Rule of Lenity**

      To the extent there is doubt that a congressional hearing to count the Electoral

College votes does not qualify as an "official proceeding" under § 1512(c)(2), the rule of

lenity would still require finding that it cannot be considered one.  Indeed, this would be

the case even if it is found that such a hearing probably is an official proceeding for the purposes of § 1512(c)(2).  In Ramos, 537 F.3d 439, in concluding that an informal, internal U.S. Border Patrol hearing regarding Border Patrol agents' misconduct was not an "official proceeding" under § 1512(c)(2), the Fifth Circuit indicated that, even if it was not confident that it had reached the right decision on the merits, the rule of lenity would have still required the same conclusion.  Id. at 463-64.  The court explained that such a conclusion would be required unless it could "say with certainty that Congress intended" a different understanding of what "official proceeding" meant in § 1512.  Id. at 464.  This is because "we 'resolve ambiguity in criminal statutes by construing such statutes narrowly.'"  Id. (quoting United States v. Marek, 238 F.3d 310, 327 (5th Cir. 2001) (en banc)).  Thus, to the extent there might have been any questions about its holding that the Border Patrol hearing it was considering was not an "official proceeding" under § 1512(c)(2), the court stated, "[W]e alternatively hold that the rule of lenity requires the conclusion that 'official proceeding' in § 1512(c) does not embrace the agency investigation at issue here."  Ramos, 537 F.3d at 464; accord Binette, 828 F.Supp.2d at 404.  Such an alternative holding is required in Mr. Bledsoe's case as well.

## CONCLUSION

Count one of the Indictment fails to state an offense involving Mr. Bledsoe because the conduct for which it charges him with Obstruction of an Official Proceeding under 18 U.S.C. § 1512(c)(2) is not conduct that is covered by the provision. Additionally, count five fails to state an offense involving Mr. Bledsoe because the hearing his alleged conduct is said to have been related to—the congressional hearing to

count the Electoral College votes—is not an "official proceeding" for the purposes of the

provision.  Each of these failures on the part of count one to state an offense involving

Mr. Bledsoe provides an independent basis to dismiss the count under Fed. R. Crim. P.

12(b)(3)(B)(v).

      WHEREFORE, the defendant, Matthew Bledsoe, moves this Honorable Court

to dismiss count five of the Indictment for failure to state an offense

                            Respectfully submitted,

                            _____/s/_____

                            Jerry Ray Smith, Jr.
                            D.C. Bar No. 448699
                            Counsel for Matthew Bledsoe
                            717 D Street, N.W.
                            Suite 310
                            Washington, DC 20004
                            Phone: (202) 347-6101
                            E-mail: jerryraysmith@verizon.net