# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | )( | |
| | )( | **Criminal No. 21-204-01 (BAH)** |
| v. | )( | **Chief Judge Howell** |
| | )( | **Trial: July 18, 2022** |
| **MATTHEW BLEDSOE** | )( | |

## MOTION TO TRANSFER VENUE FOR TRIAL
## OR, ALTERNATIVELY, ALLOW FOR EXPANDED VOIR DIRE
## AND POINTS AND AUTHORITY IN SUPPORT THEREOF

COMES NOW the defendant, Matthew Bledsoe, by and through undersigned counsel, and respectfully moves this Honorable Court, pursuant to Federal Rule of Criminal Procedure 21, to transfer the venue of his case for trial because, in the community from which his jury panel will drawn if his trial is held in the United States District Court for the District of Columbia, so great a prejudice exists that an impartial jury cannot be empaneled. In the alternative, in the event the Court denies a transfer of venue for trial, Mr. Bledsoe moves the Court to permit expanded examination of prospective jurors before and during formal voir dire. Specifically, Mr. Bledsoe asks:

(1) that the defense be allowed to prepare a questionnaire that, after review and approval by the Court, would be distributed to summoned prospective jurors to return before trial;

(2) that the parties be present for any pre-screening questioning of prospective jurors that the Court conducts before the beginning of formal voir dire; and

(3) that the parties be permitted to question jurors individually during voir dire.

In support of this motion, Mr. Bledsoe would show:

1

1.In connection with the events of January 6, 2021 at the United States Capitol, Mr. Bledsoe has been charged in a five-count indictment (Indictment) (ECF #23).  The counts of the Indictment are as follows: 1) Obstruction of an Official Proceeding and Aiding and Abetting (18 U.S.C. §§ 1512(c)(2) and 2);  2), Entering and Remaining in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(1)); 3) Disorderly or Disruptive Conduct in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(2)); 4) Disorderly Conduct in a Capitol Building (40 U.S.C. § 5104(e)(2)(D)); and 5) Parading, Demonstrating, or Picketing in a Capitol Building (40 U.S.C. § 5104(e)(2)(G)).  Only count 1 is a felony.  Counts 2 and 3 are misdemeanors, and counts 4 and 5 are petty offenses.

2.In count one of the Indictment, the count charging Mr. Bledsoe with Obstruction of an Official Proceeding, it is specifically alleged:

> On or about January 6, 2021, within the District of Columbia and elsewhere, Matthew Bledsoe attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, by entering and remaining in the United States Capitol without authority and threatening Congressional officials.

Indictment at 1.

3.In discovery, the government has turned over to Mr. Bledsoe video evidence that captures a person it claims is him from the time this person entered the Capitol on January 6 until the time he left it.  This video evidence shows that the person the government claims is Mr. Bledsoe did not assault anyone, damage any property, or make any kind of forced entry.  Additionally, the evidence shows that this person was not present when anyone else engaged in such conduct.

4.Given the evidence against Mr. Bledsoe, the contested issues at trial will likely revolve not around whether he actually entered the Capitol but rather around what his mental

2

state was when he did so. Importantly, in connection with the main count against him (the felony obstruction-of-an-official-proceeding count), the contested issue will likely be whether Mr. Bledsoe entered the Capitol with the intent to obstruct a congressional hearing—that is, the hearing for counting the Electoral College votes.

5. This case involves events that much of the public already has negative opinions about due to media coverage, especially opinions about the intentions of persons who entered the Capitol Building as part of those events. A will be shown, these opinions are disproportionately widespread in this District. Indeed, these negative opinions are so prevalent in this District that they pose a grave threat to Mr. Bledsoe's right to a fair trial. In this District, there is an intolerable risk that jurors' preexisting views will fill in any gaps between the allegations and evidence.

