# Exhibit A

# Filed Under Seal

# Exhibit B

Facebook

Sign Up

Email or phone

Password

Log In

Forgot account?

Our Data Policy is changing. You can view our new Data Policy here.

 > What kinds of information do we collect?

 > How do we use this information?

 > How is this information shared?

 > How can I manage or delete information about me?

 > How do we respond to legal requests or prevent harm?

 > How our global services operate

 > How will we notify you of changes to this policy?

 > How to contact Facebook with questions

Facebook Ads Controls

Privacy Basics

Cookies Policy

Terms

More Resources

- View the complete Data Policy
- Interactive Tools
- Minors and Safety
- Facebook Privacy Page
- Facebook Safety Page
- Facebook Site Governance Page

# Data Policy

We give you the power to share as part of our mission to make the world more open and connected. This policy describes what information we collect and how it is used and shared. You can find additional tools and information at Privacy Basics.

As you review our policy, keep in mind that it applies to all Facebook brands, products and services that do not have a separate privacy policy or that link to this policy, which we call the "Facebook Services" or "Services."



Return to top

# What kinds of information do we collect?

Depending on which Services you use, we collect different kinds of information from or about you.

**Things you do and information you provide.**

- EU-U.S. Privacy Shield and Swiss-U.S.
  Privacy Shield Notice

We collect the content and other information you provide when you use
our Services, including when you sign up for an account, create or share,
and message or communicate with others. This can include information
in or about the content you provide, such as the location of a photo or
the date a file was created. We also collect information about how you
use our Services, such as the types of content you view or engage with or
the frequency and duration of your activities.

**Things others do and information they provide.**
We also collect content and information that other people provide when
they use our Services, including information about you, such as when
they share a photo of you, send a message to you, or upload, sync or
import your contact information.

**Your networks and connections.**
We collect information about the people and groups you are connected
to and how you interact with them, such as the people you communicate
with the most or the groups you like to share with. We also collect
contact information you provide if you upload, sync or import this
information (such as an address book) from a device.

**Information about payments.**
If you use our Services for purchases or financial transactions (like when
you buy something on Facebook, make a purchase in a game, or make a
donation), we collect information about the purchase or transaction. This
includes your payment information, such as your credit or debit card
number and other card information, and other account and
authentication information, as well as billing, shipping and contact details.

**Device information.**
We collect information from or about the computers, phones, or other
devices where you install or access our Services, depending on the
permissions you've granted. We may associate the information we collect
from your different devices, which helps us provide consistent Services
across your devices. Here are some examples of the device information
we collect:

- Attributes such as the operating system, hardware version, device
  settings, file and software names and types, battery and signal strength,
  and device identifiers.

- Device locations, including specific geographic locations, such as
  through GPS, Bluetooth, or WiFi signals.

- Connection information such as the name of your mobile operator or
  ISP, browser type, language and time zone, mobile phone number and
  IP address.

**Information from websites and apps that use our Services.**
We collect information when you visit or use third-party websites and
apps that use our Services (like when they offer our Like button or
Facebook Log In or use our measurement and advertising services). This
includes information about the websites and apps you visit, your use of
our Services on those websites and apps, as well as information the
developer or publisher of the app or website provides to you or us.

**Information from third-party partners.**
We receive information about you and your activities on and off

We receive information about you and your activities on and off
Facebook from third-party partners, such as information from a partner
when we jointly offer services or from an advertiser about your
experiences or interactions with them.

**Facebook companies.**
We receive information about you from companies that are owned or
operated by Facebook, in accordance with their terms and policies. Learn
more about these companies and their privacy policies.

Return to top

# How do we use this information?

We are passionate about creating engaging and customized experiences for people.
We use all of the information we have to help us provide and support our Services.
Here's how:

**Provide, improve and develop Services.**
We are able to deliver our Services, personalize content, and make
suggestions for you by using this information to understand how you use
and interact with our Services and the people or things you're connected
to and interested in on and off our Services.

We also use information we have to provide shortcuts and suggestions to
you. For example, we are able to suggest that your friend tag you in a
picture by comparing your friend's pictures to information we've put
together from your profile pictures and the other photos in which you've
been tagged. If this feature is enabled for you, you can control whether
we suggest that another user tag you in a photo using the "Timeline and
Tagging" settings.

