## NITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-204-BAH** |
| **MATTHEW BLEDSOE,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Matthew Bledsoe to 70 months' incarceration, three years of supervised release, $2,000 in restitution, a fine, and the mandatory $100 special assessment for each count of conviction.   The guidelines imprisonment range is 70 months to 87 months.

### I.      INTRODUCTION

Matthew Bledsoe participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forcefully interrupted the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, trapped and traumatized people who worked at the Capitol building, and resulted in more than 2.7 million dollars' in losses.[1]

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.   That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police."

On January 6, 2021, Bledsoe marched from former President Trump's "Stop the Steal" rally to the Capitol.   A massive crowd had gathered on the west front of the Capitol by the time Bledsoe arrived on Capitol grounds.   Joining the other rioters who were pushing up and into the building, Bledsoe scaled a wall to access the upper northwest terrace.   He took advantage of other rioters' breach of the senate wing door to enter the Capitol, yelling as he entered, "We in this bitch! In the Capitol!   This is our house!   We pay for this shit!   Where's those pieces of shit at?"

Bledsoe walked through the Capitol Building, joining the mob of rioters in chants.   While in the Crypt, they chanted, "Stop the Steal!" repeatedly.   As the rioters ascended the stairs leading up to the second floor where the House and Senate Chambers are located along with office suites, including Speaker Pelosi's suite, other members of the mob ominously chanted, "Nancy! Nancy! Nancy!"   Bledsoe chose to continue up the stairs rather than turning around to leave.

On the second floor, Bledsoe filmed a selfie-style video in the Rotunda while yelling, "Our House!"   He also paraded around with a Trump flag he obtained and ultimately climbed a statue of President Gerald Ford to plant the flag in its arm.   Bledsoe then walked back past the stairs he had taken from the first to the second floor choosing to stay on the second floor rather than going back to the door through which he had entered.

Despite ample opportunities to leave, Bledsoe continued to wander through the Statuary Hall at a leisurely pace before joining another crowd of rioters that had broken through a police line and flooded towards the House Main Door.   Bledsoe circled the House Chamber, all while members of Congress were trapped inside and unable to evacuate.   Bledsoe remained inside the Capitol for a total of 22 minutes, eventually leaving.   Bledsoe then went back to his truck to charge his cellphone before returning and lingering outside the Columbus doors by the Rotunda.

Bledsoe testified at trial. He made self-serving statements that minimized his participation and conduct in the unprecedented attack on the Capitol. Bledsoe testified that when he entered the Capitol and yelled, "Where are those pieces of shit at?", he was not referring to politicians but simply meant, "…where can we go protest at…". Bledsoe testified that he believed the rioters were permitted to enter the Capitol to protest because he saw police officers standing near the outside of the Senate Wing Door who did not leave their post to prevent the rioters' entry. Bledsoe denied seeing signs of forced entry and hearing an alarm blaring as he crossed the threshold into the Capitol.

Mr. Bledsoe (1) scaled the wall of the Capitol building; (2) entered the Senate Wing Door close in time (within 15 minutes) to the breach; (3) entered the area outside the House Chamber; (4) posted on social media before, during, and after the riot; (5) obstructed justice by misleading the jury under oath; (6) lacked remorse; (7) sought to profit from riot; and (8) was not compliant with conditions of release. The government recommends that the Court sentence Bledsoe to 70 months' incarceration, which is at the low end of the advisory Guidelines' range of 70-87 months, which the government submits is the correct guidelines calculation. A 70-month sentence reflects the gravity of Bledsoe's conduct.[2]

[2] There were three other co-defendants charged in this indictment. Jack Jesse Griffith was sentenced on 10/28/21 to 36 months probation and 90 days of home confinement; $500 restitution for Parading, Demonstrating, or Picketing in a Capitol Building. Eric Chase Torrens was sentenced on 10/29/21 to 36 months probation with 90 days of home confinement; $500 restitution for Parading, Demonstrating, or Picketing in a Capitol Building. Blake Austin Reed was sentenced on 4/14/22 to three years of probation, including 42 days of intermittent confinement, 3 months of home detention, $2,500 fine, $500 restitution for Entering and Remaining in a Restricted Building or Grounds.

## II.     FACTUAL BACKGROUND

### A.     Defendant's Role in the January 6, 2021 Attack on the Capitol

*Approach to the Capitol*

Matthew Bledsoe crimes are documented through selfie-style photographs and videos, CCTV footage from inside the Capitol, open source and third-party videos, social media posts and comments, and text messages.   Bledsoe believed that the election was stolen, and he came to Washington, D.C. to show support for President Trump.   Tr. 7/20/22 @ 61:14-23.   He traveled to the Washington, D.C. area from his home outside of Memphis, Tennessee on January 5, 2021.   Tr. 7/20/22 @ 68:7-14.   The next day, he attended the "Stop the Steal" rally at the Ellipse.   Tr. 7/20/22 @ 68:16—69:8.   His wife kept him apprised of events occurring at the Capitol during the electoral college certification while he was at the rally.





Ex. 2.07

4



Ex. 2.08



Ex. 2.09

After the rally, Bledsoe marched to the U.S. Capitol to "protest."   Tr. 7/20/22 @ 70:1-6.

Bledsoe walked down Pennsylvania Avenue towards the Capitol, arriving on the west front around

2:17 p.m.   He walked through scores of other rioters and past bike rack fences that were

disassembled and pushed aside.



Bledsoe saw rioters standing on a terrace area of the Capitol building.   Tr. 7/20/22 @ 71:7-

11.   People were walking up stairs and others were climbing the wall to reach the terrace.   *Id.*

Bledsoe climbed the wall to access the terrace. *Id.* at 71:15-20.



Ex. 7.01A

After reaching the terrace, Bledsoe snapped a picture and posted it to his social media:

6



Ex. 1.17

From the terrace, Bledsoe walked towards the Senate Wing Door.   There he witnessed a large crowd including other non law enforcement individuals in riot and other protective gear.



