# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | )( | |
| | )( | **Criminal No. 21-204 (BAH)** |
| **v.** | )( | **Chief Judge Howell** |
| | )( | **Sentencing: October 21, 2022** |
| **MATTHEW BLEDSOE** | )( | |

## MEMORANDUM IN AID OF SENTENCING

COMES NOW the defendant, Matthew Bledsoe, by and through undersigned counsel, and respectfully provides the following information to aid the Court in determining the appropriate sentence for him:

1.      In connection with the events at the U.S. Capitol on January 6, 2021, Mr. Bledsoe was arrested at his home near Memphis, Tennessee on January 15, 2021.  After his arrest, he was released on conditions which included curfew and location monitoring via a GPS-equipped ankle bracelet.

2.      In March 2021, Mr. Bledsoe was indicted on five counts.  The charges in the indictment are: 1) Obstruction of an Official Proceeding (18 U.S.C. §§ 1512(c)(2), 2); 2), Entering and Remaining in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(1)); 3) Disorderly or Disruptive Conduct in a Restricted Building or Grounds 18 U.S.C. § 1752(a)(2)); 4) Disorderly Conduct in a Capitol Building (40 U.S.C. § 5104(e)(2)(D)); and 5) Parading, Demonstrating, or Picketing in a Capitol Building (40 U.S.C. § 5104(e)(2)(G)).  Indictment (ECF #23).  Only the first count is a felony; the other four counts are misdemeanors.

3.      In addition to Mr. Bledsoe, the Indictment charges three other persons: Eric Torrens, Blake Reed, and Jack Griffith.  Indictment at 2-3.  Codefendants Torrens, Reed, and Griffith were only charged in the misdemeanor counts of the Indictment; they were not

charged with the felony Obstruction count.  Id.  Codefendants Torrens, Reed, and Griffith all entered into plea agreements with the government and were all given probationary sentences.  Judgment for Torrens (ECF #133) at 2; Judgment for Reed (ECF #177) at 2; Judgment for Griffith (ECF #131) at 2.

4.     Mr. Bledsoe went to trial and was convicted on all five of the counts in the Indictment.  He has remained on release pending trial, and after the trial, he was allowed to remain on release pending sentencing.  His sentencing is scheduled for October 21, 2022.

5.     The appropriate sentence for Mr. Bledsoe is 15 months followed by a period of supervised release.  It is believed that such a sentence is at the bottom of the Guidelines range as properly determined.  Moreover, even if a higher Guidelines range is found to apply, a sentence of 15 months followed by a period of supervised release is still the appropriate sentence for Mr. Bledsoe when determined, as it must be, under 18 U.S.C. § 3553(a).

**DISCUSSION**

In determining an appropriate sentence for a defendant, the Court is to consider the factors spelled out in 18 U.S.C. § 3553(a).  These factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kind of sentences available;

(4) the kinds of sentence and the sentencing range established… [by the Sentencing Guidelines];

(5) any pertinent policy statement… issued by the Sentencing Commission…;

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

## Nature and Circumstances of the Offense

### A.  Government's Evidence at Trial

At trial, the government presented evidence showing that, in the lead-up to January 6, Mr. Bledsoe sent text messages to friends and family members and made posts to his Facebook account about his belief that the election had been stolen and his intent to come to D.C. on January 6 to protest the election results.  It should be noted that no evidence was presented to show that Mr. Bledsoe coordinated or organized his trip with anyone else. At trial, the government presented evidence that, on January 6, Mr. Bledsoe attended the rally that Donald Trump held on the White House Ellipse.  Its evidence further showed that, sometime after Mr. Trump told the assembled crowd to march to the Capitol, Mr. Bledsoe made the walk over to the building with hundreds and likely thousands of others.  The government's video evidence showed that, after Mr. Bledsoe got up a patio area on the west side of the building, he followed a crowd of people into the Capitol through a door (the Senate Wing door) that had already been forced open.  Once in the building, he proceeded to the Crypt and then up a staircase to the Rotunda.  The government's video evidence showed that, in the Rotunda, Mr. Bledsoe demonstrated with others.  He located a Trump flag and paraded around the Rotunda holding that flag up high.  After doing this, he placed that flag in the arm of one of the statues in the Rotunda in an apparent attempt to make it look as if the statue was holding the flag.   The government's video evidence

showed that, at this point, Mr. Bledsoe became aware that the police were deploying tear gas just outside the Rotunda.  He then left the Rotunda, moving away from the tear gas towards the House of Representatives.  He ended up going back and forth between two hallways near the House of Representatives that connected to each other at their ends at a right angle.  Eventually, he entered a hallway that connected with one of those hallways that had an exit at its other end.  He entered that hallway and exited the building.  He was in the building for 22 minutes.  The government's video evidence shows that, on January 6, Mr. Bledsoe did not assault, confront, or threaten any police officers or engage in any property destruction.  Moreover, there is no evidence that he saw anyone else do such things.  It should be noted that the video evidence shows that Mr. Bledsoe did walk past police officers who were standing near the juncture of the two hallways near the House of Representatives that he was going back and forth between.  However, the evidence shows that, when passing the officers, Mr. Bledsoe took pains to signal to them that he did not pose a threat to them—i.e., he put his hand up in a surrender-type gesture and seemingly asked them if it was okay to pass.

The government's evidence also showed that, after Mr. Bledsoe exited the building, he returned to it later and gathered with others at the top of the steps where the so-called Columbus Doors are, on the east façade of the building.  The doors were closed at the time. Mr. Bledsoe and others milled around outside the Columbus Doors until police arrived and formed an advancing line to get people to vacate the area around the doors and go back to the bottom of the stairs.  Mr. Bledsoe and all the other people by the Columbus Doors vacated the area around the doors and went to the bottom of the steps.  Not too long after this, Mr. Bledsoe vacated the Capitol grounds altogether.  The video evidence shows that he left alone.

