UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )( | |
| )( | Criminal No. 21-204 (BAH) |
| v.   )( | Chief Judge Howell |
| )( | Sentencing: October 21, 2022 |
| MATTHEW BLEDSOE )( | |

**RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM**

COMES NOW the defendant, Matthew Bledsoe, by and through undersigned counsel, and respectfully responds to the Government's Sentencing Memorandum. Towards this end, Mr. Bledsoe would show:

**U.S.S.G. § 2J1.2(b)(1)(B)**

In its Presentence Investigation Report (ECF #226) (PSR), the Probation Office has determined that Mr. Bledsoe's Total Offense Level is 27. PSR ¶ 52. In reaching this number, the Probation Office adds 8 points to Mr. Bledsoe's Offense Level by applying U.S.S.G. § 2J1.2(b)(1)(B). PSR ¶ 44. The government concurs with the Probation's Office's determinations at to Mr. Bledsoe's Total Offense Level, including its determination regarding the applicability of § 2J1.2(b)(1)(B). Government's Sentencing Memorandum (ECF # 228) (Gov't Memo) at 17-19. The government concurs with the Probation Office's application of the 8-point enhancement to Mr. Bledsoe's Offense Level under U.S.S.G. § 2J1.2(b)(1)(B) despite acknowledging that the Probation Office's claimed factual predicate for applying this enhancement does not exist. The Probation Office maintains that the enhancement applies "[b]ecause the offense involves causing or threatening to cause physical injury to a person [to wit: the defendant, while inside the US Capitol, called out the name of the Speaker of the House of Representatives Nancy Pelosi, specifically targeting her, among others] in order to obstruct the administration of justice."

1

PSR ¶ 44 (brackets and bracketed language in the original).  In its sentencing memorandum, however, the government acknowledges that Mr. Bledsoe never called out the name of the Speaker Pelosi.[1]  Gov't Memo at 9.

    Mr. Bledsoe has zero Criminal History Points, and he is in Criminal History Category I.  See PSR ¶57.  At Offense Level 27, his Guidelines range is 70-87 months.  See PSR ¶ 101.  The government is asking the Court to give Mr. Bledsoe a sentence of 70-months incarceration.  Gov't Memo at 3, 65.  In doing this, the government is asking the Court to sentence Mr. Bledsoe at the low end of a Guidelines range applicable to an Offense Level that has been determined based upon a factual claim that even the government acknowledges is wrong.  Without the application of the 8-point enhancement under U.S.S.G. § 2J1.2(b)(1)(B), Mr. Bledsoe's Total Offense Level would obviously come down to 19.  As Mr. Bledsoe points out in Memorandum in Aid of Sentencing (ECF #229) (Defendant's Memo), his correctly determined Total Offense Level is actually lower than this.  See Defendant's Memo at 11-20.  However, even if Mr. Bledsoe's Total Offense Level were 19, his Guidelines range would still only be 30-37 months.  Thus, in asking the Court to sentence Mr. Bledsoe in compliance with a Guidelines range that would be applicable to him if his Total Offense Level were 27, the government is making use of a factual determination that even it acknowledges is wrong, to ask the Court to sentence him within a Guidelines range that is more than double the one that would otherwise apply.

    At this point, it should again be acknowledged that, though Mr. Bledsoe never called out the name of Speaker Pelosi, he was at least briefly in the vicinity of people who did.  See Defendant's Memo at 14-15.  However, that others in Mr. Bledsoe's vicinity may have called out the Speaker's name is still not something that he can be held accountable for so as to warrant applying 18 U.S.S.G. 2J1.2(b)(1(B) to his Offense Level.  At Mr.

---

[1] It is perhaps worthwhile to note here that, though the PSR states that, by calling out the name of Speaker Pelosi, Mr. Bledsoe was "specifically targeting her, among others," (PSR ¶44) (emphasis added), it makes no sense that any such alleged conduct by Mr. Bledsoe could be viewed as specifically targeting anyone but Speaker Pelosi.  Beyond this, of course, the fact remains that Mr. Bledsoe never called out the Speaker's name in the first place