6. "Upon a defendant's motion, [a] court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). "A motion to transfer may be made at or before arraignment or at any other time the court or these rules prescribe." Fed. R. Crim. P. 21(d)

7. Mr. Bledsoe has the right to be tried by jurors that will judge him on the evidence alone—and without their prejudices coloring how they view the evidence against him. Accordingly, this case should be transferred to a different district because the risk is simply too great that jurors drawn from this District will evaluate the evidence against Mr. Bledsoe based on their prejudgments about persons who, like him, are charged in connection with the events of January 6.

8. If the Court does not transfer the venue for trial of his case, then expanded examination of prospective jurors will be essential to minimize the extent to which a trial would be infected by jury prejudice against Mr. Bledsoe.

**DISCUSSION**

**I.  THE COURT SHOULD PRESUME THAT A JURY DRAWN FROM RESIDENTS OF THE DISTRICT OF COLUMBIA WILL BE PREJUDICED AGAINST MR BLEDSOE AND TRANSFER HIS CASE ELSEWHERE FOR TRIAL**

The Fifth Amendment's due-process clause and the Sixth Amendment's jury-trial clause guarantee a defendant the right to a fair trial by an impartial jury.  Skilling v. United States, 561 U.S. 358, 378–79 (2010).  Ordinarily, the trial should be held in, and the jury should be drawn from, "the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  However, "if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process'"—then "[t]he Constitution's place-of-trial prescriptions… do not impede transfer of the proceeding to a different district at the defendant's request."  Skilling, 561 U.S. at 378 (quoting In re Murchison, 349 U.S. 133, 136 (1955)).  In "the extreme case," Skilling, 561 U.S. at 381, where "[the] trial atmosphere [has been] utterly corrupted by press coverage," id. at 380 (quoting Murphy v. Florida, 421 U.S. 794, 798–99 (1975)), a court must presume prejudice from the pretrial publicity.  Unlike "actual prejudice," which only can be confirmed through voir dire, see Skilling, 561 U.S at 385–95, presumed prejudice presents a threat to due process that cannot be negated by jurors' voir dire responses, see id. at 379.  Indeed, in Skilling, the Court approvingly pointed out that, in Rideau v. Louisiana, 373 U.S. 723 (1963), because of presumptive prejudice, the Court "d[id] not hesitate to hold, without pausing to examine a

4

particularized transcript of the voir dire," that trial in the contested venue violated due process. Skilling, 561 U.S. at 379 (quoting Rideau, 373 U.S. at 727).

In Skilling, the Supreme Court identified three factors for courts to consider when deciding whether pretrial publicity has affected the potential jury pool to the extent that prejudice should be presumed so as to warrant moving the trial to a different venue: (1) the size and composition of the community where the jury would currently be drawn from, (2) the pervasiveness and tenor of media coverage in that community, and (3) the length of time between the relevant events and trial. Id. at 382–83. Each of these considerations weighs strongly in favor of presuming that a jury drawn from D.C. residents will be prejudiced against Mr. Bledsoe.

### A. The Size and Composition of the Community

The Census Bureau estimates that D.C.'s total population was 670,050 on July 1, 2021, with approximately 18.2 percent being under the age of 18, leaving a voting-age population under 550,000.[1] D.C.'s entire population resides in a space of just 68.34 square miles.[2] With the Capitol Building near the geographic center, all of the District's residents live within seven and one-half miles of the site. While the events of January 6 were major news nationally, the fact remains they affected D.C. residents much more directly than persons outside the District. Immediately after those events, Mayor Bowser ordered a citywide curfew, declared a two-week state of emergency, and discouraged out-of-towners from attending the Presidential Inauguration on January 20 because of road closures and heightened security.[3] Tens of thousands National

---

[1] U.S. Census Bureau Quickfacts: District of Columbia, https://www.census.gov/quickfacts/DC (last visited Feb. 23, 2022).
[2] U.S. Census Bureau, District of Columbia: 2010 13 (2012), https://www.census.gov/prod/cen2010 /cph-2-10.pdf#page=33.
[3] Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today, DC.gov (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning6pm-today; Mayor Bowser Issues

Guardsmen "streamed into the region" in the days after January 6 and leading up to the Inauguration on January 20, 2021.[4]  Moreover, ongoing security measures taken in anticipation of follow-up protests continue to keep the events of January 6 fresh in the minds of D.C. residents.[5]  Not only did the events of January 6 widely and directly affect D.C. residents, but they obviously did so more than people outside the District.