When we have location information, we use it to tailor our Services for
you and others, like helping you to check-in and find local events or offers
in your area or tell your friends that you are nearby.

We conduct surveys and research, test features in development, and
analyze the information we have to evaluate and improve products and
services, develop new products or features, and conduct audits and
troubleshooting activities.

**Communicate with you.**
We use your information to send you marketing communications,
communicate with you about our Services and let you know about our
policies and terms. We also use your information to respond to you when
you contact us.

**Show and measure ads and services.**
We use the information we have to improve our advertising and
measurement systems so we can show you relevant ads on and off our
Services and measure the effectiveness and reach of ads and services.

Learn more about advertising on our Services and how you can control how information about you is used to personalize the ads you see.

**Promote safety and security.**
We use the information we have to help verify accounts and activity, and to promote safety and security on and off of our Services, such as by investigating suspicious activity or violations of our terms or policies. We work hard to protect your account using teams of engineers, automated systems, and advanced technology such as encryption and machine learning. We also offer easy-to-use security tools that add an extra layer of security to your account. For more information about promoting safety on Facebook, visit the Facebook Security Help Center.

We use cookies and similar technologies to provide and support our Services and each of the uses outlined and described in this section of our policy. Read our Cookie Policy to learn more.

Return to top

# How is this information shared?

**Sharing On Our Services**
People use our Services to connect and share with others. We make this possible by sharing your information in the following ways:

**People you share and communicate with.**
When you share and communicate using our Services, you choose the audience who can see what you share. For example, when you post on Facebook, you select the audience for the post, such as a customized group of individuals, all of your Friends, or members of a Group. Likewise, when you use Messenger, you also choose the people you send photos to or message.

Public information is any information you share with a public audience, as well as information in your Public Profile, or content you share on a Facebook Page or another public forum. Public information is available to anyone on or off our Services and can be seen or accessed through online search engines, APIs, and offline media, such as on TV.

In some cases, people you share and communicate with may download or re-share this content with others on and off our Services. When you comment on another person's post or like their content on Facebook, that person decides the audience who can see your comment or like. If their audience is public, your comment will also be public.

**People that see content others share about you.**
Other people may use our Services to share content about you with the audience they choose. For example, people may share a photo of you, mention or tag you at a location in a post, or share information about you that you shared with them. If you have concerns with someone's post, social reporting is a way for people to quickly and easily ask for help from someone they trust. Learn More.

**Apps, websites and third-party integrations on or using our Services.**
When you use third-party apps, websites or other services that use, or
are integrated with, our Services, they may receive information about
what you post or share. For example, when you play a game with your
Facebook friends or use the Facebook Comment or Share button on a
website, the game developer or website may get information about your
activities in the game or receive a comment or link that you share from
their website on Facebook. In addition, when you download or use such
third-party services, they can access your Public Profile, which includes
your username or user ID, your age range and country/language, your list
of friends, as well as any information that you share with them.
Information collected by these apps, websites or integrated services is
subject to their own terms and policies.

Learn more about how you can control the information about you that
you or others share with these apps and websites.

**Sharing within Facebook companies.**
We share information we have about you within the family of companies
that are part of Facebook. Learn more about our companies.

**New owner.**
If the ownership or control of all or part of our Services or their assets
changes, we may transfer your information to the new owner.

**Sharing With Third-Party Partners and Customers**
We work with third party companies who help us provide and improve our Services
or who use advertising or related products, which makes it possible to operate our
companies and provide free services to people around the world.

Here are the types of third parties we can share information with about you:

**Advertising, Measurement and Analytics Services (Non-Personally
Identifiable Information Only).**
We want our advertising to be as relevant and interesting as the other
information you find on our Services. With this in mind, we use all of the
information we have about you to show you relevant ads. We do not
share information that personally identifies you (personally identifiable
information is information like name or email address that can by itself be
used to contact you or identifies who you are) with advertising,
measurement or analytics partners unless you give us permission. We
may provide these partners with information about the reach and
effectiveness of their advertising without providing information that
personally identifies you, or if we have aggregated the information so that
it does not personally identify you. For example, we may tell an advertiser
how its ads performed, or how many people viewed their ads or installed
an app after seeing an ad, or provide non-personally identifying
demographic information (such as 25 year old female, in Madrid, who
likes software engineering) to these partners to help them understand
their audience or customers, but only after the advertiser has agreed to
abide by our advertiser guidelines.