Ex. 301 snapshot



Ex. 2.27

The windows and door were smashed and broken open by other rioters at approximately 2:13pm, allowing rioters to pour into the Senate Connecting Corridor.  *See* Ex. 5.01, at 2:54-4:30. Bledsoe proudly announced his presence and purpose as he approached and crossed the threshold into the Capitol: "We in this bitch!   In the Capitol!   This is our house!   We pay for this shit! Where's those pieces of shit at?"   Ex. 2.29.   He ignored signs of forced entry as he entered and disregarded a blaring alarm—among several obvious indicators that rioters were not permitted inside to enter through a fire door with no security screening in the midst of a riot.


Ex. 2.29 (snapshot from video)

Bledsoe entered the Capitol at 2:25 p.m.   Ex. 4.05, 4.05A.   He walked with the mob of rioters toward the Crypt.   In the Small House Rotunda immediately outside the Crypt, they chanted "Stop the Steal", "U.S.A.," and "Whose House, Our House!"   Ex. 3.04 (Bledsoe at 1:54 with hand raised and moving in rhythm with chant); Ex. 4.09A; Ex. 7.02 (Bledsoe at :01 chanting). The mob—including Bledsoe—climbed the stairs.   Here, the rioters' chant turned ominous, as they yelled "Nancy! Nancy! Nancy!".   Ex. 7.02, at :48-1:10 (Bledsoe does not appear to chant). Bledsoe did not turn and leave the building, instead he climbed the stairs and continued into the

second floor with the mob.

Bledsoe made his way to the Rotunda.   Here, he made several laps around the room carrying a Trump flag before climbing a statue and planting it in the statue's arm.



Ex. 4.11, 4.11B

A cloud of chemicals spilled into the Rotunda, and Bledsoe then left in the direction of the stairs he had just come up shortly before.   Rather than leaving through the pathway which which he was familiar, Bledsoe chose instead to continue into Statuary Hall where he leisurely walked around taking photographs.

He then chose to walk further away from the stairs he had come up, joining a crowd of rioters outside the House Chamber.   Bledsoe was within eyesight of the House Chamber Main Door where other rioters were trying to gain access to the House Floor.   Bledsoe walked around the halls around the House Chamber.   *See* Exs. 4.16, 4.17, 4.18.   During this time, Members of the House of Representatives and staff were trapped inside the House Gallery while Bledsoe along

with other mob members obstructed the paths to safety.   *See* Ex. 8.01 (snapshot below).



Bledsoe exited the Capitol at 2:47pm.   Ex. 4.19.

In the aftermath of the riot, Bledsoe bragged that he "stormed the Capitol".

**Author** US Moving Fast (Facebook: 100004248793130)
**Sent** 2021-01-06 23:06:17 UTC
**Body** are you here sir on DC

**Author** Matt Bledsoe (Facebook: 508548968)
**Sent** 2021-01-06 23:23:14 UTC
**Body** I was

**Author** Matt Bledsoe (Facebook: 508548968)
**Sent** 2021-01-06 23:23:24 UTC
**Body** Left about 10 min ago

**Author** US Moving Fast (Facebook: 100004248793130)
**Sent** 2021-01-06 23:49:03 UTC
**Body** how is everything on the Marsh

**Author** US Moving Fast (Facebook: 100004248793130)
**Sent** 2021-01-06 23:49:46 UTC
**Body** how was everything on DC

**Author** Matt Bledsoe (Facebook: 508548968)
**Sent** 2021-01-07 00:06:59 UTC
**Body** Wild

**Author** Matt Bledsoe (Facebook: 508548968)
**Sent** 2021-01-07 00:07:00 UTC
**Body** But fun

**Author** Matt Bledsoe (Facebook: 508548968)
**Sent** 2021-01-07 00:07:05 UTC
**Body** Stormed the capital

Ex. 1.19

12

And he showed a lack of remorse and insensitivity to those victimized by the rioters'—and his own—actions.



Ex. 1.27

| Source | From | To | All timestamps | Content | Deleted |
|---|---|---|---|---|---|
| Native Messages | Matt* (owner) ▓ | David ▓ | **Timestamp:** 1/10/2021 3:50:39 PM(UTC-6)<br><br>**Delivered:** 1/10/2021 3:50:39 PM(UTC-6) | **Direction:** Outgoing<br>**Body:**<br>They are all going to be executed<br><br>Participants:<br><br>Participant   Delivered   Read   Played<br>▓<br>David<br><br>**Source file:** Matt's Iphone/mobile/Library/SMS/sms.db : 0x7297A3D (Table: message, handle, Size: 194748416 bytes)<br>Status: Sent<br>**Message Type:** iMessage | |

Ex. 2.49

### *Defendant's Testimony*

At trial, Bledsoe had little to no recollection of some of the communications he received–or whether he read them—on January 6.   He claimed the "service was kind of spotty that day" and that "[t]hings were coming in, you know, slowly and sporadically …".   Tr. 7/20/22 @ 72:21-

73:1.   He admitted receiving texts from his wife and brother while he was at the rally but said they were unsolicited.   Tr. 7/20/22 @ 73:6-9.   But he claimed that the text messages—if he read them—did not make sense because he did not understand the "whole process", i.e., vote certification.   Tr. 7/20/22 @ 73:2-5.   Bledsoe also discussed the text message he received from "David" asking "You making them evacuate capital [sic] hill?!!", to which Bledsoe replied, "We here".   *See* Ex. 2.17.   Bledsoe claimed he did not really understand the meaning of the text message, but his response "we here" meant "there is just an enormous amount of people."   Tr. 7/20/22 @ 75:3-7.

Bledsoe described walking from the Ellipse down Pennsylvania Avenue towards the Capitol to protest.   When he got up to the Capitol, he did not see any police barricades or police lines or tear gas.   Tr. 7/20/22 @ 70:1-25.   He saw a "sea of people".   Tr. 7/20/22 @ 71:2-5.   He climbed the wall, took a picture, and posted it to his social media with a caption: "Nothing can stop what's coming".   Ex. 1.17.   Bledsoe said the caption only referred "to the amount of people coming to protest."   Tr. 7/20/22 @ 75:14-21.