At trial, the government presented evidence to show that Mr. Bledsoe sent text messages to friends and family members and made posts on his Facebook page while the events of January 6 were unfolding and immediately thereafter that indicated he approved

of those events.  It is worthwhile to note that, to the extent the government's video evidence showed Mr. Bledsoe having any individual interactions with anyone in his physical presence during the events of January 6, those interactions were brief and random. The video evidence showed that, on January 6, Mr. Bledsoe wore ordinary street clothes. There is no evidence that he wore any protective gear or carried any weapons.  Moreover, there is no evidence that Mr. Bledsoe ever made any efforts to conceal or destroy evidence of his activities in relation to the events of January 6—such as deleting text messages and Facebook posts.  The government, of course, ended up obtaining Mr. Bledsoe's text messages and Facebook posts and using them against him at his trial.

### B.  Mr. Bledsoe's Testimony

Mr. Bledsoe took the stand in his own defense at trial.  He indicated that he came to D.C. on January 6 because, at the time, he believed the election had been stolen from Donald Trump and he wanted to protest for that reason.  He testified that he believed this to be true because that he was what he was being told by news sources and politicians.  He testified that he later came to realize that he had been misled, and he acknowledged that his belief that the election had been stolen was wrong.  Mr. Bledsoe testified that, in coming D.C. on January 6, his plan was to attend the protest rally that was going to be held at the Ellipse by the White House.  He testified that he came alone.  He testified that, once he got to D.C. on January 6, he did in fact attend the rally on the Ellipse and that he heard Donald Trump speak.  At the rally, Mr. Bledsoe heard Mr. Trump tell the assembled crowd to march to the Capitol, and he noted that people then began moving towards the Capitol.  He waited behind for a while because he was hoping to meet with certain right-wing media celebrities who he thought were present at the rally.  Eventually, however, he followed after the people marching to the Capitol.  Mr. Bledsoe acknowledged that, when he got to the Capitol, he climbed a wall to bypass the crowd-thronged steps that lead up to the patio area outside the Senate Wing door.  He acknowledged that, after he climbed the wall, he

gathered with the crowd on the patio outside the Senate Wing door and that he ended up following the crowd into the Capitol through that door.  He acknowledged that he went to the Crypt and then up some stairs to the Rotunda.  He acknowledged that he marched around the Rotunda with a Trump flag and that he put the flag in a statue's arm.  He acknowledged that, as he was doing this, he noticed the police were deploying tear gas just outside the Rotunda.  He testified that he went to the above-mentioned hallways near the House of Representatives that connected to each other at a right angle to get away from the tear gas.  He testified that, while he was going back and forth between the two hallways near the House of Representatives that connected at the 90-degree right angle, he was trying to find a way that was not blocked.  He testified that he was trying to get out of the building because he felt the crowds were starting to become violent.  He testified that he finally saw people in front of him asking the police officers at the juncture of the two hallways where the exit was.  He then followed those people to the exit that the police appeared to direct them to and left the building with them.  All of this was shown on the videos the government introduced at trial.  Mr. Bledsoe acknowledged that he later came back to the Capitol and stood around with others outside the Columbus Doors until the police arrived and got people to vacate that area and the steps leading up to the doors.  Mr. Bledsoe testified that he saw his conduct inside the Capitol on January 6 as a continuation of the protest that he first joined by the White House Ellipse that day and that, when he came back to the Capitol to stand around outside the Columbus doors, he perceived himself at this point to be a spectator.

### History and Characteristics of the Defendant

**A. Mr. Bledsoe's Personal History**

Mr. Bledsoe is 38 years old.  He was born in Arizona, but when he was three, his family moved to Memphis, Tennessee.  Since then, Mr. Bledsoe has lived continuously in the greater Memphis area.  See Presentence Investigation Report (PSR) (ECF #226) at 14.

Mr. Bledsoe's parents never divorced, and they raised Mr. Bledsoe and his three siblings. It appears that Mr. Bledsoe had a good upbringing in a stable family.  Id.  There are no indications that any of Mr. Bledsoe's siblings have ever had any legal problems.  However, Mr. Bledsoe clearly had issues with substance abuse in his late teens and early 20's.  See id. at 16.  Not surprisingly, in his late teens and early 20's, Mr. Bledsoe was convicted three times for DUI and related offenses.  Id. at 11-12.  The youngest of these convictions, however, goes back to when Mr. Bledsoe was 23, id. at 12, and he has not had any criminal convictions of any sort since then, see id. at 11-12.  His criminal history score under the Guidelines is zero, and his Criminal History Category is I.  Id. at 13.

Mr. Bledsoe did not graduate from high school.  However, he did get his GED in 2003.  See PSR at 16.  Mr. Bledsoe is married and has two daughters, aged eight (Ryan) and five (Luna).  See PSR at 14.  In 2016, Mr. Bledsoe started his own moving company. See id. at 16.  Prior to that, Mr. Bledsoe had learned the moving trade by working for a number of moving companies in the Memphis area.  See id. at 17.  At trial, Mr. Bledsoe testified that, when his first daughter came along, he realized that he needed to get serious about being a provider, and he borrowed some money and started his own moving company.  Currently, the company has between 10-13 employees at any given time.  See id.  Mr. Bledsoe has worked hard to make his moving company successful.  In 2021, he was able to finish paying off the loans he took out to start the company, see id., and the company now provides Mr. Bledsoe with sufficient income to support his family.  Mr. Bledsoe's wife does not work outside the home.  She focuses on raising her and Mr. Bledsoe's two daughters, whom she also home-schools.  See id. at 15.