Bledsoe's trial, the only evidence that showed anyone calling the name of Speaker Pelosi came from a video recording that the government presented. The recording was made by someone who was in the Capitol around the same time that Mr. Bledsoe was. The recording has an audio component. The portion of the recording that was introduced at trial shows that, as the person who made the recording was climbing a staircase inside the Capitol, people who were climbing the staircase with him began to spontaneously chant the name "Nancy" for approximately 20 seconds. During this time, the person pans his camera to look down the staircase to the crowded foyer area at the base of the staircase. Mr. Bledsoe is in this crowd. The video captures him for approximately 15 seconds. He is not involved in any chanting, and he is also not advancing while the chanting is occurring. When the camera first captures Mr. Bledsoe, he is facing towards the staircase (and the camera). However, as the camera is panning away from him, he turns around so that his back is to the staircase (and the camera). Especially given this, that people on the staircase spontaneously began chanting the name "Nancy" as they ascended is not conduct that can be attributed to Mr. Bledsoe under § 2J1.2(b)(1)(B). See Rosemond v. United States, 134 S.Ct. 1240, 1250-51 (2014) (where evidence did not show that drug-trafficking defendant was aware his accomplice was armed at time defendant associated himself with drug-trafficking venture, he could not be held liable on an aiding-and-abetting theory for the fact that, during the venture, his accomplice took out a firearm and used it).

### The Government's Request for a 70-Month Sentence

As already noted, the government is asking the Court to give Mr. Bledsoe a sentence of 70 months incarceration. See supra at 2. Undersigned counsel is aware of only four other January 6 defendants who have received sentences greater than 70 months. These are Guy Reffitt (21-cr-32 (DLF)), Thomas Robertson, (21-cr-34 (CRC)), Thomas Webster (21-cr-208 (APM)), and Kyle Young, (21-cr-291 (ABJ)). Mr. Reffitt went to trial and received a sentence of 87 months. Judgment for Reffitt (ECF #170) at 3. Mr.

Robertson went to trial and also received a sentence of 87 months.  Judgment for Robertson (ECF #140) at 3.  Mr. Webster went to trial received a sentence of 120 months.  Judgment for Webster (ECF #110) at 3.  And Mr. Young pled guilty and received a sentence of received of 86 months.  Judgment for Young (ECF # 149) at 2.  Thus, in asking for a sentence of 70 months for Mr. Bledsoe, the government appears to be asking that he be given the fifth harshest sentence to date for a January 6 defendant—this for a man who did not organize or incite others to storm the Capitol, did not pre-plan to storm the Capitol himself, did not pre-plan for any violence, was only in the building for 22 minutes, did not assault any police officers or confront any police officers, did not participate in any assaults on or confrontations with police officers, was not even present when others were assaulting or confronting police officers, did not destroy any property or break through any doors or windows, was not even present when others were destroying property or breaking through any doors or windows, took no leadership role in connection with the events of January 6, did not coordinate his activities with any others on January 6, and did not destroy or even attempt to destroy any evidence after the events of that day

  In regards to the four sentences that have been handed out that are greater than the 70- month sentence the government is seeking for Mr. Bledsoe, the sentence given to Mr. Webster (120 months) is significantly greater, but the sentences given to Mr. Reffitt (87 months), Mr. Robertson (87 months), and Mr. Young (86 months) are not all that much greater.  Mr. Young was given his sentence after pleading guilty, but like Mr. Bledsoe, Mr. Reffitt and Mr. Robertson both went to trial.  A review of the conduct that Mr. Reffitt and Mr. Robertson engaged in bears out how extraordinarily severe the government's request for a 70-month sentence for Mr. Bledsoe is.

  According to the Government's Sentencing Memorandum for Guy Reffitt, (ECF#158), Mr. Reffitt traveled from Texas to D.C. to a participate in the events of January 6 and brought with him "an AR-15-style semi-automatic rifle and a Smith & Wesson .40 caliber handgun."  Government's Sentencing Memorandum at 5.  Further, he