Beyond the fact that the events of January 6 specifically affected D.C. residents directly, it must also be noted that more than 92 percent of D.C. voters cast their ballots for Joseph Biden in the 2020 presidential election.[6]  Even the most charitable interpretation of the events of January 6 is that they involved a protest against having Mr. Biden certified as President, and it cannot be credibly claimed that they are not widely regarded as involving an actual attempt to prevent him from being certified as President.  Moreover, Mr. Bledsoe in particular is specifically charged with "corruptly obstruct[ing] , influenc[ing], and imped[ing]" the very congressional hearing in which the certification of Mr. Biden as President was actively occurring.  In short, the government is prosecuting Mr. Bledsoe upon allegations that he corruptly interfered with certifying as President the very candidate that D.C. voters overwhelmingly supported.  Thus, the charges against Mr. Bledsoe frame his conduct in such a

---

Mayor's Order Extending Today's Public Emergency for 15 Days, DC.gov (Jan 6, 2021), https://mayor.dc.gov/release/mayor-bowser-issues-mayor's-order-extending-today%E2%80%99spublic-emergency-15-days-a1; Jane Recker, DC Mayor Says Americans Should Not Come to Washington for the Inauguration, Washingtonian (Jan. 11, 2021), https://www.washingtonian.com /2021/01/11/dc-mayor-says-americansshould-not-come-to-washington-for-the-inauguration/.
[4] Ellen Mitchell, Army: Up to 25,000 National Guard in DC for Biden inauguration, The Hill (Jan. 15, 2021), https://thehill.com/policy/defense/534497-army-up-to-25000-national-guard-in-dc-for-biden-inauguration.
[5] Colleen Long et al., In Edgy Washington, Police Outnumber Jan. 6 Protesters, U.S. News (Sept. 18, 2021), https://www.usnews.com/news/politics/articles/2021-09-18/police-say-theyre-ready-for-rallysupporting-jan-6-rioters ("In a city still on edge after the Jan. 6 insurrection, law enforcement bore down in large numbers on the Capitol on Saturday over concerns that a rally in support of the jailed rioters would turn violent."); Billy House and Chris Strohm, Jan. 6 Anniversary Will Bring Heightened Security to Capitol, Bloomberg (Jan. 3, 2022), https://www.bloomberg.com/news/articles /2022-01-03/jan-6-anniversary-will-bring-heightened-security-to-capitol (reporting that "Capitol Police, federal and local agencies are beefing up security at the U.S. Capitol complex ahead of this week's anniversary of the Jan. 6 insurrection," and "added police power will be significant and visible").
[6] General Election 2020: Certified Results, D.C. Bd. of Elections (Dec. 2, 2020), https://electionresults .dcboe.org/election_results/2020-General-Election.

way that the overwhelming majority of people who will in the jury pool if his trial is held here will see as a direct affront to their political rights.

Given the above, "the size and [the] characteristics of the community" lends strong support for a presumption that a jury drawn from the residents of D.C. will be prejudiced against Mr. Bledsoe.

### B. Media Coverage

In Skilling, the Court noted that a presumption of prejudice could be found where there is media coverage that "readers or viewers could not reasonably be expected to shut from sight" once they become jurors. 561 U.S. at 382. Here, the media coverage has been such that jurors drawn from the residents of D.C. will likely view Mr. Bledsoe as being guilty of the charges against him because of that media coverage—and not based on a fair evaluation of the evidence.