Please review your advertising preferences to understand why you're
seeing a particular ad on Facebook. You can adjust your ad preferences if
you want to control and manage your ad experience on Facebook.

**Vendors, service providers and other partners.**
We transfer information to vendors, service providers, and other partners who globally support our business, such as providing technical infrastructure services, analyzing how our Services are used, measuring the effectiveness of ads and services, providing customer service, facilitating payments, or conducting academic research and surveys. These partners must adhere to strict confidentiality obligations in a way that is consistent with this Data Policy and the agreements we enter into with them.

Return to top

# How can I manage or delete information about me?

You can manage the content and information you share when you use Facebook through the Activity Log tool. You can also download information associated with your Facebook account through our Download Your Information tool.

We store data for as long as it is necessary to provide products and services to you and others, including those described above. Information associated with your account will be kept until your account is deleted, unless we no longer need the data to provide products and services.

You can delete your account any time. When you delete your account, we delete things you have posted, such as your photos and status updates. If you do not want to delete your account, but want to temporarily stop using Facebook, you may deactivate your account instead. To learn more about deactivating or deleting your account, click here. Keep in mind that information that others have shared about you is not part of your account and will not be deleted when you delete your account.

 Return to top

# How do we respond to legal requests or prevent harm?

We may access, preserve and share your information in response to a legal request (like a search warrant, court order or subpoena) if we have a good faith belief that the law requires us to do so. This may include responding to legal requests from jurisdictions outside of the United States where we have a good faith belief that the response is required by law in that jurisdiction, affects users in that jurisdiction, and is consistent with internationally recognized standards. We may also access,

preserve and share information when we have a good faith belief it is necessary to: detect, prevent and address fraud and other illegal activity; to protect ourselves, you and others, including as part of investigations; or to prevent death or imminent bodily harm. For example, we may provide information to third-party partners about the reliability of your account to prevent fraud and abuse on and off of our Services. Information we receive about you, including financial transaction data related to purchases made with Facebook, may be accessed, processed and retained for an extended period of time when it is the subject of a legal request or obligation, governmental investigation, or investigations concerning possible violations of our terms or policies, or otherwise to prevent harm. We also may retain information from accounts disabled for violations of our terms for at least a year to prevent repeat abuse or other violations of our terms.

 Return to top

## How our global services operate

Facebook may share information internally within our family of companies or with third parties for purposes described in this policy. Information collected within the European Economic Area ("EEA") may, for example, be transferred to countries outside of the EEA for the purposes as described in this policy. We utilize standard contract clauses approved by the European Commission, adopt other means under European Union law, and obtain your consent to legitimize data transfers from the EEA to the United States and other countries.

You can contact us using the information provided below with questions or concerns. We also may resolve disputes you have with us in connection with our privacy policies and practices through TRUSTe. You can contact TRUSTe through their website.

 Return to top

## How will we notify you of changes to this policy?

We'll notify you before we make changes to this policy and give you the opportunity to review and comment on the revised policy before continuing to use our Services.

 Return to top

## How to contact Facebook with

# questions

To learn more about how privacy works on Facebook, please check out Privacy Basics. If you have questions about this policy, here's how you can reach us:

---

If you live in the US or Canada…

Please contact Facebook, Inc. online or by mail at:

**Facebook, Inc.**
**1601 Willow Road**
**Menlo Park, CA 94025**

---

If you live anywhere else…

The data controller responsible for your information is Facebook Ireland Ltd., which you can contact online or by mail at:

**Facebook Ireland Ltd.**
**4 Grand Canal Square**
**Grand Canal Harbour**
**Dublin 2 Ireland**

---

Date of Last Revision: September 29, 2016

English (US)   Español   Français (France)   中文(简体)   العربية   Português (Brasil)   Italiano   한국어   Deutsch   हिन्दी   日本語

Sign Up    Log In    Messenger    Facebook Lite    Watch    Places    Games    Marketplace    Facebook Pay    Oculus    Portal    Instagram    Bulletin    Local
Fundraisers    Services    Voting Information Center    Groups    About    Create Ad    Create Page    Developers    Careers    Privacy    Cookies    Ad choices    Terms
Help