Bledsoe stood with other rioters on the terrace outside the Senate Wing door and chanted. Tr. 7/20/22 @ 79:24-25.   He saw that people were entering the Capitol building and thought the doors were open.   Tr. 7/20/22 @ 80:7-15.   He told someone next to him that "they're letting people in the building," Tr. 7/20/22 @ 80:15-17, and he saw people "getting in line to walk into the building."   Tr. 7/20/22 @ 81:23-24.   Bledsoe acknowledged that several police officers were standing near a door in the same area, but he believed "their body language and everything was as if nothing was wrong," and "there was no indication that we weren't" permitted to go inside.   Tr. 7/20/22 @ 81:25-82:7.

14

Bledsoe got in line to enter the Capitol.   Bledsoe said he did not see the broken glass as he walked through the door, and he did not hear the beeping of an alarm.   Tr. 7/20/22 @ 82:12-23.   In fact, Bledsoe said "the first real sign that we shouldn't be there" was when he was in the Rotunda and saw tear gas coming from another hallway.   Tr. 7/20/22 @ 92:25-93:6.   Bledsoe walked through Statuary Hall, took some photographs, then joined a mob of rioters gathered in the Statuary Hall Connector.   He claimed at this point he was "ready to get out of the building" because "the demeanor ha[d] changed", and he "kind of realized" that "[they] weren't supposed to be there at that point."   Tr. 7/20/22 @ 101:7-11.

Bledsoe described walking the halls outside the House Chamber, but explained that he was simply "wandering around, looking for a way out."   Tr. 7/20/22 @ 106:14-15.   He denied seeing the exit down a short hallway that he walked past twice.   Tr. 7/20/22 @ 109:16-21.   As he passed officers in the hall, he saw "the looks on their faces" and thought they "didn't look like they were having the easiest day," so he reassured them he "was nothing to worry about."   Tr. 7/20/22 115:11-18.   Bledsoe did not ask the officers for a way out at that time.   He made another pass, then he saw others talking to officers.   Tr. 7/20/22 @ 118:1-3.   An officer asked Bledsoe if he was trying to leave.   Tr. 7/20/22 @ 118:8-11.   Bledsoe said he was, then he followed the officer and a few others to the exit.   Tr. 7/20/22 @ 118:10-19.

Bledsoe claimed that much of the government's evidence was taken out of context.   In particular, he was asked about a text message he sent to "David" on January 10, 2021.   *See* Ex. 2.49.   Bledsoe said the conversation was about "people that would have stolen the election" and "what would have happened to them."   Tr. 7/20/22 @ 67:8-18.   He denied "they" was a reference to politicians and never explained specifically who "they" were.   Tr. 7/20/22 @ 67:22-24.

### III.     THE CHARGES

On March 10, 2021, a federal grand jury returned an indictment charging the defendant with Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2) and § 2, Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).   On July 21, 2022, a jury returned a verdict of guilty on all five counts.

### IV.     STATUTORY PENALTIES

Bledsoe now faces sentencing on all five counts of the indictment upon which he was convicted.   Bledsoe is subject to a maximum of twenty-three years in custody (up to 20 years for 18 U.S.C. § 1512(c)(2), a Class C felony; up to one year for each of the two Class A misdemeanors; and up to six months for each of the two Class B misdemeanors); a term of probation of not more than five years for each of the two Class B misdemeanors pursuant to 18 U.S.C. § 3561(c); a term of supervised release of not more than three years, pursuant to 18 U.S.C. § 3583(b)(2), for the Class C felony, and one year for each of the two Class A misdemeanors); a fine of not more than $460,000 (up to $250,000 for the Class C Felony pursuant to 18 U.S.C. § 3571(b)(3) and (d), $100,000 for each of the two Class A misdemeanors pursuant to 18 U.S.C. § 3571(b)(5), and $5,000 for each of the two Class B misdemeanors pursuant to 18 U.S.C. § 3571(b)(6)); and special assessments totaling $170 ($100 for the Class C Felony, $25 for each of the two Class A misdemeanors pursuant to 18 U.S.C. § 3013(a)(1)(A)(iii), and $10 for each of the two Class B misdemeanors pursuant to 18 U.S.C. § 3013(a)(1)(A)(ii).

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government concurs with Probation that the Sentencing Guidelines offense level is 27 but disagrees with Probation about how that offense level is calculated.   The Guidelines set out the specific "order" of the analysis:   first, determine the offense guideline; second, determine the base offense level and apply appropriate specific offense characteristics, cross references, and special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3.   U.S.S.G. § 1B1.1(a)(1)-(3).   Then, repeat each step for each count.   U.S.S.G. § 1B1.1(a)(4).   Finally, perform the grouping analysis in Part D of Chapter 3.   *Id*.

In the draft pre-sentence report ("PSR"), the Probation Officer did not employ this specified procedure to determine the total combined offense lever.   Rather, the Probation Officer started with the grouping analysis in Part D of Chapter 3, then did the Guidelines analysis in U.S.S.G. § 1B1.1(a)(1)-(3), but only for Count One.   PSR ¶¶ 41-52.   The appropriate offense level computations for Counts One, Two and Three prior to any grouping analysis under Part D of Chapter 3 are as follows:

**Count One: 18 U.S.C. § 1512(c)(2) and § 2 - Obstruction of an Official Proceeding Before Congress, and Aiding and Abetting**

| Base offense level: | 14 | U.S.S.G. §2J1.2 (a) |
|---|---|---|
| Special Offense Characteristic | +8 | U.S.S.G. §2J1.2 (b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." |
| Special Offense Characteristic | +3 | U.S.S.G. §2J1.2 (b)(2): "the offense resulted in substantial interference with the administration of justice." |
| Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense" |
| Total | 27 | |

**Count Two: 18 U.S.C. § 1752(a)(1) - Entering and Remaining in a Restricted Building or Grounds**

| Base Offense Level | 4 | U.S.S.G. §2B2.3(a) |
|---|---|---|
| Specific Offense Characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." |
| Cross Reference | | U.S.S.G. §2B2.3(c)(1) |
| Base Offense Level (adjusted) | 25   (from Count One) | U.S.S.G. § 2X1.1(a): "the base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." |
| Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense" |
| Total | 27 | |

**Count Three: 18 U.S.C. § 1752(a)(2) - Disorderly and Disruptive Conduct in a Restricted Building or Grounds**

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense" |
| Total | 12 | |

Counts One through Three group because all involve the same victim: Congress. U.S.S.G. § 3D1.2(d). The offense level for that Group is the level "for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group." U.S.S.G. § 3D1.3(a). Since Counts One and Two have the highest offense levels for any count in the group, the offense level for the group is 27. And because there is only one group, the total adjusted offense level is the level for that group: 27. Although the Probation Officer did not perform all the foregoing calculations, it concluded that the combined total offense level in this case is 27. PSR ¶ 52.