## B.  Mr. Bledsoe's Post-Arrest Conduct

Mr. Bledsoe has been on release in this case for over 20 months.  During this whole time, there have only been two reports from the Probation Office that have indicated that Mr. Bledsoe has had any difficulties with his release conditions.  In July 2021, a report was

submitted in which it was indicated that Mr. Bledsoe had informed his supervising

probation officer that he had recently got in a swimming pool with his daughter.  This was

a problem because Mr. Bledsoe wears an ankle bracelet for curfew and location

monitoring.  As it turns out, the pool in question was a plastic kiddy wading pool, and Mr.

Bledsoe had simply waded into the pool with his daughter.  In order to do this and make

sure he did not damage his ankle bracelet, Mr. Bledsoe had purchased a waterproof "boot"

that people who have casts on their ankles use to go swimming.  The boot has a bladder

pump that allows the person using the boot to vacuum seal the boot around the cast.  After

getting in trouble for going into the kiddy pool with the boot on, Mr. Bledsoe never did so

again.  In July of this year, the probation office submitted a report in which it was indicated

that, when a probation officer had recently contacted Mr. Bledsoe to make sure that he

understood his release-conditions obligations while going out of town for trip that the

Court had indicated he would be allowed to take, Mr. Bledsoe became argumentative with

the officer.  The report indicated that, ultimately, Mr. Bledsoe allowed the officer to say

what he had contacted Mr. Bledsoe to say.  It should be noted that Mr. Bledsoe complied

with release conditions while on the trip at issue.

Mr. Bledsoe has not violated any of his travel and curfew restrictions since his

arrest in this case 20 months ago.  There are no indications that he has engaged in a

criminal activity since January 6, 2021.

### The Need for the Sentence Imposed (A) to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense; (B) to Afford Adequate Deterrence to Criminal Conduct; and (C) to Protect the Public from Further Crimes of the Defendant

It is not possible to argue that the events at the Capitol on January 6 were not

serious and disturbing.  The fact that Mr. Bledsoe allowed himself to get caught up in those

events and participated in them admittedly warrants punishment.  However, in evaluating

Mr. Bledsoe's conduct on January 6, it is important to take note of his lack of connection

to others who were also present for the events of January 6 and his lack of involvement in any violence.

In regards to Mr. Bledsoe's lack of connection to others who were also present for the events of January 6, it is important to note that, while in the lead-up to January 6, Mr. Bledsoe did send text messages to friends and family members and make posts to his Facebook account about his belief that the election had been stolen and his intent to come to D.C. on January 6 to protest the election results, there is no evidence that he coordinated with others to come to D.C.  Moreover, he testified that he came to D.C. alone and that he was alone at the rally at the White House Ellipse on January 6.  This is consistent with the evidence.  While he did follow along with the crowd to the Capitol after Donald Trump directed the crowd to go there, there are no indications that he was associating with anyone in particular as he did so.  And even later, while he was actually on the Capitol grounds and inside the building, the video evidence shows that his individual interactions with others were random and brief.  The video evidence shows that he left the Capitol alone.

In regards to Mr. Bledsoe's lack of involvement in violent activity when he came to D.C. on January 6, it is important to note that Mr. Bledsoe was not planning to storm the Capitol or to engage in any conduct that might cause harm to anyone, including himself. He wore his street clothes, and there is no evidence that he wore any protective gear or caried any weapons.  He testified that the reason he even came to D.C. from west Tennessee in the first place was to attend the rally to protest the election results that ended up being held at White House Ellipse.  There is no reason to doubt this.  While at the Capitol on January 6, Mr. Bledsoe enthusiastically demonstrated—probably most memorably by parading around the Rotunda while holding a Trump flag high in the air. However, during the events of January 6, Mr. Bledsoe did not assault any police officers or even engage in confrontational behavior towards any police officers.  In fact, the video evidence shows that, when he did pass by officers towards the end of his 22-minute stay inside the Capitol, he took pains to signal to them that he was not a threat by putting his

hands up in a surrender-type gesture and seemingly asking them if it was okay to pass. While at the Capitol on January 6, Mr. Bledsoe, did not engage in any property destruction. Also, it is important to note that there is no evidence that, during the events of January 6, Mr. Bledsoe was ever present when others were engaging in assaultive and confrontational conduct towards the police or causing property damage.

Given all the above, it is submitted that sentence of 15 months reflects the seriousness of Mr. Bledsoe's criminal conduct and is sufficient to promote respect for the law and provide just punishment for his conduct.  Additionally, it is submitted that a sentence of 15 months is more than enough to deter Mr. Bledsoe from engaging in future criminal activity and to protect the public from him.  While Mr. Bledsoe did get convicted for DUI and related offenses three times when he was in his late teens and early 20's, the youngest of these convictions was for conduct that occurred fifteen years ago, when Mr. Bledsoe was 23.  His convictions in this case are his first convictions since that one. Moreover, there is no evidence that he has engaged in any criminal activity since the events of January 6.  It thus seems fair to say that Mr. Bledsoe's conduct in this case is anomalous.  Additionally, while Mr. Bledsoe did send text messages to friends and family members and make posts to them on his Facebook page while the events of January were unfolding and immediately thereafter that showed he approved of those events, it must be noted that, at the time, Mr. Bledsoe genuinely believed that the election had been stolen from Donald Trump based on what he was being told by news sources and politicians. When he testified at his trial, he publicly disavowed his previous belief, saying that he realizes now that he had been misled.  Also, while the probation office has submitted two negative reports during 20 months that Mr. Bledsoe has been on pretrial release (one concerning the fact that he had got in a wading pool with a waterproof boot over his ankle bracelet and the other concerning the fact he got argumentative with a probation officer who was calling to make sure he understood his travel obligations), there is no evidence that he violated his curfew or travel restrictions or other conditions while on release in this

case.  Given all the above, it seems to safe to say that the risk of Mr. Bledsoe engaging in future criminal activity is low regardless of what sentence he might be given in this case.