recruited another individual to come with him who also brought "his own handgun and AR-15 rifle on the trip." Id. at 6.  On January 6, Mr. Reffitt brought his handgun with him to the Capitol while wearing "a tactical helmet and bulletproof armor."  Id. at 5.  The vest was capable of stopping rifle rounds.  Id. at 6.  His companion also wore bullet-proof plates that Mr. Reffitt help him secure to his shoulders and chest.  Id.  Also, Mr. Reffitt brought "police-style flexicuffs" with him to the Capitol on January 6.  Id. at 5.  In going to the Capitol on January 6, Mr. Reffitt "did not intend to simply obstruct Congress' certification of the Electoral College vote.  Rather, [he] intended to physically remove legislators from the building (using his firearm and flexicuffs, and the power of the crowd) and actually 'take over' Congress."  Id. at 10.  Mr. Reffitt had a leadership role in the Texas Three Percenters [TTP] militia group, id. at 7, and he "used his membership in the Texas Three Percenters and other militia groups to encourage others to follow his lead to violently attack the Capitol," id. at 8.  For instance, while attending the rally at the White House Ellipse on January 6, Mr. Reffitt, citing his membership in the TTP, the Oath Keepers, and other militia groups, actively riled up others in attendance, repeatedly encouraging people to storm the Capitol, engage in violence against congressmen, and remove them by force from the building.  Id. at 8-11.  Once he got to the Capitol, Mr. Reffitt rushed U.S. Capitol Police Officers on stairs on the west side of the building.  The officers tried unsuccessfully to repel him with non-lethal projectiles. While rushing the officers, Mr. Reffitt encouraged others to charge forward with him, and as a group, he and the others were able to overwhelm the officers and gain access to the Upper West Terrace of the building.  This led directly to the breach of the building near the Senate Wing door (the initial breach of the building).  Id. at 5-6.  In the immediate aftermath of January 6, Mr. Reffitt threatened to take the building again, id. at12, and he indicated that the events of January 6 were a "preface" of political violence to come, id. at 14.  He also attempted to recruit two other persons whom he had apparently met on January 6 to engage in further armed political violence against "California, Big Tech, and MSM [mainstream media]."

5

Id. a 12-13.  Further, he attempted to recruit fellow TTP members to also engage in such violence.  Id. at 14-16.   After January 6, Mr. Reffitt deleted incriminating text messages he had sent about his plans to engage in violence that day.  Id. at 6-7.  He threatened to shoot his two teenage children if they turned him into the FBI.  Id. at 7.  When the police searched his house on January 16, 2021, they found three firearms, including the AR-15-style rifle he brought with him to D.C. for January 6 and the handgun he had on him when he actually stormed the Capitol that day.  In addition to the three firearms, they also found an illegal silencer.  Id. at 18.

  According to the United States' Sentencing Memorandum for Thomas Robertson (ECF #124), in the lead-up to January 6, Mr. Robertson, an Army veteran and a current police officer with the Rocky Mount, Virginia Police Department, advocated on social media for an armed, violent rebellion to overthrow the presidential election results.  United States' Sentencing Memorandum at 4.  For the events of January 6, he travelled to D.C. with two other men.  Id.  He had recruited these men to join him.  Id. at 9.  When he came to D.C. for the events of January 6, he carried, among other things, gas masks and military food rations for himself and his two companions.  Id. at 4.  He also carried a police-baton-like stick.  Id.  While just outside the Capitol on January 6, just prior to the initial breach of the building, Mr. Robertson took up a position at the front of crowd to block Metropolitan Police Department (MPD) Officers who were coming to reinforce U.S. Capitol Police Officers who were then actively engaged in preventing rioters from gaining access to the Upper West Terrace and thus to the building itself.  Id. at 5.  The crowd was able to repel the MPD Officers by assaulting them and throwing a smoke grenade at them.  Id.  When the officers regrouped and tried to advance again, Mr. Robertson, wearing a gas mask, stood directly in front of them and "raised up his wooden stick in 'port arms,' a tactical position used by military and law enforcement."  Id.  As the officers pushed past him, two officers were struck by Mr. Robertson's baton-like stick.  Id.  At around the same time, the rioters who were engaged with the U.S. Capitol Police Officers were able to overwhelm