It cannot be credibly denied that the media coverage of January 6 has been extensive. Moreover, it cannot be credible denied that it has been largely negative in tone. Indeed, the events of January 6 have been ascribed a once-in-a-generation infamy in media coverage and, indeed, in public discourse. For instance, in connection with the one-year anniversary observance of January 6, it was reported in the Washington Post:

> [Vice President Kamala Harris] compared the Jan. 6 insurrection to two other dates when the United States came under attack: Dec. 7, 1941, when the Japanese bombed Pearl Harbor and Sept. 11, 2001, when terrorists turned commercial airplanes into missiles and attacked the World Trade Center and the Pentagon
>
> "Certain dates echo throughout history, including dates that instantly remind all who have lived through them where they were and what they were doing when our democracy came under assault," Harris said. "Dates that occupy not only a place on our calendars but a place in our collective memory."[7]

---

[7] Annie Linskey, Biden goes after Trump for lies and self-aggrandizement in Jan. 6 insurrection anniversary speech, WashingtonPost.com (Jan. 6, 2022), https://www.washingtonpost.com/politics /biden-goes-after-trump-for-lies-and-self-aggrandizement-in-jan-6-insurrection-anniversaryspeech/2022/01/06/fdb39c14-6eff-11ec-aaa8-35d1865a6977_story.html.

The Washington Times also carried Vice President Harris' statement.[8]  The Vice President was hardly the first compare draw such historical parallels.[9]  Moreover, while even persons outside of D.C. have also been exposed to media coverage of January 6, the fact remains that the events of January 6 directly affected the residents of D.C. more than others.  See supra at 5-7.  Accordingly, the media coverage of those events has had more relevance for them than for others.

That the media coverage of the events of January 6 has particularly affected the residents of D.C. is borne out in a survey commissioned by the Federal Public Defender.  Exhibit, Survey by Select Litigation (Survey).  The Survey compares answers given to pertinent questions by D.C. residents with the answers given to those same questions by persons residing in the Northern District of Georgia, which includes the Atlanta metropolitan area and therefore has some similar urban demographics to D.C.  Id. at 1.  Also, it compares answers given to pertinent questions by D.C. residents with answers given by persons on the national level.  Id. at 4.  Based on what the Survey found, D.C. residents are overwhelmingly likely to automatically assume that persons charged in connection with the events of January 6 are guilty as a general matter.  Moreover, they appear to be unusually predisposed to such judgement.  According to the Survey, residents of both this District and the Northern District of Georgia were asked for their "[o]pinion of whether people arrested for Jan 6 activities are guilty or not guilty of the charges brought against them."  Survey at 7.  Among the Georgia respondents, 54 percent answered, "Guilty," 10 percent said, "Not guilty," and the remaining 36 responded, "Depends" or "Don't

---

[8] Valerie Richardson, Republicans accuse Democrats, media of exploiting Jan. 6 riot, WashingtonTimes.com (Jan. 6, 2022), https://www.washingtontimes.com/news/2022/jan/6 /republicans-accuse-democrats-media-exploiting-jan-/.
[9] See, e.g., David Mastio, After ousting Liz Cheney, Republicans prove they're a bigger threat than 9/11 hijackers, USA Today (May 13, 2021), https://www.usatoday.com/story/opinion/voices/2021 /05/13/jan-6th-insurrection-greater-danger-democracy-than-9-11-column/5057119001/ ("As surely as the terrorists of 9/11 wanted to tear down American democracy in 2001, the terrorists of Jan. 6 want to tear down our democracy…. Yes, 9/11 cost many more lives than Jan. 6 has so far, but comparing the two attacks is reasonable because the Big Lie is more dangerous to our way of life than the 2001 terrorists' medieval ideology ever was.").

know/refused." Id.  Respondents in the District, however, were significantly more convinced of the January 6 defendants' guilt and much less ambivalent in their answers: 71 percent said, "Guilty," just 3 percent said "Not guilty," and only 26 percent responded, "Depends" or "Don't know/refused." Id.