Meta © 2022

# Exhibit C

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
Western District of Tennessee

In the Matter of the Search of ⟩
*(Briefly describe the property to be searched* ⟩
*or identify the person by name and address)* ⟩ Case No.   21-SW-019
⟩
⟩

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____Western_____ District of _____Tennessee_____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1752 (a)(1)-(2) | Knowingly Entering or Remaining in any Restricted Building w/o Lawful Authority |
| 40 USC  5104(e)(2)(D),(G) | Violent Entry and Disorderly Conduct on Capitol Grounds |

The application is based on these facts:

SEE Attached AFFIDAVIT OF FBI TFO KENNETH HALE

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

KENNETH HALE, FBI TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Telephone and Internet_____ *(specify reliable electronic means)*

Date: ___January 14, 2021___

*Judge's signature*

City and state:  MEMPHIS, TN                    TU M. PHAM, CHIEF U.S. MAGISTRATE JUDGE
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Western District of Tennessee

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>█████████████████████████ | )<br>)<br>)<br>)<br>)<br>) |

Case No.  21-SW-019

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Western _____ District of _____ Tennessee _____
*(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A which is attached hereto and fully incorporated herein by reference

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B which is attached hereto and fully incorporated herein by reference

**YOU ARE COMMANDED** to execute this warrant on or before _1/28/2021_ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Tu M. Pham _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      January 14, 2021   1:30 pm                                              _____
                                                                                                                           *Judge's signature*

City and state:      Memphis, TN                                          TU M. PHAM,  Chief U.S. Magistrate Judge
                                                                                                      *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  21-SW-019 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

**IN THE MATTER OF THE SEARCH OF:**

████████████████████████████
████████████████████████████

Case No.   21-SW-019

### STATEMENT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, **Kenneth Hale**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as █████████████ ███████████████ ("**PREMISES**"), further described in Attachment A, for the things described in Attachment B.

2.      I am a federal deputized Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI"), and I have been a TFO since May 2019.  Between November 2003 and May 2019, I served as an officer and detective with the Memphis Police Department.  My training and experiences include the preparation of numerous criminal affidavits. I am currently assigned to the Joint Terrorism Task Force ("JTTF") of the FBI Field Office, in Memphis, Tennessee. As a TFO, I have been involved in investigations of both international and domestic terrorism. During the course of these investigations, I have conducted or participated in physical and electronic

surveillance, assisted in the execution of search warrants, debriefed informants, and reviewed other pertinent records. Through my training, education, and experience, I have become familiar with the efforts of persons involved in criminal activity to avoid detection by law enforcement.

3.     I am familiar with the facts and circumstances of this investigation, both from my own investigative activities and from information obtained from other law-enforcement officers and others with personal knowledge of the facts set forth in this affidavit. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this Affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1752(a), Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, and 40 U.S.C. §5104(e)(2), Violent Entry and Disorderly Conduct on Capitol Grounds, have been committed by Mathew Bledsoe ("Bledsoe"). As explained below, there is also probable cause to search the **PREMISES**, described in Attachment A, for evidence of these crimes, instrumentalities of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5.     The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

6.     On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

2

7.      On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Vice President Mike Pence was presiding in the Senate chamber.

8.      With the joint session underway and with Vice President Mike Pence presiding, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades surround the exterior of the U.S. Capitol Building. U.S. Capitol police were present and attempting to keep the crowd away from the Capitol buildings and the proceedings underway inside.

9.      At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building. At such time, the joint session was still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol. Shortly after 2:00 p.m., however, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows.

10.     Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and the United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m.

3

Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

11.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

12.     During the investigation into the events at the U.S. Capitol, FBI Agents received a tip that Matthew Bledsoe had been part of the group that illegally entered the U.S. Capitol.  Upon following up, they received a video compilation that was posted to his Instagram account—theessentialmattbledsoe—which included several selfie photographs of Mr. Bledsoe throughout the day and some videos clips. These images appear to be captured by Mr. Bledsoe on a mobile device.