Bledsoe has several misdemeanor convictions that are dated and therefore not assigned criminal history points. PSR ¶¶ 54-56. The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 57. Accordingly, Bledsoe's Guidelines imprisonment range is 70 to 87 months' imprisonment. PSR ¶ 101.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford

adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was one of very few times in our history when the building was literally occupied by hostile participants.   By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances and their conduct directly contributed to those circumstances.  As a person entered the Capitol, they would—at a minimum—have passed numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air.  Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, we must assess such conduct on a spectrum.   This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's

time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.   While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this defendant's crimes weigh heavily in favor of a significant term of incarceration.   Bledsoe came to Washington, D.C. because he believed the election was stolen.   After attending the rally at the Ellipse, Bledsoe walked to the Capitol, passing barricades that were disassembled by other rioters before he arrived.   He scaled a wall to access a terrace area on the northwest side of the building.   Bledsoe then took a picture of others climbing the same wall, he wrote "Nothing can stop what's coming," then posted the picture on social media. This shows his intent, and his understanding of others' intentions—that rioters were taking over the Capitol building regardless of any obstacles in their path, that they intended to interfere with and stop the vote certification, and that they are going to have their voices heard.

Bledsoe entered the Capitol building after climbing the wall up to the Northwest terrace, an action that he characterized as the "funner" option.   He entered through the Senate Wing Door conveniently ignoring signs of a violent, forced entry—smashed windows to either side of the door, cracked glass in the door, and a blaring alarm—as he crossed the threshold.   He conveniently ignored multiple people in various forms of protective gear in the crowd.   He tried to blame the clearly overwhelmed handful of officers guarding a nearby door for not coming into the crowd of by his estimation 200-300 people in that courtyard to tell him one-on-one that he was not allowed to enter the U.S. Capitol.

He conveniently ignored the complete lack of security screening despite knowing that such security screenings were in place earlier to access an outdoor event, let alone inside a building housing the Congress of the United States.   And as he entered, he yelled for the location of "those pieces of shit" and "This is our house!"   Yet he had the gall to claim on the stand under oath, that he actually meant, "Where can we go to protest at" and that he was not really referring to anybody with the sobriquet pieces of shit.   Tr. 7/20/22 @ 15:17-19.   And he claimed not to hear as the crowd he had been chanting with moments before started ominously calling out, "Nancy, Nancy, Nancy" as they climbed the stairs to the second floor.

He then paraded through the Rotunda with a Trump flag and climbed up onto a statue to stick the flag in its arm.   Only at this point does he admit to realizing that they should not be there when tear gas came into the Rotunda from the senate wing of the building.   Instead of choosing to leave down the stairs he had come up a short time before, he walked past those stairs and lingered in the nearby Statuary Halls leisurely taking pictures.   He then walked further away from this known exit route in the halls surrounding the House Chamber.   Members of Congress were trapped inside the House Gallery during this time as Capitol Police officers, guns drawn behind a hastily constructed furniture barricade at the Main House Door, were preventing other rioters from further breaking into the House Chamber while still other rioters were trying to break in through the Speaker's lobby.   The presence of unscreened rioters, including Bledsoe, roaming the hallways prevented the evacuation of Members trapped inside the House Gallery.

Bledsoe exited the Capitol after spending approximately 22 minutes inside.   He bragged about his participation in the riot.   He sent a message on Facebook stating he "stormed the Capitol."   He reposted a photograph on social media showing Members of Congress cowering in

22

front of seats in the House Gallery, with the caption, "How corrupt politicians should feel."

Bledsoe has not exhibited true remorse and contrition for his participation in the darkest day our democracy has known.   Instead, he attempted to minimize and justify his behavior when he explained his participation in the day's events to the jury.   He bragged about his actions via social media and via texts.

His observations were clearly selective as he remembered helpful details but just could not seem to remember anything that harmed him.   This is clearly demonstrated in his simultaneous assertion that he was not sure if he saw texts about violence but was sure that he just discounted it if he did; in his assertion that texting his wife "good" in response to information about bomb threats did not actually mean "good" but was "just brushing it off";   in his admission to having spent his entire morning at a rally about the certification of the electoral college, to sitting through President Trump's whole speech, to receiving multiple texts from his wife with updates about the electoral college, and receiving a text from his brother about the electoral college, followed by a claim that he just didn't know much about the certification of the electoral college; in his assertion that it would be taking it out of context to say his response, "We here" to "You making them evacuate Capitol Hill" meant he was making members of congress and their staff evacuate Capitol Hill; in his assertion that he wouldn't use those terms at all when asked if he stormed the Capitol despite admitting he had in fact used those words in his messages; in his assertion that the sobriquet pieces of shit did not refer to anybody or possibly referred to anybody that would have stolen an election. Simply put, his testimony was not credible.[3]   Bledsoe's conduct demands a lengthy sentence of

---

[3] Furthermore, this is demonstrated in the assertions made in his GiveSendGo campaign that, "Matthew, as well as many other Americans who entered the capitol building on January 6th, have been up against a legal system that is biased. https://tinyurl.com/2p8fyjdf Many people have highlighted the inability for anyone to get an unbiased jury in DC. (https://tinyurl.com/f8h9bvs5) The constitution demands these trials be moved elsewhere.   Prior to trial,

imprisonment.

### B.  The History and Characteristics of the Defendant

Bledsoe is 38 years old and lives in Olive Branch, Mississippi.   PSR p. 3.   Bledsoe has

prior misdemeanor convictions dating from 2002.  PSR ¶¶ 54-56.  Following a conviction for

possession of drug paraphernalia and DUI in 2002, he was placed on probation.   PSR ¶ 54.   NCIC

records indicate Bledsoe was cited for a probation violation within six months of his conviction,

but the disposition of the violation is unknown.   PSR ¶ 54.   Bledsoe was also convicted of filing

a false report and evading arrest in 2006.   PSR ¶ 55.