## Sentencing Guidelines

The PSR indicates that, pursuant to U.S.S.G. § 1B1.9, the Sentencing Guidelines do not apply to Mr. Bledsoe's convictions on counts 4 and 5 of the Indictment due to their minor nature.  PSR at 10.  The PSR further indicates that, pursuant to U.S.S.G. § 3D1.2(b), Mr. Bledsoe's misdemeanor convictions for counts 2 and 3 should be grouped with his felony conviction for count 1.  Id.  The PSR then goes on to determine Mr. Bledsoe's Guidelines Offense Level for that group based on determining the Offense Level applicable to count 1. Id.

In determining the Guidelines Offense Level for count 1, the PSR uses U.S.S.G § 2J1.2  PSR at 10.  Mr. Bledsoe does not dispute that this is the applicable Guidelines provision for count 1.  The PSR correctly indicates that the Base Offense Level for count 1 per that provision is 14.  U.S.S.G § 2J1.2(a).  The PSR then goes on to indicate that Mr. Bledsoe should be given an 8-point enhancement to his Offense Level under U.S.S.G. § 2J1.2(b)(1)(B) and an additional 3-point enhancement under U.S.S.G. § 2J1.2(b)(2).  PSR at 10.  The PSR also indicates that Mr. Bledsoe should be given a further 2-point enhancement under U.S.S.G § 3C1.1.  PSR at 7, 10.  With these three enhancements applied, Mr. Bledsoe Total Offense Level would be 27.  See id. at 10.  Mr. Bledsoe disputes that any of these three enhancements apply and maintains that his Total Offense Level should be scored at 14.

### A.  U.S.S.G. § 2J1.2(b)(1)(B) and U.S.S.G. § 2J1(b)(2)

As an initial matter, on a legal level, neither U.S.S.G. § 2 J1.2(b)(1)(B) nor U.S.S.G. § 2J1.2(b)(2) apply to the conduct that underlies Mr. Bledsoe's conviction under 18 U.S.C. § 1512(c)(2).  U.S.S.G. § 2J1.2(b)(1)(B) can only apply to convictions where the

underlying conduct was engaged in "in order to obstruct the <u>administration of justice</u> [emphasis added]," and U.S.S.G §2 J1.2(b)(2) can only apply to convictions where the underlying conduct "resulted in substantial interference with the <u>administration of justice</u> [emphasis added]."  The conduct underlying Mr. Bledsoe's conviction under 18 U.S.C. § 1512(c)(2), however, concerns interference with the congressional hearing to certify the Electoral College votes that occurred at the United States Capitol on January 6, 2021, and that hearing was not a hearing that involved the administration of justice.  Accordingly, as a legal matter, for the conduct underlying Mr. Bledsoe's conviction under 18 U.S.C. § 1512(c)(2), neither U.S.S.G. § 2 JI.2(b)(1)(B) nor U.S.S.G. § 2J1.2(b)(2) apply.

In <u>United States v. Aguilar</u>, 515 U.S. 593(1995), the Supreme Court indicated that, for a defendant to be convicted under 18 U.S.C. § 1503 for obstructing the "due administration of justice," it must be shown that his conduct was intended "to influence judicial or grand jury proceedings."  <u>Id.</u> at 599.  In doing this, the Supreme Court thus signaled that the phrase "administration of justice" as used in § 1503 is meant to refer only to judicial proceedings, including grand jury proceedings.  Following the Supreme Court's lead, federal circuit courts addressing whether or not a defendant's conduct can amount to obstruction of the "due administration of justice" under § 1503, have uniformly held that that conduct must be shown to have affected a judicial proceeding.  <u>See</u> <u>United States v. Richardson</u>, 676 F.3d 491, 502-503 (5th Cir. 2012) ("obstructing the due administration of justice means interfering with the procedure of a judicial hearing or trial"); <u>United States v. Brenson</u>, 104 F.3d 1267, 1279-80 (11th Cir. 1997) ("due administration of justice" means "judicial procedure" and "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving thoughtful testimony when subpoenaed"); <u>United States v. Warlick</u>, 742 F.2d 113, 116 (4th Cir. 1984) (defining obstruction of the "administration of justice" as acts that "thwart the judicial process"); <u>United States v. Rasheed</u>, 663 F.2d 843, 851 (9th Cir. 1981) ("administration of justice" commences with "a specific judicial proceeding").

The same tools for interpreting language in statutes apply when interpreting language in the Guidelines.  United States v. Martinez, 870 F.3d 1163, 1166 (9th Cir. 2017); United States v. Fulford, 662 F.3d 1174, 1177 (11th Cir. 2011).  Accordingly, it would not make sense to interpret the phrase "administration of justice" in connection with U.S.S.G. § 2 JI.2(b)(1)(B) and U.S.S.G. § 2J1.2(b)(2) any differently than that phrase has been interpreted in connection with 18 U.S.C. § 1503.  This is especially so since both of these Guidelines provisions were expressly meant to apply to offenses under § 1503. U.S.S.G. §2J1.2 cmt. Statutory Provisions.  Indeed, this conclusion is further reinforced by the application note for § 2J1.2 regarding the meaning of the phrase "substantial interference with the administration of justice," which is used in 2J1.2(b)(2):

> "Substantial interference with the administration of justice" includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

U.S.S.G. §2J1.2 cmt. n. 1.  The types of proceedings listed in the comment strongly suggests, as used in § 2J1.2, the phrase "administration for justice" is meant to apply to judicial proceedings.