them and gain access to the Upper West Terrace.  Mr. Robertson then joined these rioters and was with them as they broke out some windows near the Senate Wing door and breached the building.  This was the initial breach of the Capitol.  Id. at 6-7.  Mr. Robertson was part of the "first wave" of rioters to enter the building.  Id. at 7.  Once he entered the building with the "first wave," Mr. Robertson proceeded to the Crypt, where he helped the assembling crowd to overwhelm another police line that had formed there.  Id. at 8.  One of the persons who came with Mr. Robertson to D.C. testified against him at trial.  Id. at 4.  This person testified that he was with Mr. Robertson in the Crypt and that, after Mr. Robertson helped the crowd to overrun the police there, he and Mr. Robertson did not advance further because they believed that they had already done all was that necessary to insure that the congressional proceeding to certify the Electoral College votes would be stopped.  Id. at 8.  Subsequent to January 6, upon being informed that the FBI had a warrant for his arrest, Mr. Robertson destroyed his phone and the phone of one his companions to conceal evidence of their criminal activity.  Id. at 9.  After being charged and released, Mr. Robertson's home was searched, and law-enforcement agents recovered a loaded M4 rifle and a partially-assembled pipe bomb.  Possession of both of these items was a violation of his release conditions.  Id. at 10.  Law-enforcement also learned that, after his release, Mr. Robertson had purchased and then transported in interstate commerce "an arsenal of 34 firearms," such conduct not only a violation of his release conditions but also of 18 U.S.C. § 922(n).  Id. at 10-11.

### Comparisons to Other Defendants by Government

In its sentencing memorandum, the government compares Mr. Bledsoe's conduct with that of three other January 6 defendants: Anthony Williams (21-cr-377 (BAH)), Thomas Robertson (21-cr-34 (CRC)), and Jacob Chansley (21-cr- 03 (RCL)).  Gov't Memo at 29-31.  As Mr. Bledsoe has already noted in his sentencing memorandum, the conduct engaged in by Mr. Williams was significantly more egregious than the conduct

7

that he engaged in.  See Defendant's Memo at 21.  Mr. Williams played an instrumental role in three significant police/rioter altercations.  Among other things, Mr. Williams used bicycle racks as ladders to help other rioters get up onto a staircase outside the Capitol so that he and those rioters could then charge and overwhelm the police line on the staircase and thus get access to the building.  Once in the Capitol, he went out of his way to seek out confrontations with the police and led a charge that overwhelmed the police line in the Crypt.  Later, he joined with rioters in the Rotunda to actively resist and physically push back on police officers who were trying to clear that room.  See id.[2]  Mr. Williams received a 60-month sentence.  Mr. Bledsoe should be given a sentence that is less than that.

As far as Mr. Robertson goes, as noted above, supra at 6-7, his conduct was also significantly more egregious than Mr. Bledsoe's—by quite a bit.  The government does not appear to deny that Mr. Robertson's conduct was more egregious than Mr. Bledsoe's, and indeed, it acknowledges that Mr. Robertson was involved in two significant confrontations with police.  Gov't Memo at 30.  Nevertheless, in an apparent attempt to make the 70-month sentence it is seeking for Mr. Bledsoe seem compatible with the 87-month sentence that Mr. Robertson was given, the government still downplays Mr. Robertson's conduct by failing to acknowledge a great deal about it  Compare supra at 6-7 with Gov't Memo at 30.  Among other things, the government fails to mention that he recruited two others to come with him from Virginia to storm the Capitol on January 6 and that he brought provisions for them to do so.  Also, it fails to indicate how he assumed a leadership role in confronting and repelling MPD Officers who were attempting to reinforce the U.S. Capitol Police Officers who were trying to prevent rioters from gaining access to the Upper West Terrace and thus the Capitol building itself.  And it fails to mention how, after the MPD

---

[2] It should also be noted that Mr. Williams came to D.C. for January 6 with a group of friends and that, on January 6, he and his friends marched together to the Capitol.  See Government's Sentencing Memorandum for Mr. Williams (ECF #120) at 10.

officers regrouped, Mr. Robertson, donning a gas masks and brandishing his baton-like stick, used his military and police training to further delay those officers from reinforcing the Capitol Police Officers.  The government also fails to mention how these actions along with other actions that Mr. Robertson undertook played an instrumental role in helping to bring about the initial breach of the Capitol on January 6.  Moreover, it fails to acknowledge that, after January 6, Mr. Robertson destroyed evidence when he learned that the FBI had a warrant for his arrest.  Additionally, the government strains to compare Mr. Bledsoe's conduct with Mr. Robertson's conduct.  For instance, the government notes that both Mr. Bledsoe have violated their release conditions. Id. at 30.  In doing this, the government is seemingly making reference to the fact that, on one occasion during the 20 months he has been on release, Mr. Bledsoe got into a plastic wading pool with his daughter while wearing a specially designed waterproof boot over his ankle bracelet and to the fact that, on another occasion, he became argumentative with a Probation Officer who contacted him about upcoming travel plans.  See Gov't Memo at 24; Defendant's Memo at 12.  Mr. Robertson, on the other hand, violated his conditions of release by possessing an M4 rifle and partially assembled pipe bomb and by purchasing and then transporting in interstate commerce "an arsenal of 34 firearms."  See supra at 7.  The sentence that Mr. Bledsoe is given should be considerably less than the sentence given to Mr. Robertson.