While D.C. residents are overwhelmingly likely to automatically assume that January 6 defendants are guilty as a general matter, they are even more overwhelmingly likely to automatically assume that those defendants who entered the Capitol had sinister motives for doing so.  In this, too, D.C. residents appears to be overly harsh in comparison with others.  According to the Survey, 63 percent of national respondents said they would describe the actions of "people who forced their way into the U.S. Capitol on January 6, 2021" with the phrase, "Trying to overturn the election and keep Donald Trump in Power."  Survey at 4-5.  However, far more D.C. residents—85 percent—said the same.  Id.  Also, only 54 percent national respondents indicated that the phrase, "Trying to overthrow the US government," correctly characterized the conduct of these persons—while 72 percent of D.C. respondents found that phrase applicable.  Id.

The fact that D.C. residents are overwhelmingly likely to automatically assume that January 6 defendants are guilty as a general matter already makes it unlikely that a jury that will not be prejudiced against Mr. Bledsoe can be empaneled here.  However, the fact that D.C. residents are even more overwhelmingly likely to automatically assume that January 6 defendants who entered the Capitol had sinister motives for doing so makes it even that much more unlikely.  This is because, given the evidence in this case, the disputes at trial will likely focus not on whether Mr. Bledsoe entered the Capitol but rather on what his mental state was at the time he did so.  Importantly, in connection with the main count against Mr. Bledsoe (the felony obstruction-of-an-official-proceeding count), the contested issue will likely be whether Mr. Bledsoe entered the Capitol with the intent to obstruct the counting of the Electoral College

votes. Thus, the chief disputes at trial will revolve around the mens rea element of the charges at issue—an element that, "[e]xcept in extraordinary circumstances, …cannot be proved by direct evidence" and must be inferred from circumstantial evidence. United States v. Haldeman, 559 F.2d 31, 115 (D.C. Cir. 1976). Given this and especially given that D.C. residents are overwhelming likely to automatically assume that January 6 defendants who entered the Capitol had a sinister motive for doing so, a defense based on lack of intent seems particularly unlikely to be evaluated fairly by a jury drawn from their ranks.

Given the above, it is submitted that a jury drawn from D.C. residents for Mr. Bledsoe's trial will be comprised of persons who cannot "reasonably be expected to shut from sight" what they have read and seen in the media when evaluating the evidence in this case Skilling, 561 U.S. at 382. Thus, the pervasiveness and tenor of media coverage of the events of January 6 weigh heavily in favor of presuming that a jury drawn from the ranks of D.C. residents will be prejudiced against Mr. Bledsoe. In short, this is a case in which "a pattern of bitter prejudice throughout the community . . . render[s] the voir dire an unsatisfactory device for selection of an impartial jury." United States v. Ehrlichman, 546 F.2d 910, 916 n.8 (D.C. Cir. 1976). Given this and given that it appears the same obstacles to finding an impartial jury will not be as pronounced elsewhere, the venue for Mr. Bledsoe's trial should be transferred to another district.

### C.      The Passage of Time

In Skilling, the Supreme Court noted that the argument for presuming that a jury will prejudiced against a defendant due to media coverage was weakened by the passage of time: "[O]ver four years elapsed between Enron's bankruptcy and Skilling's trial. Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse." 561 U.S. at 383. In Mr. Bledsoe's case, however, the trial is scheduled to start only one and a half years after the events

at issue, and the reckoning over those events continues to generate front-page news. The investigation and actions of a House Select Committee regularly feature prominently in print, television, and internet media. Moreover, news coverage of January 6 is still common-place. Indeed, the media continues to produce new content about January 6, including documentaries by several major media companies.[10] Thus, if "the decibel level of media attention" is "diminish[ing]" at all, see Skilling, 561 U.S. at 383, it is doing so very slowly, and there is no indication that the passage of time has yet meaningfully mitigated the prejudice in this District that would make it unlikely for Mr. Bledsoe to receive a fair trial here.