13.     A video compilation posted on theessentialmattbledsoe Instagram account shows the crowd approaching the U.S. Capitol building.  Another photo in the same video shows people climbing the walls of the building; it appears the person who took that photograph was located on top of the wall.  This is followed by a selfie of an individual who appears to be Bledsoe, wearing a baseball hat with the words "TRUMP 2020."  All of these photographs appear to be from a mobile device.



14.        The compilation video on Bledsoe's Instagram account contains a clip of Mr. Bledsoe and

his companions immediately outside an exterior door of the Capitol.  An alarm can be heard blaring in the

background.  His companion says, "We're going in!"  Mr. Bledsoe turns the camera from what appears to

be a mobile device so that the camera shows the door, and he then says, "In the Capitol.  This is our house.

We pay for this shit.  Where's those pieces of shit at?"  As Mr. Bledsoe is walking and talking with what

appears to be a mobile device, he continues to videotape while passing through the outer door and into the

hallway.  The two screenshots below show Mr. Bledsoe prior to entry.

 

15.     The following two photographs show him after entry into the U.S. Capitol:

 

16.     The video ends with another video clip captured by a person out of view of the camera where the crowd is chanting, "Stop the steal! Stop the steal!," as they march through the halls of the Capitol.

17.     The FBI also received a screenshot of "theessentialmattbledsoe" Instagram home page from a confidential source who knows Bledsoe and who identified the Instagram account as belonging to Bledsoe. A copy of the screenshot of is below.



18.     Mr. Bledsoe's identity was also checked against his driver's license photo, which shows

him to be the same person shown in the video and photos above:



7

19.     The source also led agents to a post by "Shea Bledsoe," who is Mr. Bledsoe's wife, in which Mrs. Bledsoe tags BLEDSOE's Facebook page.  In the Facebook posting, Shea Bledsoe states, "Matt was inside the Capitol, he was one of the first."



20.     In addition, the FBI received a screenshot of Bledsoe's Facebook page, from a confidential source who knows Matt Bledsoe and who identified the Facebook account as belonging to Matthew Bledsoe.  The screenshot has the same picture and self-description as "Father, Husband, Patriot, Business Owner, #MemphisTn #thiccboybiekclub" as Bledsoe's Instagram account.  A copy of the screenshot is below:

8



**Matt Bledsoe**

Father, Husband, Patriot, Business Owner,
#MemphisTn #thicccboybikeclub



Owner and Founder at **Primetime Movers**

21.    In addition, Mrs. Bledsoe previously posted the image below of a firearm on her

Instagram account raisingbledsoes:



9

22.     Since the above facts were obtained, all social media belonging to Matthew and Shea Bledsoe have been deleted.

23.     On January 13, 2021, the FBI observed a dark-colored Ford F-250 parked in the drive-way of the residence located at the PREMISES.  Based on FBI database checks, Bledsoe is the registered owner of a Ford F-250.  The vehicle was backed into the drive-way so that a license tag could not be observed.

24.     During the investigation, the FBI searched law-enforcement databases, which revealed that Matthew Bledsoe's physical address is the same as the PREMISES.

## TECHNICAL TERMS

25.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

10

b. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c. Storage medium: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

26.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the **PREMISES**, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media, including cell phones. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

27.     *Probable cause.*  I submit that if a computer or storage medium, including a cell phone, is found on the **PREMISES**, there is probable cause to believe that records related to Bledsoe's commission of the above-described offenses, and thus records that are evidence of these crimes, described in this statement will be stored on those electronic devices, for at least the following reasons:

1. Individuals who engage in criminal activity, including violations of 18 U.S.C. § 1752(a) (Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority) and 40 U.S.C. §5104(e)(2) (Violent Entry and Disorderly Conduct on Capitol

11

Grounds), use digital devices, like cell phones or computers, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like cell phones or computers, documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; social media posting information; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation. I also know that individuals who are involved in criminal conduct similar to what is described herein often use electronic devices, cellular phones and computers to record activity and also to post recordings to social media. Individuals engaging in the conduct described herein usually keep their electronic devices close to their person or stored in their residence.

    a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.