Following his arrest in January 2021, Bledsoe was ordered to comply with conditions of

release.   A Pretrial Violation Report was filed on July 6, 2022, outlining the defendant's poor

attitude and demeanor while on pretrial release.   PSR ¶ 12.   His assertions to his probation officer

that he had other more important things to do than communicate with the officer, his refusal to

provide necessary information when requested, his refusal to follow instructions regarding his

electronic monitoring equipment, and his disrespectful attitude and statements to probation officers

does not point to a person who will be compliant with sentencing requirements going forward.

Bledsoe's actions on January 6 of disregarding clear signs that the public was not permitted

in the Capitol and entering after scaling a wall are comparable to his prior contacts with law

enforcement and his behavior on supervision.   His conduct shows that he has contempt for

supervision, for the law, and will chose to do whatever pleases him.   These and other reasons

support the recommended prison sentence.

---

Matthew was offered a plea deal but refused to go against his conscience and say he was guilty of a crime he did not commit. The biased jury found him guilty on all charges.   He is fighting an uphill legal battle and he needs our help."   The government notes that the campaign created by section names the defendant's wife.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Bledsoe's criminal conduct in obstructing an official proceeding, and boasting about his participation, evidences a complete disrespect for law and order.

When Bledsoe entered Capitol grounds and the Capitol itself, it was abundantly clear that lawmakers, and the law enforcement officers who tried to protect them, were under siege.   Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. Bledsoe took advantage of the violence and destruction of other rioters to get into the Capitol.   He was not a passive observer.   He "stormed the Capitol," eagerly paraded around inside participating in chanting, per his own claim starting the "Our House!" chant, and freely explored the halls which contributed to the prolonged delay in evacuating members of Congress as well delaying the Certification proceeding.

In sum, the rule of law was not only disrespected; it was under attack that day.   A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

obstruct official proceedings are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.   The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power.   As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven

---

[5] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.   This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.").   And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. The defendant continued making statements on his social media even after January 6 consistent with a man girding for another battle.   Since his conviction, the defendant's wife has posted a page on GiveSendGo raising money he claims will go to legal expense based on his actions and seeking out positive reviews for his business all while claiming the legal system in D.C. is biased and that he did not commit the crime of which has been convicted.

Even if the court interprets his statement that he does not now believe the election was stolen as remorse or if he chooses to finally apologize to the people he harmed at the Capitol that day during sentencing, the timing of such remorse renders it problematic.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol.   It didn't come when he went home.   It came when he

realized he was in trouble.   It came when he realized that large numbers of Americans and people

worldwide were horrified at what happened that day.   It came when he realized that he could go

to jail for what he did.   And that is when he felt remorse, and that is when he took responsibility

for his actions.") (statement of Judge Chutkan).

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens

of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United

States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied]

and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency,

complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S.

85, 96 (2007); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to

'base its determinations on empirical data and national experience, guided by professional staff

with appropriate expertise,'" and "to formulate and constantly refine national sentencing

standards."   *Kimbrough*, 552 U.S. at 108.   Accordingly, courts must give "respectful

consideration to the Guidelines." *Id.* at 101.   As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing
> Commission's in-depth research into prior sentences, presentence investigations,
> probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro,
> comment 3. More importantly, the Guidelines reflect Congress's determination of
> potential punishments, as set forth in statutes, and Congress's on-going approval of
> Guidelines sentencing, through oversight of the Guidelines revision process. See
> 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the
> Guidelines). Because the Guidelines reflect the collected wisdom of various
> institutions, they deserve careful consideration in each case. Because they have
> been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## F.   Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

As of the date of this sentencing memorandum, the government believes the most analogous case to be sentenced is United States v. Anthony Robert Williams, 21-cr-377.

Williams entered the grounds on the west side of the Capitol, scaled a small wall and some purloined bike rack fencing, entered through the Senate Wing Door (albeit about 8 minutes after Mr. Bledsoe), posted on social media before and after the riot, and was convicted at trial of Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and 2.   Williams received a sentence of 60 months of incarceration, in part because he faced a lower guidelines range because he did not have the enhancement for obstructing justice with his testimony.   While the two cases are not exactly analogous, they are more similar than other cases where a conviction on that charge occurred.

Thomas Robertson, 21-cr-34 (CRC), a Rocky Mountain, Virginia police officer, attempted to block Metropolitan Police from crossing the west lawn by holding a wooden stick across his chest in a tactical stance.   He was in the first wave of rioters to ascend the Northwest stairs to the Upper West Terrace and to enter the Capitol through the Senate Wing door.  Robertson was part of the crowd in the Crypt who overran the line of United States Capitol Police officers attempting to block rioters from pushing further into the building.     Robertson advocated on social media for the use of violence to overturn the election results, and following the riot, he bragged about his conduct on social media.     Following a guilty verdict at trial, Robertson (facing a Guidelines range of 87 to 108 months) was sentenced to 87 months' imprisonment.   The cases can be distinguished  because Robertson had direct (though not assaultive) confrontations with police, whereas Bledsoe did not.   Robertson violated the conditions of his release by purchasing firearms.   Bledsoe likewise violated his release conditions albeit in a different manner.

Jacob Chansley, 21-cr-3 (RCL), was also in the first wave of rioters to enter the Capitol

through the Senate Wing door.   Unlike Bledsoe, Chansley made it to the Senate floor and left a threatening note for then-Vice President Mike Pence on the Senate dais.   Following the riot, Chansley gave interviews to media outlets where – like Bledsoe's expressions of pride on social media after the riot – Chansley gloated and said he considered January 6th "a win."   Chansley (facing a Guidelines range of 41 to 51 months) was sentenced to 41 months' imprisonment after the government recommended 51 months.   Importantly, Chansley's case is different from the instant one because Chansley accepted responsibility at a relatively early stage in his criminal proceedings by pleading guilty to violating § 1512(c)(2) and did not seek to avoid penalty by dissembling.   Here, Bledsoe has not accepted responsibility for his actions.

The government requests that this Court impose the recommended sentence in this case. Doing so plainly would not create an unwarranted disparity.   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."   *Gall v. United States,* 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017).[6]   Therefore, for the reasons stated above, granting the government's instant recommendation would not constitute an unwarranted sentencing disparity.