Given that the phrase "administration of justice" as used is in § 2J1.2 is meant to apply to judicial proceedings, it cannot be claimed that the specific enhancement provisions of § 2J1.2(b)(1)(B) and § 2J1.2(b)(2) apply to the conduct upon which Mr. Bledsoe's conviction under 18 U.S.C. § 1512(c)(2) is based.  Under § 1512(c)(2), Mr. Bledsoe was found guilty of obstructing the congressional hearing to certify the Electoral College votes that occurred at the U.S. Capitol on January 6, 2021.  However, this hearing was not a judicial proceeding in any commonly understood way.  Indeed, the legislative branch, of which Congress is obviously a part, is altogether separate from the branch of government charged with administering justice.  As has been noted, "Congress does not engage in… 'the administration of justice.'" United States v. Montgomery, 578 F.Supp.3d 54 (D.D.C 2021).  Thus, while Mr. Bledsoe has been found guilty of obstructing the

January 6, 2021 congressional hearing to certify the Electoral College votes, his conduct did not involve a proceeding related to the administration of justice, and thus as legal matter, neither U.S.S.G. § 2 JI.2(b)(1)(B) nor U.S.S.G. § 2J1.2(b)(2) can apply to it.

Beyond this, even if it could somehow be said that the January 6, 2021 congressional hearing to certify the Electoral College votes was, as a legal matter, a hearing related to the administration of justice, there are still no factual bases for finding that U.S.S.G. § 2 JI.2(b)(1)(B) and U.S.S.G. § 2J1.2(b)(2) actually apply to the conduct upon which Mr. Bledsoe's conviction under 18 U.S.C. § 1512(c)(2) was based.  In order for Mr. Bledsoe to be given an 8-point enhancement to his Offense Level under U.S.S.G § 2J1.2(b)(1(B), it must be shown that his conduct "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."  In order for Mr. Bledsoe to be given a 3-point enhancement under U.S.S.G. § 2J1.2(b)(2), it must be shown that his conduct "resulted in substantial interference with the administration of justice."  However, it cannot be shown that Mr. Bledsoe's conduct qualifies for either of these enhancements.

In regards to U.S.S.G. § 2J1.2(b)(1)(B), the PSR indicates that Mr. Bledsoe should be given the applicable 8-point enhancement, "[b]ecause the offense involved causing or threatening to cause physical injury to a person [to wit: the defendant, while inside the US Capitol, called out the name of the Speaker of the House of Representatives, Nancy Pelosi, specifically targeting her, among others] in order to obstruct the administration of justice [brackets in original]."  PSR at 10.  This assertion is simply not true.  There is no evidence that Mr. Bledsoe ever called out the name "Nancy" (or any other name).  At trial, a video and audio recording made by someone who was in the Capitol on January 6 at the same time that Mr. Bledsoe was in building was introduced into evidence.  On the recording, people who are in the vicinity of the person who made the recording as that person is climbing a staircase inside the building can be heard to spontaneously start calling the name "Nancy."  However, the video shows that Mr. Bledsoe was not one of these people.

Indeed, the video shows that, at the time the person who made the video was climbing the staircase, Mr. Bledsoe was standing silently in the thronged foyer area at the base of the staircase.  Even if it is assumed that the people on the staircase who were calling the name "Nancy" were actually making a threat to cause physical injury to Speaker Pelosi by doing so, it is still not at all clear that they would have been making such a threat against her in order to obstruct the hearing to certify the Electoral College votes (as opposed to just making a threat against her as a general matter).  And even if so, the point still remains that Mr. Bledsoe was not one of these people.  Accordingly, there is no factual predicate for giving Mr. Bledsoe an 8-point enhancement to his Offense Level under § 2J1.2(b)(1)(B).

In regards to U.S.S.G § 2J1.2(b)(2), the PSR indicates that Mr. Bledsoe should be given the applicable 3-point enhancement to his Offense Level because that offense "involved the substantial interference with the administration of justice."  PSR at 10.  However, the PSR fails to specifically indicate how Mr. Bledsoe's conduct resulted in the substantial interference with the administration of justice.  While the overall effect of hundreds and perhaps thousands of people going into the Capitol on January 6 certainly caused substantial interference to the congressional hearing to certify the Electoral College votes, the PSR fails to indicate how Mr. Bledsoe can be held accountable for the effect that all of those people going into the building had.[1]  Moreover, it fails to show how any specific conduct he personally engaged in or any specific conduct that he aided and abetted resulted in the substantial interference with the hearing.  Accordingly, there is no factual predicate for giving Mr. Bledsoe a 3-point enhancement to is Offense Level under § 2J1.2(b)(2).

---

[1] To simply say that everyone who entered the Capitol on January 6 is accountable for the overall effect of all the people who entered the building that day is to say that everyone who entered the building is guilty of Obstruction of an Official Proceeding under 18 U.S.C. § 1512(c)(2).  However, if this is in fact the case, then it must be acknowledged that the government is therefore engaging in selective prosecution by only charging a small minority of those people with such an offense.

**B.  U.S.S.G § 3C1**

In addition to indicating that Mr. Bledsoe should be given enhancements to his Offense Level under U.S.S.G. § 2 JI.2(b)(1)(B) and U.S.S.G. § 2J1.2(b)(2), the PSR also indicates that Mr. Bledsoe should be given a 2-point enhancement to his Offense Level under U.S.S.G. § 3C1.1.  PSR at 7, 10.

It is stated in the PSR that Mr. Bledsoe provided materially false testimony about 4 items:

1. "his knowledge and understanding of what was taking place in Congress with respect to the vote certification."

2. "the lawfulness of his entry into the US Capitol and clear signs that he was not permitted inside."

3. "the identities of individuals he entered the US Capitol looking for."

4. "the meaning of text messages and content posted on social media condoning violence and storming the US Capitol."

PSR at 7.

As an initial matter, it must be noted that the Sentencing Commission expressly indicates that caution should be used when applying U.S.S.G § 3C1.1:

> In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

U.S.S.G. § 3C1.1 cmt. n. 2.