        Finally, in regards to Jacob Chansley, the government appears to argue that the 41-month sentence given to Mr. Chansley would not be appropriate for Mr. Bledsoe because, unlike Mr. Chansley, "Mr. Bledsoe has not accepted responsibility for his actions."  Gov't Memo at 31.  However, apart from acknowledging that Mr. Chansley went onto the Senate floor and left a threatening note for Vice President Pence, Gov't Memo at 31, the government does not recognize any of the other important ways that Mr. Chansley's conduct is more serious than Mr. Bledsoe's, including the ways in which Mr. Chansley assumed a leadership and instigator role in storming the Capitol both before January 6 and on it.  According to the Government's Memorandum in Aid of Sentencing for Mr.

Chansley (ECF #81) (Chansley Sentencing Memo), prior to January 6, Mr. Chansley had "accrued thousands of followers across several [social media] platforms, including Facebook, Rumble, Parler, and YouTube." Chansley Sentencing Memo at 5. In the lead-up to January 6, Mr. Chansley "used his social media presence to spread the type of false information and hateful rhetoric that led thousands of rioters to descend on the U.S. Capitol on January 6, 2021." Id. He advocated for violence. For instance, he posted to Facebook, "We shall have no real hope to survive the enemies arrayed against us until we hang the traitors lurking among us." Id. On January 6, Mr. Chansley was among the rioters to first approach the police line on the west side of the building. He then climbed the nearby media-tower scaffolding. Id. He "was dressed in a Viking hat with fur and horns, was shirtless, wearing red, white, and blue face paint, and carrying an American flag tied to a pole with a spear at the tip and a bullhorn." Id. When the first rioters overwhelmed the police line, Mr. Chansley was able to use the scaffolding to join them on stairs leading up to Upper West Terrace. He then helped them push past another police line and gain access to the Upper West Terrace. Id. at 6. Mr. Chansley was present when two other rioters broke through windows near the Senate Wing door and breached the building. This was the initial breach of the building. Mr. Chansley entered the building within a minute of these two rioters and "was among the first 30 rioters inside the U.S. Capitol building on [January 6]." Id. at 7. Once inside the building, Mr. Chansley proceeded towards the Senate. In a "clearing" of some sort, he and other rioters encountered a line of police officers who instructed them to leave the building. Not only did he disregard this order, but he also began "using his bullhorn to rile up the crowd and demand that lawmakers be brought out." Id. at 8. He then went up a flight of stairs and was able to enter the Senate Gallery. At that point, he began to "scream obscenities in the Gallery, including 'time's up motherfuckers,' while other rioters flooded the chamber below." Id. at 9-10. He then went back down the stairs and entered onto the Senate floor. Id. at 10. Once on the floor of the Senate, he proceeded to the dais and took the seat of

Vice President Mike Pence.  Id.  A police officer who was present told him to vacate the seat, but he refused, stating, "Mike Pence is a fucking traitor."  While still in Mike Pence's seat, he wrote a note on some paper that read, "It's only a matter of Time.  Justice is Coming!"  Id. at 10-11.  Disregarding the officer's continuing orders to vacate the seat and leave the chamber, Mr. Chansley began "calling other rioters up to the dais and leading them in an incantation over his bullhorn."  Id. at 11.  At some point, additional police officers arrived, and Mr. Chansley was "escorted" from the building.  Id. at 12.  He had been inside the building for approximately one hour at this point.  Id.  Mr. Bledsoe should be given a sentence that is less than Mr. Chansley's.

## Conclusion

WHEREFORE the defendant, Matthew Bledsoe, responds to the Government's Sentencing Memorandum.

Respectfully submitted,

_____/s/_____
Jerry Ray Smith, Jr.
D.C. Bar No. 448699
Counsel for Matthew Bledsoe
717 D Street, N.W.
Suite 310
Washington, DC 20004
E-mail: jerryraysmith@verizon.net
Phone: (202) 347-6101