### D. Summary

For all the reasons discussed above, the Court should presume that a jury drawn from the residents of the District of Columbia will be especially prejudiced against Mr. Bledsoe. This is a case where "voir dire [would be] an unsatisfactory device for selection of an impartial jury." Ehrlichman, 546 F.2d at 916 n.8. Since a presumption of prejudice is warranted here, the trial of Mr. Bledsoe must be transferred to another district to comply with Rule 21 and the Fifth and Sixth Amendments' guarantees of due process and a fair trial by an impartial jury.

## II. IF THE COURT DENIES TRANSFER OF VENUE, THEN EXPANDED EXAMINATION OF PROSPECTIVE JURORS BEFORE AND DURING FORMAL VOIR DIRE IS REQUIRED TO MIIGATE ACTUAL PREJUDICE

If the Court concludes that prejudice should not be presumed at this point and thus that there is not currently sufficient grounds for transferring Mr. Bledsoe's trial to another venue, then the Court must at least allow for an expanded examination of prospective jurors in order to insure that Mr. Bledsoe receives a fair trial. See Haldeman, 559 F.2d at 63 ("[I]f an impartial

---

[10] See, e.g., Four Hours at the Capitol (HBO 2021), https://www.hbo.com/documentaries/four-hoursat-the-capitol; 24 Hours: Assault on the Capitol (ABC News 2021), https://www.hulu.com/series/24- hours-assault-on-the-capitol; Day of Rage (N.Y. Times 2021), https://www.nytimes.com/video/us /politics/100000007606996/capitol-riot-trump-supporters.html.

jury actually cannot be selected, that fact should become evident at the voir dire."). On this point, it is important to note that, in <u>Skilling</u>, although the Supreme Court did not find presumed prejudice, it acknowledged that "the widespread community impact [of the alleged conduct] necessitated careful identification and inspection of prospective jurors' connections to Enron," and noted approvingly that the district court's "extensive screening questionnaire and follow-up voir dire were well suited to that task." 561 U.S. at 384.

      Views prejudicial to Mr. Bledsoe's defense are so widespread among the residents of D.C. that empaneling an impartial jury for his trial from their ranks might not be possible. It bears repeating here that, in the survey commissioned by the Federal Public Defender, 71 percent of D.C. respondents indicated that they believe that January 6 defendants are guilty of the charges against them and 85 percent of those respondents believe that those defendants who entered the Capitol did so with the evil intent to overturn the election results. <u>See</u> <u>supra</u> at 9. However, if it is even possible to empanel an impartial jury for Mr. Bledsoe's trial in the District of Columbia, such a jury can only be identified through expanded examination that allows the parties a thorough opportunity to explore individual prejudices. To accomplish this, Mr. Bledsoe therefore requests of the Court:

    (1) that the defense be allowed to prepare a questionnaire that, after review and approval by the Court, would be distributed to summoned prospective jurors to return before trial;

    (2) that the parties be present for any pre-screening questioning of prospective jurors that the Court conducts before the beginning of formal voir dire; and

    (3) that the parties be permitted to question jurors individually during voir dire.

## **CONCLUSION**

For the foregoing reasons, Mr. Bledsoe respectfully moves the Court to transfer these proceedings to another district or, in the alternative, to allow expanded questioning of prospective jurors as set out above.

Respectfully submitted,

\_\_\_\_/s/_____
Jerry Ray Smith, Jr.
D.C. Bar No. 448699
Counsel for Matthew Bledsoe
717 D Street, N.W., Suite 310
Washington, DC 20004
E-mail: jerryraysmith@verizon.net
Phone: (202) 347-6101