12

Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

28. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files and/or mobile cellular data that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that

13

establishes how such devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **PREMISES** because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet

14

history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline

15

information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing

16

is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.   I know that when an individual uses a computer to send or post messages over the Internet, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.   The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

29.     *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

17

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

18

30.   *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying digital devices and storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

31.   I know from my training and experience, as well as from information found in publicly available materials, including those published by Apple, that some models of Apple devices, such as iPhones and iPads, offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password.  This feature is called Touch ID.  Some models also allow users to unlock their devices by allowing the device to capture an image of the user's face.  The device then uses facial recognition software to unlock the device in lieu of a numeric or alphanumeric passcode or password.  This feature is called Facial Recognition.

32.   If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device.  In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way

19

to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

33.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

34.     The passcode or password that would unlock a target device is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user of the Apple iPhone to the device's Touch ID sensor, or to point the device's camera at Bledsoe's face, to activate Facial Recognition in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the target device in this manner is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

35.     It is likely that Bledsoe is the user of the target device and thus that his fingerprints are among those that are able to unlock the device via Touch ID. Additionally, it is likely that Bledsoe's face would be able to unlock the device using Facial Recognition.

20

36.     Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience, I know that it is common for a user to unlock a Touch ID-enabled Apple device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the Subject Device as described above within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

37.     Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of Bledsoe to the Touch ID sensor of the device for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

38.     Because several people may share the **PREMISES** as a residence, it is possible that the **PREMISES** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

39.     Because electronic evidence can be accessed, destroyed, altered or manipulated remotely and without notice or indication of being accessed, authorization to execute this warrant as to any digital devices or other storage media recovered from the **PREMISES** at any time of the day or night is requested.

21

## **CONCLUSION**

40.    I submit that this affidavit supports probable cause for a warrant to search the

**PREMISES** described in Attachment A and seize the items described in Attachment B.


AND FURTHER, AFFIANT SAITH NOT.

_____
Kenneth Hale
Task Force Officer
Federal Bureau of Investigation


Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 on January 14, 2021.

_____
TU M. PHAM
CHIEF UNITED STATES MAGISTRATE JUDGE
WESTERN DISTRICT OF TENNESSEE

22

## ATTACHMENT A



The property to be searched is █████████████████████████
**("PREMISES")**, including any outbuildings, appurtenances, storage areas, and vehicles found within the curtilage thereon.

23

## **ATTACHMENT B**

*Property to be seized*

The items to be seized are fruits, evidence, or instrumentalities of and relating to violations of 18 U.S.C. § 1752(a), Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority; 40 U.S.C. §5104(e)(2), Violent Entry and Disorderly Conduct on Capitol Grounds:

This includes the following:

1.     Cellular telephones and other mobile devices, including tablets, cameras, mobile video cameras, and other mobile electronic devices.

2.     Clothing worn by Bledsoe on or around January 6, 2021, including a bandana or mask appearing to replicate an American flag, and a baseball hat with the words "TRUMP 2020."

~~3.     Information referring and relating to Bledsoe's state of mind from in and around December 2020 through January 2021, including information concerning violence.~~  T M P

4.     Information referring and relating to the identity and location of perpetrators, aiders and abettors, coconspirators, and accessories after the fact.

5.     Information referring and relating to any travel from in and around December 2020 through January 2021, including plans for travel, expenses, reservations, and other logistics.

6.     Information referring and relating to any photographs and video concerning violence, incitement to riot, civil unrest, and the U.S. Capitol from in and around December 2020 through January 2021.

7.     Information referring and relating to Bledsoe's activities in and around Washington, D.C., in or around January 2021.

24

8.      Information referring and relating to the subject of the investigation and any co-conspirators, and criminal associates.

9.      Information referring and relating to the offenses of 18 U.S.C. § 1752(a), Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, and 40 U.S.C. §5104(e)(2), Violent Entry and Disorderly Conduct on Capitol Grounds.

10.     Information referring and relating to Bledsoe's intentions for traveling to and from Washington, D.C., in or around January 6, 2021.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the search of the PREMISES described in Attachment A, law enforcement personnel are also specifically authorized to obtain from BLEDSOE (but not any other individuals present at the PREMISES at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any Device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s), to

25

include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of:

(a)        any of the Device(s) found at the PREMISES,

(b)        where the Device(s) are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments,

for the purpose of attempting to unlock the Device(s)'s security features in order to search the contents as authorized by this warrant.

While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person(s) state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the Device(s).  Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information.  However, the voluntary disclosure of such information by the aforementioned person(s) is permitted.  To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any Device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

26