31

## VII.    RESPONSE TO DEFENDANT'S OBJECTIONS/CORRECTIONS TO PSR

*Paragraph 15*

First, we disagree with counsel's argument that the wording in paragraph 15 suggests either that the entire crowd or Mr. Bledsoe specifically participated in chanting Nancy as they climbed the stairs.   The language does not say every member of the mob, nor does it say Mr. Bledsoe did so himself.   We do assert that the defendant standing nearby the stairs as several members of the mob around him chanted "Nancy! Nancy! Nancy!" is relevant to his subsequent decision to climb those same stairs and parade through the Rotunda rather than turning to leave at that point.

To the extent that counsel is arguing that Mr. Bledsoe could not hear the loud chanting at the base of that small set of stairs, the government points out that the chanting began when the person filming the video was still at the bottom of the stairwell and Mr. Bledsoe is certainly within sight and sound of that person as they move up that small set of stairs which is open to the area where he is standing.   Ex. 7.02, at :48-1:10.   Nor does it sound or look as though the chanting is limited to a person or persons immediately next to the camera man.



*Paragraph 21*

The Defense argues that the sentence Mr. Bledsoe "denied reading any text message from family members about violence at the Capitol" appears to mischaracterize Mr. Bledsoe's testimony.   Yet when asked, "So you did see a text?"   Tr. 7/20/22 @ 24:2.   Defendant Bledsoe stated, "I said -- no. I said if I did, it wasn't what I was seeing."   Tr. 7/20/22 @ 24:3-4.   When asked about the text which told him to go hit Mitch McConnell in the face, he said he did not recall that one.   Tr. 7/20/22 @ 24:13.   When his memory was refreshed by reviewing the family text message chain, he indicated that text chain was on do not disturb, that he did not know when he even read all those, that spotty service would have prevented him from getting links, and that he does not even know if he did read them.   Tr. 7/20/22 @ 25:7-12.

When confronted with the messages to him about violence followed shortly by his "On my way" text, he claimed that a lot of the time he does not read all the messages in his family chat.   Tr. 7/20/22 @ 26:4-5.   When confronted again with the on my way statement, he admitted to getting the gist of the whole Capitol thing.   Tr. 7/20/22 @ 26:8-9.   When asked a final time if he was telling them he was on his way to the Capitol, he said, "I guess so.   Hard to say."   Tr. 7/20/22 @ 26:14.   Mr. Bledsoe's testimony was not a simple case of not remembering one or two text messages or when exactly he read them, but rather it reflected his wide-ranging search for ways to avoid acknowledging the ample warnings of violence at the Capitol he received before he even arrived on the grounds.

*Paragraph 23*

There is both evidence that Mr. Bledsoe could have seen the exterior Upper House door from the hallway he passed through as well as evidence that he did do so.   See Ex. 4.18B Clip.wmv (zoomed clip showing Mr. Bledsoe's head turned in the direction of the exterior door as he walks by the opening).   This hallway between the inner hall where Mr. Bledsoe is standing and the exterior door is very short.   See map below where red x represents the area where Mr. Bledsoe is visible on Ex. 4.18B and the yellow shows the short hallway.



As Mr. Bledsoe comes into view, he turns his head in the direction of the exit as he walks down the hallway.   Screenshots from 4.18 below.   Note that the daylight from this exterior door clearly illuminates the room casting shadows from the people walking around.

34





The short distance of the hallway can be seen in the screenshot from Ex. 4.18 and 4.19 below

where Mr. Bledsoe crosses from the same area he was above to the outside door in about 9 seconds.







You can also see the short distance between those two points on the Benjamin Reports

([https://youtu.be/DHessyWYXqM](https://youtu.be/DHessyWYXqM)) and NEMOS ([https://rumble.com/vcydy7-nemos-news-](https://rumble.com/vcydy7-nemos-news-)

[network-exclusive-storming-dc-capitol-jan-6-2021.html](network-exclusive-storming-dc-capitol-jan-6-2021.html)) open-source videos.





Furthermore, the government would point to how tall this door is relative to even the tallest of people present giving more than adequate view of the open doorway even in "extremely crowded conditions."   The alternative explanation for why Mr. Bledsoe finally chose to exit is that he was confronted with a giant puff of tear gas moving down the hallway towards him that pushed him back from the direction he was traveling and contributed to his sudden decision to leave.

Regarding Mr. Bledsoe's time by the Rotunda doors, the timeline is as follows:

| Approx. 4:57 pm | Officers in riot gear come up the stairs and begin instructing people to leave the stairs.   Mr. Bledsoe walks down the stairs.   Mr. Bledsoe remains at the bottom of the stairs with the group of rioters.<br>Ex. 2.44 screenshot below<br><br>Ex. 4.22A<br> |

| Approx. 5:05 pm | MPD Officers arrive and assist the other officer in riot gear shifting the line of officers forward a short distance.   Mr. Bledsoe makes a startled movement and runs away a short distance, then comes back and talks with other members of the crowd.   The government does not contend that Mr. Bledsoe received specific one on one directions from officers at this point. Ex. 4.21 screenshot below<br><br> |
| Approx. 5:14 pm | Mr. Bledsoe begins leaving Capitol grounds on foot with another man. |

The government does not contend that the police were "getting people to vacate the Capitol grounds altogether" at that particular moment.   Based on officer movements across the entire Capitol complex, it seems highly likely that this was due to a manpower issue and did not reflect law enforcement sanction of Mr. Bledsoe's actions.   The court should reject this argument like Mr. Bledsoe's claim that officers in the northwest courtyard near the Senate Wing Door had to leave their post and go person to person announcing to each one that they were not authorized to

be there.   Given Mr. Bledsoe's running away when MPD arrived, albeit briefly, it does not seem

likely that he thought he had a right to be where he was at that time.

*Paragraph 32*

*"his knowledge and understanding of what was taking place in Congress with respect to the vote*

*certification."*

Mr. Bledsoe claimed that he did not know about or understand the process that was going

on that day at the Capitol.

> "A   I didn't really know much about the whole process anyway, so it didn't --
> none of it really made much sense to me."
> Tr. 7/20/21 73:3-5.