In regards to the claim that Mr. Bledsoe provided false testimony concerning "his knowledge and understanding of what was taking place in Congress with respect to the vote certification," the PSR discusses the testimony that Mr. Bledsoe gave about was what taking place in Congress on January 6 in paragraph 19.  PSR at 6.  There, it is stated that even though Mr. Bledsoe "acknowledged that his wife and brother were sending him text

updates on the Joint Session," he nevertheless testified that he "did not <u>fully</u> understand what they meant [emphasis added]." <u>Id.</u>  The PSR seems to question the veracity of this testimony, but it is hard to see how this can be considered a lie.  This is especially so since, as the PSR itself even indicates, Mr. Bledsoe went on the acknowledge, "I knew what the Electoral College was, but I didn't know the whole process involved with counting the votes and all that." <u>Id.</u>  Moreover, it should be noted here that Mr. Bledsoe's understanding about the actual specifics of how the Joint Session was dealing with the Electoral College votes was not material to the issue at hand—that is, whether or not he was intending to obstruct that Joint Session.  Further, the PSR claims that, in regards to a text message he received from a friend indicating that "[he] was making them leave Capitol Hill," Mr. Bledsoe testified that he thought the statement was referencing the fact "there were 'an enormous amount of people [at the Capitol].'"  The PSR seems to also question the veracity of this testimony, but again it is hard to see how this testimony can be regarded as a lie either.

In regards to the claim that Mr. Bledsoe provided false testimony concerning "the lawfulness of his entry into the US Capitol and clear signs that he was not permitted inside," the PSR discusses Mr. Bledsoe's testimony on these points in paragraph 23.  PSR at 7.  There, it is stated that Mr. Bledsoe testified that "he believed [] police officers were allowing people into the US Capitol and he did not believe he was doing anything wrong by going inside." <u>Id.</u>  Also, it is stated that Mr. Bledsoe, in his testimony, "denied hearing an alarm sounding when he entered the US Capitol or seeing shattered glass in the door he walked through." <u>Id.</u>  There is no evidence that any of this referenced testimony by Mr. Bledsoe was actually false.  The evidence at trial shows that United States Capitol Police

Officers were in fact standing off to the side of the door that Mr. Bledsoe entered through and that they were not making any attempts whatsoever to stop people from going through the door.  Also, it is not hard to imagine that, in the heat of the moment with all the crowding that was going on and all the noise, Mr. Bledsoe actually did not recognize that there was a beeping alarm sounding in the area of the door.  Moreover, it is not hard to imagine that he may not have seen the pane of glass in the door that had been damaged. While the jury ultimately found Mr. Bledsoe guilty on the two trespass charges brought against him under 18 U.S.C. § 1752, there are no indications as to what specific evidence the jury based these findings of guilt on.  Beyond this, even if it is found that Mr. Bledsoe was lying about his belief that police were allowing people into the building and about not hearing the alarm or seeing the broken glass, this testimony would not have been material to the Obstruction (count 1) he was charge with but rather to the trespass charges that were brought against him under 18 U.S.C. § 1752 (counts 2 and 3).  Thus, giving Mr. Bledsoe a 2-point enhancement to his Guidelines Offense Level for the Obstruction count because of such testimony would still not be appropriate even if that testimony was flatly dishonest.

In regards to the claim that Mr. Bledsoe provided false testimony concerning the "identities of individuals he entered the US Capitol looking for," the PSR discusses his testimony on this point in paragraph 20.  PSR at 6.  There, the following is stated:

> [W]hen asked who the 'pieces of shit' were he was looking for when he entered the Capitol, [Mr. Bledsoe] testified, "I wasn't really referring to anybody.  Just going in to protest.  That's basically what I was referring to.  Where can we go to protest. That is basically what I was referring to.  Where can we go to protest…[.]" Defendant Bledsoe stuck with his story when pressed, "[I]ike I said, just being a loudmouth and more of a general statement than referring to anyone in particular."

The above referenced testimony shows that, when Mr. Bledsoe was replying to the question about "who the 'pieces of shit' were he was looking for when he entered the

Capitol," he was focusing on the underlying suggestion of the question that he was looking for people in order to harm or threaten them.  His answer is thus properly viewed as an attempt to point out that he was not looking for people in order to harm or threaten them but rather looking for an audience to protest in front of.  Moreover, it should also be noted that there is no evidence that Mr. Bledsoe did in fact have actually have any specific persons in mind when he asked where "those pieces of shit" were.  Thus, it cannot be claimed that, when he testified that he "wasn't really referring to anybody" or to "anyone in particular," he was actually lying.   Accordingly, it cannot be said that Mr. Bledsoe provided materially false testimony regarding the "the identities of individuals he entered the US Capitol looking for."

Finally, in regards to the claim that Mr. Bledsoe provided false testimony concerning "the meaning of text messages and content posted on social media condoning violence and storming the US Capitol," the PSR does not cite any specific text messages or social media posts condoning violence and the storming of the Capitol whose meaning Mr. Bledsoe actually lied about.  However, it is assumed the PSR is referring to testimony that Mr. Bledsoe gave regarding certain memes he posted immediately after the events of January 6.  This assumption is made because the PSR goes out of its way to say that Mr. Bledsoe "attempted to distance himself from the commentary on the memes by explaining that he 'just hit the repost button [emphasis added]'" and because the memes at issue did admittedly contain commentary that condoned violence and the storming of the Capitol.  However, Mr. Bledsoe never denied that they did not, nor did he deny having posted the memes.  Moreover, there is no evidence that he was lying when he indicated that he was not the one who actually created the memes.  While Mr. Bledsoe's testimony that he "just

hit the repost button," was obviously intended to make the point that there is a difference between actually creating a meme and simply reposting one, this is not necessarily an invalid point to make. And it certainly cannot be said that he provided materially false testimony for having made it.

### C. Summary Regarding Guidelines Calculations

Because neither the 8-point enhancement under U.S.S.G. § 2J1.2(b)(1)(B), the 3-point enhancement under U.S.S.G. § 2JI.2(b)(2), nor the 2-point enhancement under U.S.S.G § 3C1.1 apply for determining the Offense Level for the Obstruction charge (count 1) that Mr. Bledsoe was convicted on, the Total Offense Level under the Guidelines for the group that is led by that charge is 14. Given that Mr. Bledsoe is in Criminal History Category I, Mr. Bledsoe recommended sentence under the Guidelines is therefore 15-21 months. Mr. Bledsoe is requesting that he be given a sentence of 15 months.