> "Q   It is your contention per your direct that you didn't know anything about the
> certification of the Electoral College?
> A   I was learning, you know, over that course of days about it, but I don't think,
> you know, most of America knew much about that process until all this happened
> after the fact.
> Q   What course of days are you referring to?
> A   Of the next, you know, week after January 6."
> Q   So you didn't know anything at all about the certification of the election on
> January 6?
> A   Didn't know much."
> Tr. 7/20/21 18:15-24.

The defense found Mr. Bledsoe's claim that he did not even know that stopping the electoral count

or interfering with the hearings to count of certify the Electoral College votes was even a possibility

sufficiently important that they chose to end his direct with that question.   Tr. 7/20/2022 at

131:13-19.

To argue that this false testimony is not material requires mental gymnastics.   One cannot

find a defendant to have intended to obstruct or impede an official proceeding that he did not know

41

existed.   To find Mr. Bledsoe guilty, the jury necessarily had to find that he knew at least enough to intend to obstruct an official proceeding that day.

There is plenty of evidence that contradicts Mr. Bledsoe's claim not to understand what the joint session of congress was doing on January 6th.   He spent his whole morning at a rally where the process was discussed in speeches.



Ex 2.05A; Tr. 7/20/21 20:10-17

He had conversations and messages from family members with details about the proceedings on January 6, 2021 both before and after the riot.

42





Ex. 207



Ex. 2.08



Ex. 2.09



Ex. 2.10





Ex. 2.17



Ex. 2.30



Ex. 2.48; see also 2.48A IMG_3304.mov

*"the lawfulness of his entry into the US Capitol and clear signs that he was not permitted inside."*

As the defense notes, the jury found Mr. Bledsoe guilty of Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S. Code § 1752(a)(1), as well as Disorderly or Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S. Code § 1752(a)(2).   Regardless of which facts the jury chose to rely on from amongst the many available

to them, they had to find that Mr. Bledsoe knowingly entered or remained in a restricted building or grounds without lawful authority to do so and that he did not have a good faith belief that he was entering with lawful authority to do so.   The below exhibits are amongst the many pieces of evidence this jury might have relied on when making this finding.



Ex. 2.19



Ex. 4.01A



Ex. 701A





Ex. 2.27



Ex. 2.29 screenshot above; see also 2.29 IMG_9314.MOV

*"the identities of individuals he entered the US Capitol looking for."*

Mr. Bledsoe's question, "Where are those pieces of shit at?" was not uttered at the Ellipse, the mall, or any other location per the evidence in the record.   Instead he chose to scream that question as he entered the Capitol building after spending the months before posting about a stolen election and then spending the morning listening to speeches on the same topic.   Inconveniently for Mr. Bledsoe, he did not say the words, where can we lawfully go to protest?   Instead, he called out for the location of the pieces of shit.   The argument made in hindsight that he was looking for

an audience of some unspecified group to protest in front of was not what he said on the stand and is not how he used this video when replying to his friend the same day.





It is inconsistent with his "[w]e here" text.





It is inconsistent with his description of his own actions closer in time to the event.

**Author** US Moving Fast (Facebook: 100004248793130)
**Sent** 2021-01-06 23:49:46 UTC
**Body** how was everything on DC

**Author** Matt Bledsoe (Facebook: 508548968)
**Sent** 2021-01-07 00:06:59 UTC
**Body** Wild

**Author** Matt Bledsoe (Facebook: 508548968)
**Sent** 2021-01-07 00:07:00 UTC
**Body** But fun

**Author** Matt Bledsoe (Facebook: 508548968)
**Sent** 2021-01-07 00:07:05 UTC
**Body** Stormed the capital

**Author** US Moving Fast (Facebook: 100004248793130)
**Sent** 2021-01-07 00:08:26 UTC
**Body** yes I'm see the video

**Author** US Moving Fast (Facebook: 100004248793130)
**Sent** 2021-01-07 00:09:09 UTC
**Body** it looked very exciting

Snapshot of Ex 1.19

Nothing prevented him from protesting in another location.   He chose the Capitol because that is

where the certification proceedings were and where the Members of Congress were located.



Snapshot from Ex. 1.27
53

*"the meaning of text messages and content posted on social media condoning violence and storming the US Capitol."*

| Facebook Business Record | Page 481 |
|---|---|

| | |
|---|---|
| **Summary** | We cannot allow them to STEAL this Election SHOP NOW OPEN @ TATUM SQUAD @The Officer Tatum/join TATUM REPORT NEWS @ OFFICIAL WEBSITE @ SHOP NOW @ BOOKING @ S... |
| **Title** | We cannot allow them to STEAL this Election |
| **Url** | https://www.youtube.com/watch?v=AfwY0pyZpMU |

| | |
|---|---|
| **Author** | Rick ███████ (Facebook: 100000133253231) |
| **Sent** | 2020-11-16 17:28:07 UTC |
| **Body** | Fuck it I'm killin 'em |

| | |
|---|---|
| **Author** | Matt Bledsoe (Facebook: 508548968) |
| **Sent** | 2020-11-16 17:28:26 UTC |
| **Body** | Yessir |

Snapshot of Ex. 1.11

Mr. Bledsoe claimed this message was "missing context," that he was not sure if he was referring to him saying that or to the actual post, and that he did not think he was referring "to him at all." Tr. 7/20/21 66:1-4.

| | |
|---|---|
| **Thread** | (10154082419783969) |
| **Current** | 2021-03-08 17:26:44 UTC |
| **Participants** | David ███████ (Facebook: 824476987) |
| | Matt Bledsoe (Facebook: 508548968) |

| | |
|---|---|
| **Author** | David ███████ (Facebook: 824476987) |
| **Sent** | 2021-01-07 01:08:11 UTC |
| **Body** | What's the plan next? |

| | |
|---|---|
| **Author** | Matt Bledsoe (Facebook: 508548968) |
| **Sent** | 2021-01-07 01:24:32 UTC |
| **Body** | Military |

Snapshot of Ex. 1.23

Mr. Bledsoe claimed this was a reference to the military being part of the legal process playing out and confirmed counsel's statement that he thought the military would take control.   Tr. 7/20/21 66:23-25, 67:1-4.