### The Need to Avoid Unwarranted Sentencing Disparities

The sole felony conviction against Mr. Bledsoe is for Obstruction of an Official Proceeding under 18 U.S.C. § 1512(c)(2). This is the charge that will obviously be driving his sentence. See PSR at 10. With this in mind, it is submitted that the sentences given to January 6 defendants Richard Michetti (21-cr-232 (CRC)) and Paul Hodgkins (21-cr-188 (RDM)) provide meaningful models for the sentence that should be given to Mr. Bledsoe. Both Mr. Michetti and Mr. Hodgkins pled guilty to Obstruction under § 1512(c)(2) in exchange for the other charges against them being dismissed. Of course, because they pled guilty, they were certainly and rightly given more lenient sentences than they would have received had they gone to trial. Nevertheless, the actual conduct they admitted to when they pled guilty was more egregious than the conduct underlying Mr. Bledsoe's convictions. Accordingly, even considering the fact that Mr. Bledsoe went to trial, the

sentences given to Mr. Michetti and Mr. Hodgkins still provide appropriate models for Mr. Bledsoe's sentence.

According to the Government's Sentencing Memorandum in Mr. Michetti's case (ECF #46), he was part of a mob that tried to force its way past a line of police officers in the hallway by the Old Senate Chamber, directly menaced those officers, told them they were "Fucking Animals," "supported actual assaults by others in the mob perpetrated upon [those officers], and even pinched one officer's sleeve.  Further, he confronted and yelled at police officers both in the Rotunda and then by the east Rotunda doors.  Later, in the Rotunda, he joined a mob that was pushing against a police line that had formed there.  Id. at 16-20.  According to the Government's Sentencing Memorandum in Mr. Hodgkins' case (ECF #32), he came to D.C. on January 6 "preparing to encounter violence," Government's Sentencing Memorandum at 12, and he brought with him "rope, protective eyewear, and latex gloves," id. at 10.  He did not simply enter the Capitol building and walk around the halls.  Rather, donning his eye goggles as he did so, he actually entered the Senate chamber, id. at 11, and at a time when other rioters were rummaging Senators' desks, walked past them to the well of the chamber where he joined in the "chanting and ranting" that others were leading from the dais, id. at 11-12.

According to his Plea Agreement (ECF #), Mr. Michetti's estimated Guidelines sentencing range was 15-21 months.  Plea Agreement at 3.  Nevertheless, he was given a below-Guidelines sentence of 9 months.  Judgement (ECF #42) at 2.  According to his Plea Agreement (ECF #22), Mr. Hodgkins' estimated Guidelines sentencing range was also 15-21 months.  Plea Agreement at 3.  Nevertheless, he too was given a similar below-Guidelines sentence—that is, 8 months.  Judgement (ECF #37) at 2.  Mr. Bledsoe should be given a sentence that is in keeping with the sentences given to Mr. Michetti and Mr. Hodgkins.

The sentences given to a number of other January 6 defendants are also instructive in regards to determining what would be an appropriate sentence for Mr. Bledsoe.  One

obvious such sentence is the one given to Anthony Williams (21-cr-377 (BAH)), whose case was tried before this Court.  Mr. Williams was convicted at trial on the very same charges that Mr. Bledsoe was convicted on.  Verdict Form (ECF #116).  However, Mr. Williams' conduct on January 6 appears to be significantly more egregious than Mr. Bledsoe's conduct.  According to the Government's Sentencing Memorandum (ECF #120) in Mr. Williams' case, the evidence at trial showed that, while outside the Capitol on January 6, Mr. Williams helped other rioters use bicycle racks to climb up onto a staircase so that he and those rioters could directly confront police officers who had formed a line there.  He then helped those rioters push through the police line to get access to the building.  Government's Sentencing Memorandum at 10-15.  Once he entered the Capitol, Mr. Williams stayed in the building for an hour, id. at 23, and continued to go out of his way to engage in violent confrontations with police.  After entering the building, he went to the Crypt, where he pushed through a crowd to directly confront police officers who were trying to prevent the crowd from advancing further into the building.  He then menaced the officers and, at the front of the charge, helped the crowd to overwhelm and push past the police officers.  Id. at 17-19.  Later, in the Rotunda, Mr. Williams joined with other rioters and actively pushed back against and resisted police officers who were trying to clear the room.  Id. at 21-23. Mr. Williams was sentenced by this Court to 60 months. Judgement in a Criminal Case (ECF #131) at 3.  Mr. Bledsoe should be given a sentence that is less than Mr. Williams' sentence.

Mr. Bledsoe should also be given a sentence that is less than the sentence given to Joshua Pruitt (21-cr-23 (TJK)).  While Mr. Pruitt pled guilty to one count of Obstruction under § 1512(c)(2) in exchange for the other charges against him being dismissed, the conduct underlying his conviction was an order of magnitude greater than the conduct underlying Mr. Bledsoe's convictions.  According to the Government's Sentencing Memorandum in Mr. Pruitt's case (ECF #66), Mr. Pruitt coordinated with the Proud Boys in the days leading up to January 6 to prepare for and engage in the violence that occurred