Ex. 2.49

Mr. Bledsoe claimed this statement was taken out of context once again and was cherry-picked. He claimed he was just referring to anybody who had stolen the election and denied he was referencing politicians.   Tr. 7/20/21 67:14-24.



Snapshot of Ex. 1.17

Mr. Bledsoe claimed this was referring to the amount of people coming to protest and nothing else.

Tr. 7/20/21 75:20-21.



Snapshot of Ex. 1.21

Mr. Bledsoe attempted to distance himself from this post by saying he just hits the repost button

on most of his posts and is not the original author.   Tr. 7/20/21 129:4-13.   He repeated this on

cross insisting that despite him having posted it in his name he was not posting or making it himself

and he did not know the full scope of what happened at the time.   Tr. 7/20/21 17:17-25, 18:1.





Snapshot of Ex. 1.27



Snapshot of Ex. 1.28

Mr. Bledsoe stated that he would not have posted these two memes if he had known the full scope

of what had happened that day.    Tr. 7/20/21 130:9-16.   He stated that he did not know the

59

politician pictured in 1.27 and that when confronted with the fact that reposting something is putting it out there in his name, he reverted to his assertion that he did not know the full scope of what happened.   Tr. 7/20/21 17:4-25, 18:1.

*Paragraphs 44 and 45 Generally*

The court has already ruled, along with many other judges from this courthouse, that the counting and certification of the electoral college votes was an Official Proceeding.   The government hereby incorporates all those pleadings already in the record in this response.

*Paragraph 44 Specifically*

The government agrees that there is no evidence that Mr. Bledsoe specifically called out for Nancy Pelosi; there is evidence that he was present as the mob around him called for Speaker Pelosi and chose not to leave at that point.   There is no other evidence in the record of Mr. Bledsoe targeting a specifically named person.

*Paragraph 48*

The government incorporates its references to Mr. Bledsoe's materially false statements laid out above.

## VIII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.   Because a federal court possesses no "inherent authority to

order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

Cir. 2011).   Two general restitution statutes provide such authority.   First, the Victim and

Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now

codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order

restitution to victims of most federal crimes."[6] *Papagno*, 639 F.3d at 1096.   Second, the

Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214

(codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of

the crimes covered" in the VWPA.   *Papagno*, 639 F.3d at 1096.   The applicable procedures for

restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.   *See*

18 U. S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA,

"may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features.   Both require that restitution "be tied to the

loss caused by the offense of conviction."   *Hughey v. United States*, 495 U.S. 411, 418 (1990)

(interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014)

(restitution under the MVRA limited to the "offense of conviction" under *Hughey*).   Both require

identification of a victim, defined in both statutes as "a person directly and proximately harmed as

a result of" the offense of conviction.[7] *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C.

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[7] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA.   *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

§ 3663A(a)(2).   Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.   *See Papagno*, 639 F.3d at 1097; § 3663(b); § 3663A(b).   Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.   *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).   The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result.   *See Emor*, 850 F. Supp. 2d at 202.   The use of a "reasonable estimate" or a reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[8]   *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses … cannot be a precise mathematical inquiry").

The statutes also differ in some respects.   As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in

---

[8] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review."   *Fair*, 699 F.3d at 513.

any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim … has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[9]

Applying these principles to this case leads to the conclusion that Bledsoe should be required to pay $2,000 in restitution. One of the offenses to which he was found guilty, 18 U.S.C. § 1752(a)(1), triggers mandatory restitution under the MVRA as an "offense against property" that resulted in pecuniary loss for the Architect of the Capitol, *see* 18 U.S.C. § 3663A(c)(1)(A)(ii). Moreover, Bledsoe's additional convictions under Title 18, *see* Count 1 (18 U.S.C. § 1512(c)(2)) and Count 3 (18 U.S.C. § 1752(a)(2)), fall within the VWPA. As of April 5, 2022, the victim in this case, the Architect of the Capitol, estimates approximate losses suffered as a result of the siege at the United States Capitol at $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and losses suffered by law enforcement officers deployed to protect Members of Congress, their staff, and other Capitol property. January 6 defendants who had pled guilty to one or more felony offenses have uniformly agreed to pay

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. § 3663(a)(1)(B)(ii); 18 U.S.C. § 3663A(c)(3)(B).

$2,000 in restitution.  *E.g., United States v. Cody Mattice and James Mault*, D.D.C., 1:21-cr-00657 (BAH), ECF 43 and 47 (plea agreements).   Recognizing the practical and legal difficulties in allocating loss amounts across all January 6 defendants, including many who will be charged in the future, judges of this Court have likewise imposed restitution in the amount of $2,000 on defendants convicted of one or more felonies following trial.  *E.g., United States v. Guy Reffitt*, D.D.C. 1:21-cr-00032 (DLF), ECF 170 (judgment).   This Court should do likewise and order Bledsoe to pay $2,000 in restitution in this case.

## IX.    FINE

Bledsoe's conviction under 1512 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3).   In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); s*ee* U.S.S.G. § 5E1.2(d).   In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. As the draft PSR notes, Bledsoe has raised over $40,000 in an online campaign through GiveSendGo donations.   PSR ¶ 90. Bledsoe advised the money was intended to offset his legal fees and expenses. *Id.*   Bledsoe should not be able to "capitalize" on his participation in the Capitol breach in this way and should not receive funds beyond those necessary for his legal defense.   The government also notes that while it is more difficult to value the fake positive reviews the defendant is soliciting for his business, they also have some sort of value also.

## X.      CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a
sentence of imprisonment of 70 months, which is the low-end of the Guidelines as calculated by
the Probation Officer, restitution of $2,000, a fine, and the mandatory $100 special assessment for
each count of conviction.


Respectfully submitted,

MATTHEW D. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052


BY:      _____/s/_____
         JAMIE CARTER
         DC Bar 1027970
         Assistant United States Attorney
         601 D Street, N.W.
         Washington, D.C. 20530
         202-252-6741
         Jamie.Carter@usdoj.gov

         MELANIE L. ALSWORTH
         AR Bar No. 2002095
         Trial Attorney
         United States Department of Justice
         Criminal Division
         On Detail to the United States Attorney's Office,
         District of Columbia
         601 D. Street, N.W.
         Washington, D.C. 20530
         Office: 202-598-2285
         Melanie.Alsworth2@usdoj.gov