at Capitol that day.  Government's Sentencing Memorandum at 6-24.  Indeed, on the morning of January 6, Mr. Pruitt posted a picture of himself holding an AR-15 rifle on social media, id. at 21-22, and then later texted a Proud Boy associate, "I hope Trump declares war," id. at 23-24.  At the Capitol on January 6, Mr. Pruitt confronted and menaced police officers on the northwest lawn of the building, id. at 24-25; picked up and hurled a wooden sign upon entering the building, id. at 27-28; led a mob in confronting, menacing, and overwhelming police officers in the Crypt, id. at 29-33; confronted and menaced police officers at the Visitor Center and threw a chair in their direction, id. at 33-35; approached and appeared to chase Senator Chuck Schumer and his security detail as Senator Schumer was being evacuated through the Visitor Center, id. at 35-37; and continued to confront officers in the Visitor Center, challenging them to fight and making other menacing statements to them, id. at 37-40.  After his arrest and release in this case, Mr. Pruitt made posts on social media with videos of himself displaying firearms and making further threats to engage in violence.  Id. at 40-42.  According to his Plea Agreement (ECF #60), Mr. Pruitt's estimated Guidelines sentencing range was 51-63 months.  He was given a lower-end Guidelines sentence of 55 months.  Judgment (ECF #73) at 2.  Mr. Bledsoe should be given a sentence that is less than Mr. Pruitt's sentence.

Finally, Mr. Bledsoe should also be given a sentence that is less than the sentences that were given Scott Fairlamb (21-cr-120 (RCL)), Duke Wilson (21-cr-345 (RCL)), Matthew Miller (21-cr-75 (RDM)), and Greg Rubenacker (21-cr 193 (BAH)).  While all these defendants pled guilty to Obstruction under 18 U.S.C. § 1512(c)(2), they also all pled guilty to the additional felony charge of Assault on a Police Officer under 18 U.S.C. § 111(a), and Mr. Rubenacker even pled guilty to another additional felony charge as well. Scott Fairlamb received a prison sentence of 41 months.  Judgement (ECF #57) at 2. Among other things, Mr. Fairlamb shoved an officer and punched his face shield and then took a police baton and brandished it while screaming at officers that he would "disarm them." Government's Sentencing Memorandum (ECF #50) at 1-2.  Duke Wilson received

a prison sentence of 51 months. Judgment (ECF #36) at 3.  Among other things, Mr. Wilson "engaged in several acts of violence against police officers," including "punching them, attempting to take their shields, and throwing objects at them."  Government Sentencing Memorandum (ECF #29) at 1-2.  Also, he picked up what appeared to be a PVC pipe and "indiscriminately struck at the officers with it." Id. at 12.  Matthew Miller received a prison sentence of 33 months. Judgment (ECF #74) at 2.  Among other things, while outside the Capitol building, Mr. Miller encouraged other rioters to get closer to the Capitol and threw a full beer can at officers.  Government Sentencing Memorandum (ECF #67) at 17.  Once he got closer to Capitol, Mr. Miller "urged other rioters to push against the police; threw batteries at police officers; and… released the contents of a fire extinguisher, a dangerous weapon when used as Miller did, directly onto law enforcement officers." Id.

Greg Rubenacker was sentenced by this Court.  He was sentenced to 41 months. Amended Judgement (ECF #77) at 3.  Among other things, he was one of the very first rioters to actually breach the Capitol, entering with the first wave of rioters in the first 60 seconds of the initial breach of the building.  Government Sentencing Memorandum (ECF # 56) at 8-9.  Once in the building,  he immediately proceeded to chase an officer up a flight of stairs (Officer Goodman) and down a hallway to within feet of the Senate chamber, ignoring the officer's repeated demands to "back up." Id. at 10-12.  Once the officer got to just outside the Senate Chamber, he was joined by other officers, and Mr. Rubenacker then went directly up to the officers in the now-forming police line to point his finger at them while another rioter was repeatedly yelling at them, "Back up!" Id. at 12-13.  Later, after exiting the Capitol, he then joined a crowd that had assembled just outside the East Rotunda doors, and he helped that crowd to overwhelm the police there and breach the building. Id. at 15-16.  Entering the building now for a second time, Mr. Rubenacker advanced to the Senate Hall where he pushed through the crowd to directly confront officers who were trying to keep the crowd from entering the Senate Chamber.

Id. at 16-17.  After those officers deployed chemical-irritant spray, Mr. Rubenacker retreated to the Rotunda where he openly smoked marijuana.  Id. at 18.  Then, when officers formed an advancing line to clear the Rotunda, Mr. Rubenacker joined with others in physically pushing the officers back.  Id. at 19-21.  He "engaged in two assaults on law enforcement."  Id. at 21.  He rushed towards the police line and pushed another rioter into an officer and then, with a plastic bottle in his hand, swung and hit an officer in the head.  Id. at 21-22.  A minute later, he threw liquid on officers, distracting them as they physically engaged with rioters. Id. at 23.  After again being forced to retreat due to the police deployment of chemical-irritant spray, Mr. Rubenacker left the building a second time—this time for good—an hour after he had initially breached it.  Id. at 24-25.  After the riot, he researched methods for concealing evidence of his criminal activity.  Id. at 27-28.

Mr. Bledsoe should be  given a sentence that is less than the sentences given to Messrs. Fairlamb, Wilson, Miller, and Rubenacker.

## Conclusion

In consideration of the above, Mr. Bledsoe submits that a sentence of 15 months followed by a period of supervised release is appropriate for him in this case.  As indicated, such a sentence is at the bottom of the Guidelines range as properly determined. See supra at 11-20.  Moreover, even if a higher Guidelines range is found to apply, a sentence of 15 months followed by a period of supervised release is still the appropriate sentence for Mr. Bledsoe when determined, as it must be, under 18 U.S.C. § 3553(a).

WHEREFORE the defendant, Matthew Bledsoe, provides the above information to

aid the Court in determining the appropriate sentence for him.

Respectfully submitted,


_____/s/_____
Jerry Ray Smith, Jr.
D.C. Bar No. 448699
Counsel for Matthew Bledsoe
717 D Street, N.W.
Suite 310
Washington, DC 20004
E-mail: jerryraysmith@verizon.net
Phone: (202) 347-6101